1

**Blake Amafa** NON-RESIDENT ALIEN

2

10300 W. Charleston
Blvd Ste 13 314

3

Las Vegas NV,89135

4

EIGHTH JUDICIAL DISTRICT COURT

5

CLARK COUNTY, NEVADA

6

200 Lewis Avenue Las Vegas Nevada 89155

7

8

| **State of Nevada Corporation** | District Court Case No **2:23-cv-02023-MMD-EJY** |
|---|---|
| Plaintiff | |
| vs. | **State Cases C1275157B, C1275157** |
| **Blake Amafa**, *pro se* | |
| Defendant | ***NOTICE OF CONSTITUTIONAL QUESTION*,** |

9

10

11

12

13

14

**COMES NOW** the Defendant, **Blake Amafa** , A Private American National and after

15

receiving Plaintiff's complaint, timely files his

16

***NOTICE OF CONSTITUTIONAL QUESTION***

17

I, **Blake Amafa**,  A Private American National party of interest in this proceeding filed

18

'Exception: Challenging constitutionality of proceeding and qualifications of the officers and
judges of the Court; and EXHIBIT  A

19

"An Act to regulate the Time and Manner of Administering certain Oaths" in,

20

case:  __C1275157A/B__   now giving notice to the Attorney General of the United States of
the following constitutional question.

21

Question: Is it constitutional to require "officers of the court in this proceeding to

22

execute the oath in " An Act to regulate the Time and Manner of Administering certain

23

Oaths", and have a record or certificate as proof they are qualified to execute the duties of

24

their respective offices ?

25

Question 1. Are the laws the defendant is accused of offending enacted

26

by constitutionally qualified persons?

27

Question 2. Is it constitutional to require the lawyers acting for the

28

defense, prosecution, or adjudication in a criminal case or a civil case proceeding in
this state of the United States To execute the oath in "An Act to regulate the Time and

Manner of administering certain Oath" required of all United States or the several States executive and judicial officers, and for them to have a record or certificate as proof before they proceed to execute the duties of their Respective offices?

3.    **Whereas 1 USC §112. Statutes at Large; contents; admissibility in evidence; mandates that:**

**'the United States Statutes at Large" shall be Legal evidence of Law,… in all the courts of the United States, the several states, and the territories…of the United States'**

4.    United States Statutes at Large": as 1 Stat. 23;

5.    **Whereas the Third Section of the Sixth Article of the Constitution of the United States mandates:**

The senators and Representatives before mentioned, and the Members of the several states legislatures, and all executive and judicial officers, both United States and of the several States, _____ shall be bound by oath or Affirmation, to support this constitution; but no religious test shall ever be required as a Qualification to any office or public Trust under the United States' whereas

"An Act to regulate the time and manner of administering certain Oaths" Is incorporated into the **"United States Statutes at Large": as 1 Stat. 23;** the same being the first law passed by the United States Congress after the ratification of the Constitution of the United States; and in which is mandated:

*That the oath or affirmation required by the Sixth Article of the Constitution of the United States, shall be administered in the form following, to wit:" I, A. B. Do solemnly swear or affirm (as the case may be) that I will support the Constitution of the United States.'*

*…And the members of the several State Legislatures, and the executive and Judicial officers of the several states, who shall be chosen or appointed after the said first day of August, shall, before     they proceed to execute the duties of their respective officers'*

*…. 'And the person or person so administering the oath hereby required to be taken, shall cause a record or certificate thereof to be made'*

6.    Question 1. Are the laws the defendant is accused of offending enacted by constitutionally qualified persons?

7.    Question 2. Is it constitutional to require the lawyers acting for the defense, prosecution, or adjudication in a criminal case or a civil case proceeding in this state of the United States To execute the oath in "An Act to regulate the Time and Manner of administering certain Oath" required of all United States or the several States executive and judicial officers, and for them to have a record or certificate as proof before they proceed to execute the duties of their Respective offices?

In accordance with federal rules of civil procedure rule 5.1. **Blake Amafa have served a copy of this notice upon the United States Attorney general and the Attorney general of the state Nevada by certified mail.**

## VERIFICATION

I, **Blake Amafa** am the Defendant in the above-entitled action, and I have read the above ***NOTICE OF CONSTITUTIONAL QUESTION*** I am competent to testify to the matters stated herein and I have personal knowledge of the matters stated herein except as to those matters stated upon belief or information and, as to those matters, I believe them to be true. I declare under penalty of perjury under the laws of the State of Nevada, that the foregoing is true, correct, complete, and not misleading. Executed this **December** **11**, 2023, in County of Clark State of Nevada.

_____**Blake Amafa**_____

**Blake Amafa**
10300 W. Charleston
Blvd Ste 13 314
Las Vegas NV,89135

## CERTIFICATE OF SERVICE

I, **Blake Amafa**, hereby certify that on this **December __11__**, 2023  that a true and correct copy of the **DEFENDANT'S NOTICE OF CONSTITUTIONAL QUESTION,** was transferred via fax___ and _x__mailed using the United States Postal Service, first class mail, postage prepaid, and addressed to:

**Attorney General of the United States**
**Merrick B. Garland**
U.S. Department of Justice
950 Pennsylvania Avenue, NW
Washington, DC 20530-0001

**Attorney General of the state of Nevada**
**Aaron D. Ford**
**Office of the Attorney General**
5420 Kietzke Lane, Suite 202
Reno, NV 89511
Telephone: 775-687-2100
Fax: 775-688-1822

By: _____**Blake Amafa**_____

**Blake Amafa**
10300 W. Charleston
Blvd Ste 13 314
Las Vegas NV,89135

1

2  **CODE**
   **Blake Amafa**
3  10300 W. CHARLESTON BLVD STE 13 314
   LAS VEGAS, NV 89314
4  Email: dum57ltd@gmail.com

5  _____

6  EIGHTH JUDICIAL DISTRICT COURT

7  CLARK COUNTY, NEVADA

   200 Lewis Avenue Las Vegas Nevada 89155
8

9  _____

10 STATE OF NEVADA,                      Case No.: **2:23-cv-02023-MMD-EJY**

11
   Plaintiff(s),
12                                       State Case **C1275157B, C1275157A**
   vs.
13 **Blake Amafa**),
   Defendant(s).
14                                       DEFENDANT  AMANDA BLAKER MOVES THIS
                                         COURT WITH A NOTICE OF REMOVAL TO THE
15                                       EIGHTH JUDICIAL DISTRICT COURT CLARK
                                         COUNTY NEVADA

16

17 _____

18   **Blake Amafa** , _(DEFENDANT(s) MOVES THIS COURT WITH A NOTICE OF REMOVAL TO_

19 _THE EIGHTH JUDICIAL DISTRICT COURT CLARK COUNTY NEVADA FOR CONSTUTITIONAL_

   _QUESTION ARISING OUT OF THE CONSTITUTION THE RIGHT TO TRAVEL._
20

21   **INTRODUCTION**
     **Plaintiffs**
22   STATE OF NEVADA.,        **Las Vegas Municipal Court CASE NUMBER  C1275157A/B**

23      **100 E.Clark Ave**      **Las Vegas NV, 89101**

   Defendant was served or named properly in jurisdictional statement within this case, but **Defendant**
24
    **Blaker Amafa IS A PEOPLE AND ONE OF "THE PEOPLE"** as referred to in the constitution
25 of the untied State of America written on 1793, a defendant in THIS CASE  ALL  defendants in

26 this case agree to remove it to this court and files this NOTICE OF REMOVAL within the 30

   (thirty) daytime period required by law .
27

28 The defendant **Blake Amafa** is claiming his right to "to ourselves and our Posterity" as one of a
   people/ " the people" with rights to the constitution, bill of rights, magna carta.

```
The people of this State, as the successors of its former sovereign,
are entitled to all the rights which formerly belonged to the King
by his prerogative. [Lansing v. Smith, 4 Wend. 9 (N.Y.) (1829), 21
Am.Dec. 89 10C Const. Law Sec. 298; 18 C Em.Dom. Sec. 3, 228; 37 C
Nav.Wat. Sec. 219; Nuls Sec. 167; 48 C Wharves Sec. 3, 7.]
```

Removal is proper because.

1. Defendant  IS A PEOPLE Claim involves a federal question ARISING OUT OF THE CONSTUTITION right to travel question for the case involving a federal question, the defendant can present it's claims to a judge who may be more familiar with the federal case  law.28 U.S.C. §§1331,1441(a);Grable &Sons Metal Prouds., Inc. Vs. Darue Eng'g & Mfg., 545 U.S. 308,312 (2005);Broder Vs. Union Pac. R.R..,80F.3d 257, 260 (8thCir. 1996)Specifically, Defendant's Claims arises under the United States of America Constitution 1793 as a people and known as "the people "with rights and powers under the kings Prerogative under YHVH, Yahweh of Y'shua Jesus, the Christ King of kings  the right to travel and this court of record under I. the laws of the case

   Is decreed as Follows: See Exhibit F and exhibit A,B,C,D,E,F as fully incorporated as herein,

   ```
   The people of this State, as the successors of its former
   sovereign, are entitled to all the rights which formerly belonged
   to the King by his prerogative. [Lansing v. Smith, 4 Wend. 9 (N.Y.)
   (1829), 21 Am.Dec. 89 10C Const. Law Sec. 298; 18 C Em.Dom. Sec. 3,
   228; 37 C Nav.Wat. Sec. 219; Nuls Sec. 167; 48 C Wharves Sec. 3,
   7.]
   ```

## NOTICE OF REMOVAL

Defendant was served with this action from (LAS VEGAS TOWNSHIP JUSTICE COURT, NOTICE OF OFFICIAL COURT DATE AND TIME)(exhibit B) and why temporary writ of restitution should not issue and this notice of removal within 30 day time period required by law in The  Nevada State Constitution, and when the city prosecuting attorney entered a plea of not guilty, the prosecutor violated my sixth amendment constitutional rights.(see exhibit C)

## Basis for Removal

1. All Defendants who have been properly served consent to the removal of this case to The Eighth Judicial District Court, Clark County, Nevada.

2. Copies of all pleadings, process, orders, and other fillings in the state court suit are attached to this notice as required by The Nevada State Constitution.

3. Venue is proper in this EIGHTH JUDICIAL DISTRICT COURT, CLARK COUNTY, NEVADA has Original jurisdiction, because when the state is a party, the Nevada State Supreme Court has Original jurisdiction.

4. Defendant will promptly file a copy of this court Notice of removal with the clerk of the District Court where the suit has been pending.

5. The Constitution of the State of Nevada: Article 6, Judicial Department, Section 4 § 1.

Sec. 4        Jurisdiction of Supreme Court and Court of Appeals; appointment of judge to sit for disable disqualified justice or judge.
1. The Supreme Court and the court of appeals have appellate jurisdiction in all civil cases arising in district courts, and also on questions of law alone in all criminal cases in which the offense charged is within the original jurisdiction of the district courts. The Supreme Court shall fix by rule the jurisdiction of the court of appeals and shall provide for the review, where appropriate, of appeals decided by the court of appeals. The Supreme Court and the court of appeals have the power to issue writs of mandamus, certiorari, prohibition, quo warranto and habeas corpus and also all writs necessary or proper to the complete exercise of their jurisdiction. Each justice of the Supreme Court and judge of the court of appeals may issue writs of habeas corpus to any part of the State, upon petition by, or on behalf of any person held in actual custody in this State and may make such writs returnable before the issuing justice or judge or the court of which the justice or judge is a member, or before any district court in the State of any judge of a district court

## JUDICIAL NOTICE

Defendant moves this court, places this Court under the authority of the supremacy and equal protection clauses of the United States Constitution Article IV Section 2. Citizens of each state have the rights to all privileges and immunities of the states of the several states, to include the common law authorities of *Haines Vs. Kerner*, 404 U.S. 519, *Platsky Vs. C.I.A.*, 953 F.2d 25, and *Anastasoff vs. United States*, 223 F.3d 898 (8th Cir.07/25/ 2001). In Re Haines: Pro Se Registered Attorneys. Regardless of the deficiencies in their pleadings, pro se litigants are Litigants (Defendant is a pro se litigant) are held to less stringent pleadings standards than BAR entitled to the opportunity to submit evidence in support of their claims. In re Platsky: The court errs if court dismisses the pro se litigant without instruction on how pleadings are deficient and how to repair the pleadings.

**U.S. SUPREME COURT AND OTHER HIGH COURT CITATIONS PROVING THAT NO LICENSE IS NECESSARY FOR NORMAL USE OF AN AUTOMOBILE ON COMMON WAYS**

**"The right of a citizen to travel upon the public highways and to transport his property thereon, by horse drawn carriage, wagon, or automobile, is not a mere privilege which may be permitted or prohibited at will, but a common right which he has under his right to life, liberty and the pursuit of happiness. Under this constitutional guaranty one may, therefore, under normal conditions, travel at his inclination along the public highways or in public places, and while conducting himself in an orderly and decent manner, neither interfering with nor disturbing another's rights, he will be protected, not only in his person, but in his safe conduct."**

This is a list of the public records consisting of fifty-one(51) Cases(51 were obtained from Pacer and Google Scholar) that the "United States of America" has filed into "United States District Court(s)" in various locations in these United States claiming the following, U.S. Supreme Court case on Right to Travel. These public records are self-authenticating under Evidence Rule 901(7) and

Thompson v. Smith, 154 SE 579, 11 American Jurisprudence, Constitutional Law, section 329, page 1135 "The right of the Citizen to travel upon the public highways and to transport his property thereon, in the ordinary course of life and business, is a common right which he has under the right to enjoy life and liberty, to acquire and possess property, and to pursue happiness and safety. It includes the right, in so doing, to use the ordinary and usual conveyances of the day, and under the existing modes of travel, includes the right to drive a horse drawn carriage or wagon thereon or to operate an automobile thereon, for the usual and ordinary purpose of life and business." –

Thompson vs. Smith, supra.; Teche Lines vs. Danforth, Miss., 12 S.2d 784 "… the right of the citizen to drive on a public street with freedom from police interference… is a fundamental constitutional right" -White, 97 Cal.App.3d.141, 158 Cal.Rptr. 562, 566-67 (1979) "citizens have a right to drive upon the public streets of the District of Columbia or any other city absent a constitutionally sound reason for limiting their access."

Caneisha Mills v. D.C. 2009 "The use of the automobile as a necessary adjunct to the earning of a livelihood in modern life requires us in the interest of realism to conclude that the RIGHT to use an automobile on the public highways

partakes of the nature of a liberty within the meaning of the Constitutional guarantees. . ."

Berberian v. Lussier (1958) 139 A2d 869, 872, See also: Schecter v. Killingsworth, 380 P.2d 136, 140; 93 Ariz. 273 (1963)". The right to operate a motor vehicle [an automobile] upon the public streets and highways is not a mere privilege. It is a right of liberty, the enjoyment of which is protected by the guarantees of the federal and state constitutions.

Adams v. City of Pocatello, 416 P.2d 46, 48; 91 Idaho 99 (1966). "A traveler has an equal right to employ an automobile as a means of transportation and to occupy the public highways with other vehicles in common use."

Campbell v. Walker, 78 Atl. 601, 603, 2 Boyce (Del.) 41". The owner of an automobile has the same right as the owner of other vehicles to use the highway,* * * A traveler on foot has the same right to the use of the public highways as an automobile or any other vehicle. "

Simeone v. Lindsay, 65 Atl. 778, 779; Hannigan v. Wright, 63 Atl. 234, 236". The RIGHT of the citizen to DRIVE on the public street with freedom from police interference, unless he is engaged in suspicious conduct associated in some manner with criminality is a FUNDAMENTAL CONSTITUTIONAL RIGHT which must be protected by the courts."

People v. Horton 14 Cal. App. 3rd 667 (1971) "The right to make use of an automobile as a vehicle of travel along the highways of the state, is no longer an open question. The owners thereof have the same rights in the roads and streets as the drivers of horses or those riding a bicycle or traveling in some other vehicle."

House v Cramer, 112 N.W. 3;134 Iowa 374; Farnsworth v. Tampa Electric Co.57 So. 233, 237, 62 Fla. 166". The automobile may be used with safety to others users of the highway, and in its proper use upon the highways there is an equal right with the users of other vehicles properly upon the highways. The law recognizes such right of use upon general principles.

Brinkman v Pacholike, 84 N.E. 762, 764, 41 Ind. App. 662, 666. The law does not denounce motor carriages, as such, on public ways. They have an equal right with other vehicles in common use to occupy the streets and roads. It is improper to say that the driver of the horse has rights in the roads superior to the driver of the automobile. Both have the right to use the easement."

Indiana Springs Co. v. Brown, 165 Ind. 465, 468. U.S. Supreme Court says No License Necessary To Drive Automobile On Public Highways/Streets No License Is

Necessary Copy and Share Freely YHVH.name 2 2 "A highway is a public way open and free to anyone who has occasion to pass along it on foot or with any kind of vehicle." Schlesinger v. City of Atlanta, 129 S.E. 861, 867, 161 Ga. 148, 159;

Holland v. Shackleford, 137 S.E. 298, 304, 220 GA. 104; Stavola v. Palmer, 73 A.2d 831, 838, 136 Conn. 670 "There can be no question of the right of automobile owners to occupy and use the public streets of cities, or highways in the rural districts."

Liebrecht v. Crandall, 126 N.W. 69, 110 Minn. 454, 456 "The word 'automobile' connotes a pleasure vehicle designed for the transportation of persons on highways."

American Mutual Liability Ins. Co., vs Chaput, 60 A.2d 118, 120; 95 NH 200 Motor Vehicle: 18 USC Part 1 Chapter 2 section 31 definitions: "(6) Motor vehicle. – The term "motor vehicle" means every description of carriage or other contrivance propelled or drawn by mechanical power and used for commercial purposes on the highways…" 10) The term "used for commercial purposes" means the carriage of persons or property for any fare, fee, rate, charge or other consideration, or directly or indirectly in connection with any business, or other undrtaking intended for profit. "A motor vehicle or automobile for hire is a motor vehicle, other than an automobile stage, used for the transportation of persons for which remuneration is received."

International Motor Transit Co. vs. Seattle, 251 P. 120 The term 'motor vehicle' is different and broader than the word 'automobile."

City of Dayton vs. DeBrosse, 23 NE.2d 647, 650; 62 Ohio App. 232 ". Thus self-driven vehicles are classified according to the use to which they are put rather than according to the means by which they are propelled" – Ex Parte Hoffert, 148 NW 20 "

The Supreme Court, in Arthur v. Morgan, 112 U.S. 495, 5 S.Ct. 241, 28 L.Ed. 825, held that carriages were properly classified as household effects, and we see no reason that automobiles should not be similarly disposed of."

Hillhouse v United States, 152 F. 163, 164 (2nd Cir. 1907). "…a citizen has the right to travel upon the public highways and to transport his property thereon…" State vs. Johnson, 243 P. 1073; Cummins vs. Homes, 155 P. 171; Packard vs. Banton, 44 S.Ct. 256; Hadfield vs. Lundin, 98 Wash 516, Willis vs. Buck, 263 P. l 982;

Barney vs. Board of Railroad Commissioners, 17 P.2d 82 ". The use of the highways for the purpose of travel and transportation is not a mere privilege, but a common and fundamental Right of which the public and the individual cannot be rightfully deprived."

Chicago Motor Coach vs. Chicago, 169 NE 22; Ligare vs. Chicago, 28 NE 934; Boon vs. Clark, 214 SSW 607; 25 Am.Jur. (1st) Highways Sect.163 "the right of the Citizen to travel upon the highway and to transport his property thereon in the ordinary course of life and business… is the usual and ordinary right of the Citizen, a right common to all."

Ex Parte Dickey, (Dickey vs. Davis), 85 SE 781 "Every Citizen has an unalienable RIGHT to make use of the public highways of the state; every Citizen has full freedom to travel from place to place in the enjoyment of life and liberty."

People v. Nothaus, 147 Colo. 210. "No State government entity has the power to allow or deny passage on the highways, byways, nor waterways… transporting his vehicles and personal property for either recreation or business, but by being subject only to local regulationi.e., safety, caution, traffic lights, speed limits, etc. Travel is not a privilege requiring licensing, vehicle registration, or forced insurances."

Chicago Coach Co. v. City of Chicago, 337 Ill. 200, 169 N.E. 22. "**Traffic infractions are not a crime**." People v. Battle "Persons faced with an unconstitutional licensing law which purports to require a license as a prerequisite to exercise of right… may ignore the law and engage with impunity in exercise of such right."

Shuttlesworth v. Birmingham 394 U.S. 147 (1969). U.S. Supreme Court says No License Necessary To Drive Automobile On Public Highways/Streets No License Is Necessary Copy and Share Freely YHVH.name 3 "The word 'operator' shall not include any person who solely transports his own property and who transports no persons or property for hire or compensation."

Statutes at Large California Chapter 412 p.83 "Highways are for the use of the traveling public, and all have the right to use them in a reasonable and proper manner; the use thereof is an inalienable right of every citizen." Escobedo v. State 35 C2d 870 in 8 Cal Jur 3d p.27 "RIGHT — A legal RIGHT, a constitutional RIGHT means a RIGHT protected by the law, by the constitution, but government does not create the idea of RIGHT or original RIGHTS; it acknowledges them. . . "Bouvier's Law Dictionary, 1914, p. 2961. " Those who have the right to do something cannot be licensed for what they already have right to do as such license would be meaningless."

City of Chicago v Collins 51 NE 907, 910. " A license means leave to do a thing which the licensor could prevent." Blatz Brewing Co. v. Collins, 160 P.2d 37, 39;

69 Cal. A. 2d 639. "The object of a license is to confer a right or power, which does not exist without it."

Payne v. Massey (19__) 196 SW 2nd 493, 145 Tex 273. "The court makes it clear that a license relates to qualifications to engage in profession, business, trade or calling; thus, when merely traveling without compensation or profit, outside of business enterprise or adventure with the corporate state, no license is required of the natural individual traveling for personal business, pleasure and transportation."

Wingfield v. Fielder 2d Ca. 3d 213 (1972) ". If [state] officials construe a vague statute unconstitutionally, the citizen may take them at their word, and act on the assumption that the statute is void."

Shuttlesworth v. Birmingham 394 U.S. 147 (1969). "With regard particularly to the U.S. Constitution, it is elementary that a Right secured or protected by that document cannot be overthrown or impaired by any state police authority."Donnolly vs. Union Sewer Pipe Co., 184 US 540; Lafarier vs. Grand Trunk R.R. Co., 24 A. 848; O'Neil vs. Providence Amusement Co., 108 A. 887. "The right to travel (called the right of free ingress to other states, and egress from them) is so fundamental that it appears in the Articles of Confederation, which governed our society before the Constitution."

(Paul v. Virginia). "[T]he right to travel freely from State to State … is a right broadly assertable against private interference as well as governmental action. Like the right of association, it is a virtually unconditional personal right, guaranteed by the Constitution to us all." (U.S. Supreme Court, Shapiro v. Thompson). EDGERTON, Chief Judge: "Iron curtains have no place in a free world. …'Undoubtedly the right of locomotion, the right to remove from one place to another according to inclination, is an attribute of personal liberty, and the right, ordinarily, of free transit from or through the territory of any State is a right secured by the Constitution.'

 Williams v. Fears, 179 U.S. 270, 274,21 S. Ct. 128,45 L.Ed. 186. "Our nation has thrived on the principle that, outside areas of plainly harmful conduct, every American is left to shape his own life as he thinks best, do what he pleases, go where he pleases." Id., at 197.

Kent vs. Dulles, see Vestal, Freedom of Movement, 41 Iowa L.Rev. 6, 13-14. "The validity of restrictions on the freedom of movement of particular individuals, both substantively and procedurally, is precisely the sort of matter that is the peculiar domain of the courts." Comment, 61 Yale L.J. at page 187. "A person detained for an investigatory stop can be questioned but is "not obliged to answer, answers may not

be compelled, and refusal to answer furnishes no basis for an arrest."Justice White, Hiibel "Automobiles have the right to use the highways of the State on an equal footing with other vehicles."

Cumberland Telephone & Telegraph Co. v Yeiser 141 Kentucky 15. "Each citizen has the absolute right to choose for himself the mode of conveyance he desires, whether it be by wagon or carriage, by horse, motor or electric car, or by bicycle, or astride of a horse, subject to the sole condition that he will observe all those requirements that are known as the law of the road."

Swift v City of Topeka, 43 U.S. Supreme Court says No License Necessary to Drive Automobile on Public Highways/Streets No License Is Necessary Copy and Share Freely YHVH.name 4 Kansas 671, 674. The Supreme Court said in U.S. v Mersky (1960) 361 U.S. 431: An administrative regulation, of course, is not a "statute." A traveler on foot has the same right to use of the public highway as an automobile or any other vehicle.

Cecchi v. Lindsay, 75 Atl. 376, 377, 1 Boyce (Del.) 185. Automotive vehicles are lawful means of conveyance and have equal rights upon the streets with horses and carriages.

Chicago Coach Co. v. City of Chicago, 337 Ill. 200, 205; See also: Christy v. Elliot, 216 Ill. 31; Ward v. Meredith, 202 Ill. 66; Shinkle v. McCullough, 116 Ky. 960; Butler v. Cabe, 116 Ark. 26, 28-29. …automobiles are lawful vehicles and have equal rights on the highways with horses and carriages. Daily v. Maxwell, 133 S.W. 351, 354.

Matson v. Dawson, 178 N.W. 2d 588, 591. A farmer has the same right to the use of the highways of the state, whether on foot or in a motor vehicle, as any other citizen.

Draffin v. Massey, 92 S.E.2d 38, 42. Persons may lawfully ride in automobiles, as they may lawfully ride on bicycles. Doherty v. Ayer, 83 N.E. 677, 197 Mass. 241, 246;

Molway v. City  of Chicago, 88 N.E. 485, 486, 239 Ill. 486; Smiley v. East St. Louis Ry. Co., 100 N.E. 157, 158. "A soldier's personal automobile is part of his 'household goods[.]'

U.S. v Bomar, C.A.5(Tex.), 8 F.3d 226, 235" 19A Words and Phrases – Permanent Edition (West) pocket part 94. "[I]t is a jury question whether … an automobile … is a motor vehicle[.]"

United States v Johnson, 718 F.2d 1317, 1324 (5th Cir. 1983).

Other right to use an automobile cases: –

EDWARDS VS. CALIFORNIA, 314 U.S. 160 –

TWINING VS. NEW JERSEY, 211 U.S. 78 –

WILLIAMS VS. FEARS, 179 U.S. 270, AT 274 –

CRANDALL VS. NEVADA, 6 WALL. 35, AT 43-44 –

THE PASSENGER CASES, 7 HOWARD 287, AT 492 –

 U.S. VS. GUEST, 383 U.S. 745, AT 757-758 (1966) –

GRIFFIN VS. BRECKENRIDGE, 403 U.S. 88, AT 105-106 (1971) –

 CALIFANO VS. TORRES, 435 U.S. 1, AT 4, note 6 –

SHAPIRO VS. THOMPSON, 394 U.S. 618 (1969) –

CALIFANO VS. AZNAVORIAN, 439 U.S. 170, AT 176 (1978)


Look the above citations up in American Jurisprudence. Some citations may be paraphrased.

Defendant answers the Plaintiff's complaint as follows;

1.    Traffic/misdemeanor citation/complaint: Defendant denies all allegations of said Complaint. As to all allegations denied, Defendant demands strict proof thereof by the Plaintiff.

## AFFIRMATIVE DEFENSES

AFFIMATIVE DEFENSE: Failure to state a claim:

1.    Plaintiff has failed to state a claim upon which relief can be granted. Plaintiff's Complaint and each cause of action therein fails to state facts sufficient to constitute a cause of action against the Defendant for which relief can be granted.

See **_United States  v. Lovasco_**,**. 431 U.S. 783, 97 S. Ct. 2044, 52 L. Ed. 2d 752 (06/09/77)** Contrary to Movant's claims has no legal standing to bring this Complaint for money based on 1) Open Book Account, 2) Money Lent; and 3) Account Stated and  based on evidence produced. Attorneys can't testify. Statements of counsel in brief or in oral argument are not facts before the court.  This finding of a continuing investigation, which forms the foundation of the majority opinion, comes from *statements of counsel* made during the appellate process. As we have said of other un-sworn statements which were not part of the record and therefore could not have been considered by the trial court: "Manifestly, [such statements] cannot be properly considered by us in the disposition of [a] case. "Statements of Counsel, in briefs or oral arguments are not sufficient for motion to dismiss or for summary judgment, **_Trinsey Vs. Pagliaro_, D.C. Pa.1964, 229 F. Supp.**

Plaintiff, under no possible view, however, of the findings we are considering can they be held to constitute a compliance with the statute, since they merely embody conflicting *statements* of *counsel* concerning the facts as they suppose them to be and their appreciation of the law which they deem applicable, there being, therefore, no attempt whatever to state the ultimate facts by a consideration of which we would be able to conclude whether or not the judgment was warranted. ***Gonzales v. Buist***. **(04/01/12) 224 U.S. 126, 56 L. Ed. 693, 32 S. Ct. 463.** No instruction was asked, but, as we have said, the judge told the jury that they were to regard only the evidence admitted by him, not *statements* of *counsel*, ***Holt   v. United States***, **(10/31/10) 218 U.S. 245, 54 L. Ed. 1021, 31 S. Ct. 2,** likable ("[a]n action must be prosecuted in the real party in interest.",)The standing  doctrine "involves both constitutional limitations on federal-court jurisdiction and prudential limitations on its exercise on its exercise**. Kowalski v. Tesmer,543 U.S. 125,128-29,125 S.Ct.564,160 L.Ed.2d 519(2004)**(quoting  **Warth v. Seldin**,**422 U.S.490,498, 95 S.Ct 2197, 45 L.Ed.2d 343 (1975)**. *Constitution Standing under Article III requires, at a minimum, that a party must have suffered some action or threatened injury as a result of the defendant's conduct, that the injury be traced to the challenged action, and that it is likely to be redressed by favorable decision.*

AFFIMATIVE DEFENSE: Violates the Parole Evidence Rule

    2.    Defendant alleges that the Complaint includes references to alleged agreements made outside of the alleged written contract, violating the Parole Evidence Rule.

AFFIMATIVE DEFENSE: Lack of Privity

    3.    Defendant claims Lack of Privity as Defendant has never entered into any contractual or debtor/creditor arrangements with the Plaintiff.

AFFIMATIVE DEFENSE: Doctrine of Estoppel

    4.    Defendant alleges that Plaintiff's Complaint, and each cause of action therein is barred by the Doctrine of Estoppel, specifically Estoppel *in Pais*.

 AFFIMATIVE DEFENSE: Right of a Citizen

    **5.**    **The right of a citizen to travel upon the public highways and transport his property thereon, by horse drawn carriage, wagon, or automobile, is not a mere privilege which may be permitted or prohibited at will, but a common right which he has under his right to life, liberty and the pursuit of happiness.**

## **CONCLUSION**

(Briefly summarize the notice) For these reasons, defendant moves this court for an order removing the suit to The Eighth Judicial District Court.

And an order dismissing this case under 12b 1 in want of subject jurisdiction.

_____**Blake Amafa**_____
**Blake Amafa**
10300 W. CHARLESTON BLVD STE 13 314
LAS VEGAS, NV 89314
Email: dum57ltd@gmail.com

## <u>VERIFICATION</u>

I, **Blake Amafa** defendant in the above-entitled action and I have read the **Defendant**

**Blake Amafa** <u>**moves this court with a notice of removal**</u> I am competent to testify to the matters

stated herein and I have personal knowledge of the matters stated herein except as to those matters

stated upon belief or information and, as to those matters, I believe them to be true. I declare under

penalty of perjury un the laws of the State of Nevada, and Union State of Nevada, that the foregoing is

true correct, complete, and not misleading. Executed this __**11**__ day, of **December**  2023, in the

County of _Clark_ Union State of Nevada.

State of Nevada

County of Clark

**}**

On _____ before me _____
                                                                    Name and Title of Office

Personally appeared **Blake Amafa** ι **makes oath** Who proved to me on the basis of
satisfactory evidence to be the person(s) whose name(s) is/are subscribed to the instrument
and acknowledge to me that he/she/they executed the same in his/her/their signature(s) on
the instrument the person(s), or the entity on behalf of which the person(s) acted, executed
the instrument.

I certify under PENALTY OF PERJURY under the lord god above and that the foregoing
paragraph is true and correct under god's laws.

Signature_____
                                              Signature of Notary Public

**Blake Amafa**
10300 W. CHARLESTON BLVD STE 13 314
LAS VEGAS, NV 89314
Email: dum57ltd@gmail.com

## **AFFIDAVIT**

I, **Blake Amafa** of age and competent to testify and state as follows based on my own personal Knowledge:

1. I am not in receipt of any document which this court has authority to disregard ***United States Statutes at Large ": as 1 Stat. 23;*** the same being the first law passed by the United States Congress after the ratification of the Constitution of the United States; and in which is mandated:

   That the oath or affirmation required by the sixth article of the Constitution of the United States, shall be administered in the form following, to wit:" I, A. B. Do solemnly swear or affirm (as the case may be) that I will support the Constitution of the United States.'

   …And the members of the several State Legislatures, and the executive and Judicial officers of the several states, who shall be chosen or appointed after the said first day of August, shall, before    they proceed to execute the duties of their respective officers'

   …. 'And the person or person or person so administering the oath hereby required to be taken, shall cause a record or certificate thereof to be made'

2. I am not in receipt of any document, which show the "officers of this court" in this court have proceeding to execute the oath in "An Act to regulate time and Manner of administering certain Oaths" and have a record or certificate as proof they are qualified to execute the duties of their respective offices.

3. I am not in receipt of any document, which give the state of Nevada or County of Arapahoe has authority to disregard "1 USC §112: Statutes at Large; contents; admissibility in evidence; mandates that:

   'the United States Statutes at Large" shall be Legal evidence of Law,…in all the courts of the United States, the several states, and the    territories…of the United States'

4. I am not in receipt of any document, which shows the prosecuting attorney has taken the oath in "An Act to regulate time and Manner of administering certain Oaths" and have a record or certificate as proof he is qualified to execute the duties of his respective offices.

5. I am not in receipt of any document which the **State of** Nevada has the statutory authority to convert a civil action to a criminal action.

6. I am not in receipt of any document which gives the court the authority to disregard the United States Constitution

7. I am not in receipt of any document which gives the **State of** Nevada courts the authority to change the interpretation of the US Supreme Court's interpretation of US Supreme Court case law.

8. I am not in receipt of any document which gives the **State of** Nevada the authority to give their Department of Public Safety officers and Police officers the authority to go phishing without a warrant.

9. I am not in receipt of any document which shows the Justice Court of North Las Vegas Clark County of North Las Vegas, Nevada was formed by an act of the Legislature of the territorial or state courts of Nevada is a Legislative Court.

10. I am not in receipt of any document which shows the placing a person in handcuffs arrest and detention.

11. I am not in receipt of any document that shows the laws that the defendant is accused of offending enacted by constitutionally qualified persons.

12. I am not in receipt of any document that shows that the court's judicial and executive officers are constitutionally qualified to prosecute and adjudicate the laws of Colorado.

13. I am not in receipt of any act from the legislature that allows the court to convert the right to travel into a privilege.

14. The arresting officer violated Rule 4 of The Rules of Criminal Procedure.

15. The arresting officer did not have a warrant signed by the Judge.

16. The arresting officer did not have a warrant to appear before a committing magistrate resting solely on probable cause at the time of the arrest.

17. The arresting officer did not have the warrant that CLEARLY identified the Judge and affiant.

18. The arresting officer did not show the warrant to the defendant nor inform the defendant of the offense charged and did not show the warrant to the defendant as soon as possible.

**Dated:** __11__ **day of** December 2023          By:

_____
**Blake Amafa**

**Blake Amafa**, *pro se*

## <u>VERIFICATION & INDIVIDUAL ACKNOWLEDGMENT</u>

I, **Blake Amafa**, am the defendant in the above-entitled action and the defendant in the case.  I have read the above AFFIDAVIT.  I am competent to testify to the matters stated herein and I have personal knowledge of the matters stated herein except as to those matters stated upon belief or information and, as to those matters, I believe them to be true.  I declare under penalty of perjury under the laws of the **State of Nevada**, that the foregoing is true, correct, complete, and not misleading. Executed **this  11   day of** December **2023**, in the **County of _____Clark_____, State of Nevada.**

STATE OF    **Nevada**

COUNTY OF **Clark**

Before me, the undersigned, a Notary Public in and for said County and State on this Executed **this   11    day of**  December  **2023**, personally appeared **Blake Amafa** to me known to be the identical person who executed the within and foregoing instrument and acknowledged to me that he executed the same as his free and voluntary act. Given under my hand and seal the day and year last above written.


My commission expires _____

_____ Notary

Public


See attachment A- **TESTILYING BRIEF**

**A,B,C,D,E,F**

# EXHIBIT

# A

# Exhibit B

**(Cite as: 67 U. Colo. L. Rev. 1037)**

University of Colorado Law Review
Fall 1996

**Reform**
**The Police**

**\*1037 TESTILYING: POLICE PERJURY AND WHAT TO DO ABOUT IT**

Christopher Slobogin [FNa]

Copyright © 1996 University of Colorado Law Review, Inc.; Christopher Slobogin

O.J. Simpson's trial for the murders of Nicole Brown Simpson and Ronald Goldman provided the nation with at least two pristine examples of police perjury. First, there was the exposure of Detective Marc Fuhrman as a liar. While under oath at trial the detective firmly asserted, in response to F. Lee Bailey's questions, that he had not used the word "nigger" in the past decade. The McKinny tapes and assorted other witnesses made clear this statement was an untruth. That proof of perjury, together with the defense's innuendo that Fuhrman had planted a glove smeared with Nicole's blood on Simpson's property severely damaged the prosecution's case. [FN1]

Second, and less well known, is Judge Lance Ito's finding that Detective Philip Vannatter had demonstrated a "reckless disregard for the truth" in the warrant application for the search of Simpson's house. [FN2] Among other misrepresentations, [FN2] Vannatter insinuated that Simpson had suddenly taken flight to Chicago when in fact police knew the trip had been planned for months, and unequivocally asserted that the substance found on Simpson's Bronco was blood when in fact it had not yet been tested. [FN3]

A third possible series of perjurious incidents occurred at the suppression hearing, when both Fuhrman and Vannatter stated that police investigating Simpson's compound had not considered O.J. a suspect, but rather had entered the premises solely out of concern for the athlete's welfare (and therefore had not needed probable cause or a warrant). Although both Judge Ito and **\*1038** Magistrate Kathleen Kennedy-Powell accepted these assertions, [FN4] most who have considered the matter believe otherwise, [FN5] on the common sense ground that police who knew that O.J. had beaten Nicole on past occasions, found what appeared to be blood on his car, and were unable to locate him after the murders would zero in on him as a possible culprit.

If one believes the defense theory of the case, Fuhrman's and Vannatter's deceitful exploits were a racist attempt to send an innocent person to jail, [FN6] as well as a form of protective lying, meant to prevent discovery of their own criminal activity in planting evidence. If one believes the prosecution's theory, these lies were merely a well-intentioned effort, albeit an improper one, to ensure conviction of a guilty person. On the latter theory, Fuhrman's denials at trial were meant to avoid a topic that would only have distracted the jury from the "real" issue. Similarly, Vannatter's lies in the warrant application and Fuhrman's and Vannatter's probable dissembling at the suppression hearing were designed to cover up irregularities in the evidence gathering process that, if discovered, might have lead to exclusion of crucial incriminating information.

We may never know with certainty the reason for the perjury in the Simpson case. But we do know that, whatever the motivation, the perjury was wrong. If the lying occurred to frame an innocent person, it was clearly corrupt. If instead it was meant to facilitate conviction of a person the police witnesses thought to be guilty, it was also reprehensible. Although, as we shall see,

many police and even some attorneys and judges seem to think otherwise, lying to convict a guilty person is wrong for several reasons. It is wrong because it involves lying under oath to judicial officers and jurors. It is wrong because it keeps from those fact finders information relevant to constitutional and other **\*1039** issues. And it is wrong because the police cannot be counted upon to get guilt right.

Perhaps most importantly, police lying intended to convict someone, whether thought to be guilty or innocent, is wrong because once it is discovered, it diminishes one of our most crucial "social goods"--trust in government. [FN7]  First, of course, the exposure of police perjury damages the credibility of police testimony. As the aftermath of the Fuhrman debacle has shown, the revelation that some police routinely and casually lie under oath makes members of the public, including those who serve on juries, less willing to believe all police, truthful or not. One comment that a New York prosecutor made about the impact of the Simpson case illustrates the point: "Our prosecutors now have to begin their cases defending the cops. Prosecutors have to bring the jury around to the opinion that cops aren't lying. That's how much the landscape has changed." [FN8]

Police perjury can cause other systemic damage as well. Presumably, for instance, the loss of police credibility on the stand diminishes law enforcement's effectiveness in the streets. Most significantly, to the extent other actors, such as prosecutors and judges, are perceived to be ignoring or condoning police perjury, [FN9] the loss of public trust may extend beyond law enforcement to the criminal justice system generally.

**\*1040** Although both lying to convict the innocent and lying to convict the guilty thus deserve condemnation, this article will focus on the latter because it is the more resistant to change and the more prevalent (two traits that are not unrelated). Lying to convict the innocent is undoubtedly rejected by most police, as well as by others, as immoral and unjustifiable. In contrast, lying intended to convict the guilty--in particular, lying to evade the consequences of the exclusionary rule [FN10]--is so common and so accepted in some jurisdictions that the police themselves have come up with a name for it: "testilying." [FN11]

Part I of this article describes the nature and causes of testilying in more detail. Part II then examines several proposals for curtailing it, ranging from expansion of the warrant requirement to the use of polygraph examinations at suppression hearings. All of these proposals are found at least partially wanting, if for no other reason than that they are aimed at suppressing lying by the police, rather than at reducing the pressure that causes it. Part III thus advances another proposal, or actually a trio of proposals. Specifically, it suggests that redefining probable cause in a more flexible manner and replacing the exclusionary rule with a damages remedy, together with clear rewards and punishments connected with lying, would significantly decrease testilying by diminishing the urge both to lie and to cover it up. While these proposals may be viewed as drastic medicine, they are defensible in their own right, and at the same time may go a long way toward shoring up the trust in the police and other government officials that is essential to a well-functioning law enforcement and criminal justice system.

**\*1041** I. The Nature of Testilying

Whether it is conjecture by individual observers, [FN12] a survey of criminal attorneys, [FN13] or a more sophisticated study, [FN14]  the existing literature demonstrates a widespread belief that testilying is a frequent occurrence. Of course, there is Alan Dershowitz's well-known assertion (made long before his participation in the O.J. Simpson case) that "almost all" officers lie to convict the guilty. [FN15]  Dershowitz may have been engaging in hyperbole, but his claim is not as far off as one might think. In one survey, defense attorneys, prosecutors, and judges estimated that police perjury at Fourth Amendment suppression hearings occurs in twenty to fifty percent of the cases. [FN16]  Jerome Skolnick, a veteran observer of the police, has stated that police perjury of this type is "systematic." [FN17] Even prosecutors--or at least former **\*1042** prosecutors--use terms like "routine," [FN18] "commonplace," [FN19] and "prevalent" [FN20] to describe the phenomenon. Few knowledgeable persons are willing to say that police perjury about investigative matters is sporadic or rare, except perhaps the police, and, as noted above, [FN21] even many of them believe it is common enough to merit a label all its own. [FN22]

Although testilying can occur at any stage of the criminal process, including trial, it usually takes place during the investigative and pretrial stages, since it is most frequently an attempt to cover up illicit evidence gathering. One of the best descriptions of such perjury comes from the Mollen Commission, named after Judge Milton Mollen, who led an investigation into corruption in the New York City Police Department in the early 1990s:

Officers reported a litany of manufactured tales. For example, when officers unlawfully stop and search a vehicle because they believe it contains drugs or guns, officers will falsely claim in police reports and under oath that the car ran a red light (or committed some other traffic violation) and that they subsequently saw contraband in the car in plain view. To conceal an unlawful search of an individual who officers believe is carrying drugs or a gun, they will falsely assert that they saw a bulge in the person's pocket or saw drugs and money changing hands. To justify unlawfully entering an apartment where officers believe narcotics or cash can be found, they pretend to have information from an unidentified civilian informant or claim they saw the drugs in plain view after responding to the premises on a radio run. To arrest people they suspect are guilty of dealing drugs, they falsely assert that the defendants **\*1043** had drugs in their possession when, in fact, the drugs were found elsewhere where the officers had no lawful right to be. [FN23]

As this excerpt suggests, the most common venue for testilying is the suppression hearing and the most frequent type of suppression hearing perjury is post hoc fabrication of probable cause. [FN24] However, lying about events in the interrogation room may be routine as well. Professor Richard Uviller's on-the-spot observations of the police led him to conclude, for example, that police may often "advance slightly the moment at which the Miranda warnings were recited to satisfy the courts' insistence that they precede the very first question in a course of interrogation." [FN25]

The Mollen Report excerpt also refers to testilying during the warrant application process, which the Fourth Amendment requires take place under oath. [FN26] Although estimating its prevalence is difficult, police misrepresentation on the application form and in oral testimony to the warrant magistrate has been recounted by numerous observers. [FN27] Most frequent, it seems, is the invention of "confidential informants" (like the "unidentified civilian informant" referred to in the excerpt), a ploy that allows police to cover up irregularities in developing probable cause or to assert they have probable cause when in fact all they have is a hunch. [FN28]

**\*1044** Finally, police perjury also occurs in connection with the fabrication of their reports. Although not technically testimony, police know these reports may be dispositive in a case resolved through plea bargaining, and can be compared to testimony in cases that aren't. As a result, "reportilying" also appears to be pervasive in some jurisdictions. The Mollen Commission, for instance, described how narcotics police "falsify arrest papers to make it appear as if an arrest that actually occurred inside a building [in violation of departmental regulations] took place on the street." [FN29] Professor Stanley Fisher has also documented prolific use of the "double filing" system, in which the official police file forwarded to the prosecution and provided to the defense is cleansed of exculpatory facts or possible impeachment evidence. [FN30]

The most obvious explanation for all of this lying is a desire to see the guilty brought to "justice." As law enforcement officers, the police do not want a person they know to be a criminal to escape conviction simply because of a "technical" violation of the Constitution, a procedural formality, or a trivial "exculpatory" fact. As Skolnick puts it, the officer "lies because he is skeptical of a system that suppresses truth in the interest of the criminal." [FN31] A related reason for police dissembling is the institutional pressure to produce "results," which can lead police to cut corners in an effort to secure convictions. [FN32] Peer practice may also play a role. One reason Skolnick says police perjury is "systematic" is that "police know that other police are perjuring themselves." [FN33]

**\*1045** These motivations are probably not the whole explanation, however. The police officer who lies to convict a criminal is generally lying under oath in a public legal forum. [FN34] Thus, the lying officer is exposed to criminal charges in a proceeding involving a legally trained adversary and open to-- indeed, usually directed against--those who can prove the perjury.

That perjury persists despite these risks can be explained by one simple factor: police think they can get away with it. Police are seldom made to pay for their lying. To some extent, this immunity may be due to their own expertise at deceit. Many prosecutors and judges believe perjury is systematic and often suspect it is occurring in individual cases. But they also frequently claim that they are not sure enough to do anything about it; [FN35] after all, the typical situation pits a police officer, well trained on how to "constitutionalize" a case, against a person charged with a crime, who is decidedly less aware of the relevant law.

However, many observers believe that perjury is frequently apparent, and that, even so, prosecutors and judges rarely take action against it. [FN36] The Simpson trial is a case in point. As Alan Dershowitz stated:

*1046 [T]he prosecutors knew that Fuhrman was a racist, a perjurer, and an evidence planter before they put him on the stand. An assistant district attorney, among others, warned the Simpson prosecutors about Fuhrman. The prosecutors also saw his psychological reports, in which he admitted his racist attitudes and actions. The only thing they didn't know is that Fuhrman--and they--would be caught by the tapes. [FN37]

While Dershowitz's take on the issue might be tainted by his involvement in the case, the view of Scott Turow, a former prosecutor, is not. As he stated in a New York Times op-ed piece about the prosecution's use of Fuhrman and Vannatter, "[t]he fact that the district attorney's office put these officers on the witness stand to tell [their] story and that the municipal judge at the pretrial hearing, Kathleen Kennedy-Powell, accepted it is scandalous. It is also routine." [FN38]

Probably the most stunning evidence of prosecutorial and judicial nonchalance toward police perjury is Myron Orfield's study of the Chicago system. [FN39] His study is stunning because, unlike many of the comments on this issue, [FN40] Orfield's findings are based on the views of prosecutors and judges as well as those of defense attorneys. In his survey of these three groups (which together comprised twenty-seven to forty-one individuals, depending on the question), 52% believed that at least "half of the time" the prosecutor "knows or has reason to know" that police fabricate evidence at suppression hearings, and 93%, including 89% of the prosecutors, stated that prosecutors had such knowledge of perjury "at least some of the time." [FN41] Sixty-one percent, including 50% of the state's attorneys, believed that prosecutors know or have reason to know that police fabricate evidence in case reports, and 50% of the prosecutors believed the same with respect to warrants (despite the fact that many prosecutors refused to talk about this latter area). [FN42] While close to half of all respondents believed that prosecutors "discourage" such perjury and fabrication, [FN43] a greater percentage believed that they "tolerate" *1047 it, [FN44] and 15% believed that prosecutors actually "encourage" it. [FN45] One former prosecutor described what he called a "commonly used" technique of steering police testimony by telling officers "[i]f this happens, we win. If this happens, we lose." [FN46] Most amazingly, 29% of the respondents did not equate lying at a suppression hearing with the crime of perjury. [FN47] Although the respondents' views on judicial, as opposed to prosecutorial, attitudes toward testilying were not as directly plumbed in this survey, when asked whether Chicago's criminal justice system effectively controls policy perjury at suppression hearings, 69% of the respondents answered "no." [FN48]

Prosecutors put up with perjury because they need a good working relationship with the police to make their cases. [FN49] Additionally, at bottom, they probably agree with the police that the end justifies the means. [FN50] Judicial acquiescence to perjury can be explained to some extent by prosecutorial failure to make the case for it. But defense attorney arguments and the judge's own observations can provide plenty of evidence of testilying in at least some cases. To the extent judges ignore obvious perjury, it is probably for the same reasons attributable to the prosecutor: sympathy for the police officer's ultimate goal [FN51] and, as Professor *1048 Morgan Cloud put it, "tact"--the fact that "[j]udges simply do not like to call other government officials liars--especially those who appear regularly in court." [FN52]

II. Some Proposals for Reducing Testilying

Several obvious ways of minimizing testilying suggest themselves. One such method is to

sensitize the police, through training, to the immorality and dangers of perjury. Along the same lines, Skolnick has suggested that, as lawyers with the same crime control orientation as thepolice, prosecutors might have enough credibility to get across to the police the importance of truth telling. [FN53]  Prosecutors can also be admonished to take their ethical duty to promote justice seriously, [FN54] including providing the defense with information about perjury when it comes to their attention. [FN55]

Less obvious solutions might involve changing the structure of the police force itself.  For instance, if community and problem-solving policing lived up to its promise, law enforcement might consist more of prevention than apprehension. [FN56]  This shift in **1049** emphasis might well lessen the need to testilie by reducing both the pressure to produce "activity" in the form of questionable stops and arrests, and the occasions when courtroom testimony is required.  Alternatively, we could try to reconstruct our police forces on the European model.  In theory at least, continental police are less adversarial in nature and thus more likely to report the facts simply as they occur. [FN57]

Theoretically, these and other "internal" changes could have a significant impact on testilying.  However, institutional change in the past has been frustratingly unsuccessful. [FN58]  In any event, describing in more detail how and whether these proposals would work is beyond the scope of this paper. Instead, I will focus primarily on the extent to which changes in traditional constitutional doctrine--particularly that having to do with the Fourth Amendment--can inhibit police lying.   Here in Part II, I discuss a number of proposals that have been advanced or alluded to by others.  In Part III, I will suggest a three-part proposal of my own.

A. Expansion of the Warrant Requirement

Professor Morgan Cloud has argued that perjury about Fourth Amendment issues can be curbed by expanding the warrant requirement to all nonexigent searches and seizures and by simultaneously defining the exigency exception very narrowly. [FN59]  This proposal may well reduce perjury to some extent. Relative to a post-search suppression hearing, police at a warrant proceeding will find the manufacture of probable cause more difficult because they do not know what their search will find and thus will not be able to fabricate "suspicions" as effectively.

**1050** Nonetheless, a warrant requirement can be eviscerated in several ways by police who have no qualms about lying.  First, whatever the validity of the pre-versus post-search lying hypothesis, the fact remains that, as noted above, [FN60] police have quite frequently managed to lie successfully during the warrant application process.  Second, police are not above conducting a surreptitious search before going to the magistrate to ensure their story will later float when they swear out a warrant affidavit. [FN61] Third, and most important, police contemplating a search may simply not bother to go to a magistrate, in the belief that they can later cook up facts supporting a claim of exigency.  Although, despite its costs, [FN62] I too have argued in favor of expanding the warrant requirement, [FN63] this proposal by itself will probably inhibit perjury only minimally.

B. Informant Production

A second proposal, designed specifically to stymie the practice of inventing snitches, is to require the police to produce their informants in front of the issuing magistrate. [FN64]  Again, however, police who have no scruples about lying can wink at this rule.  They can coach their informant, or even someone else acting as an informant, to lie about the information necessary for probable cause.  They also might simply say the informant is unavailable, in the face of which a magistrate may feel helpless.  The cost of the proposal would be longer warrant reviews, a curtailment of the worthwhile telephonic warrant system (unless informants **1051** could somehow be patched in), [FN65] and the risk that informants' identities will be exposed.

C. The Panch System

A third idea is to follow the lead of foreign countries like France and India and require police conducting a house search to be accompanied by lay citizens who observe its execution. [FN66]

Theoretically, this procedure, called the panch system in India, [FN67] would provide a neutral source of information about the search of the house. It could also be extended to other types of searches and seizures, as well as to interrogations.

One wonders, in the Indian and French systems, where the lay citizens come from (i.e., whether they are simply picked up off the street or can be informants or other police minions), and how often they actually testify in conflict with the police. Further, citizen overview would presumably not be feasible in emergency situations, which the police could manufacture. Nonetheless, the idea is worth considering. In theory, at least, such a system would confront lying officers with eyewitnesses who, unlike defendants, are untainted by criminal charges.

D. Videotaping

If the pancha system has some merit, we could also institute its technological equivalent and require that all police actions be videotaped. This requirement would be relatively simple to implement in the interrogation context. Indeed, several American jurisdictions have already demonstrated that fact. [FN68] Video **\*1052** taping searches, seizures, and undercover operations is more difficult technologically, but not impossible, as has been demonstrated in situations involving car stops, street searches, and stings. [FN69]

While this film verite would go far toward inhibiting testilying, it is expensive, subject to tampering, and prone to practical devilments, like deciding when the tape must be turned on and off. It also might unnecessarily endanger undercover police. Furthermore, in the case of searches and seizures, and perhaps undercover operations as well, it could result in a more serious privacy invasion than is occasioned through mere police observation.

A separate question is how, assuming that technological (or human) observation is feasible, the police could be forced to use it. One argument, which I think plausible but which has been nascent since United States v. Wade, [FN70] is that the Confrontation Clause entitles a defendant to a taping of all critical investigative events. As Justice Brennan argued in Wade (in connection with lineup identifications), [FN71] unless the defense attorney, in person or via a meaningful substitute, is allowed to observe the police action in question, he is significantly hobbled in reconstructing what happened; usually his only resource is his client, and the judge and jury are unlikely to believe a criminal suspect in a swearing match with the police. However, the constitutional argument for videotaping is unlikely to be accepted by the courts **\*1053** in light of developments since Wade. [FN72] Thus, any impetus for human or technological monitoring of the police will have to come from elsewhere.

E. Subjecting Police Witnesses to Lie Detection

Professor Donald Dripps has offered a proposal that he believes might provide just such an impetus, relying on another technological innovation--the polygraph. [FN73] Dripps proposes that if, at the conclusion of a suppression hearing, the court determines that its outcome depends upon a credibility assessment of the police and the defendant, it should be authorized to request that the parties supplement the record with a polygraph examination. The judge would not be bound by the results of these examinations, but in an appropriate case (i.e., where the tests indicate that one party was lying and the other telling the truth), he could give them dispositive weight. [FN74] To the argument that polygraph examinations are insufficiently reliable as indicators of veracity, Dripps points out the low likelihood that two polygraph examinations (i.e., the defendant's and the officer's) would be wrong. [FN75]

Dripps hopes that the possibility of such a polygraph battle will lead the police to adopt corroboration methods such as videotaping of interrogations. [FN76] Presumably they will do so, however, only if the polygraph tests could be wrong. If, as Dripps argues, polygraphs are accurate, then truthful officers have no incentive to provide such corroboration, and of course lying officers will try to manufacture it. Nonetheless, Dripps is **\*1054** probably right that the threat of a polygraph exam will at least encourage police to "tell straighter stories to the prosecution." [FN77]

The primary problem with Dripps's proposal is not that it won't reduce police lying (I think it will), and not that it won't increase attempts at corroboration (I do not know whether it will or not), but that it undermines what this article has assumed to be the primary reason for fighting testilying: the belief that to have an effective police force and law enforcement system we need to trust the police. Hooking police men and women up to machines undermines that trust; it tells the public that the credibility of officers of the law needs to be tested like that of criminal suspects, suspected traitors, and job applicants. As with some of the other proposals discussed above, I think Dripps's idea may be worth trying, either alone or in combination with one or more of the others. But if there were an appropriate way to get police to tell the truth without such a trust-busting "techno-fix," I would prefer it.

III. Reducing the Pressure to Lie and to Ignore Lying

As this article has suggested, the pressure to lie comes at the police from all sides. Peers routinely engage in deceit, supervisors stress quotas, and the public wants criminals behind bars without having to hear too much about how they got there. The criminals themselves lie all the time, and the police naturally enough would prefer to see them incarcerated rather than out on the street two weeks after they are arrested. The impetus to lie is so great that the police will probably always find a counter to deterrence-driven solutions-- whether it is more lying, tampering with videotape, or practicing how to beat a lie detector. A preferable way of dealing with testilying is to reduce the pressure to commit it. Simultaneously, one could increase incentives for prosecutors and judges to do something about the perjury that does occur, which should also have the effect of assuring greater compliance with substantive constitutional law as police realize they cannot cover up their illegal actions. Below I suggest three proposals designed to accomplish these goals.

**\*1055** A. Punishments and Rewards

Deterrence of testilying in the face of the intense pressure to lie requires stiff punishment: a perjury conviction and dismissal from the force. [FN78] For the reasons given above, however, punishment alone, even if routinely applied, will not change police behavior in this regard; indeed, it may well reinforce the "us-against-them" attitude that encourages further deceit. As Albert Quick has argued, [FN79] police need positive reinforcement for the type of conduct we think is appropriate.

Thus, officers who provide corroboration of their testimony, whether through panchas, videotape, or some other mechanism, should be commended and promoted for their efforts. Officers who expose police perjury should also be singled out for favorable treatment (although it cannot be denied that the rewards would have to be significant to break the code of silence followed by the police). [FN80] The essential point is that the sensitivity training alluded to earlier is not enough. A society concerned about testilying must put its money where its mouth is.

B. Flexifying Probable Cause

Police lying is not always a calculated assault on our Fourth, Fifth, and Sixth Amendment rights. For instance, at the time they engage in a search or a seizure police usually believe, in good faith, that they have the goods on the suspect. But when they truthfully explain themselves to a judge, they often find that their suspicion, based on experience and gut feeling, was an unconstitutional "hunch." Consider what an officer told Jerome Skolnick, after both he and Skolnick saw a person the cop knew to be an addict turn away from him with his left fist closed:

    **\*1056** It's awfully hard to explain to a judge what I mean when I testify that I saw a furtive movement. I'm glad you were along to see this because you can see what we're up against. . . . I can testify as to the character of the neighborhood, my knowledge that the man was an addict and all that stuff, but what I mean is that when I see a hype move the way that guy moved, I know he's trying to get rid of something. [FN81]

The officer felt that he had enough evidence to search the man's hand, but also believed, according to Skolnick rightly so, that he did not have probable cause as that term is defined by the courts. In such a situation, elaboration of the facts, perhaps adding that the person tried to

run away, or that the drug was in plain view, is a natural reaction on the part of a police officer. Professor Uviller calls this type of perjury an "instrumental adjustment, [a] slight alteration in the facts to accommodate an unwieldy constitutional constraint and obtain a just result." [FN82]

At least one constitutional constraint--probable cause--should not be so unwieldy. We need to take seriously the Supreme Court's injunction that probable cause is a "common sense" concept which should incorporate the experience of the officer. [FN83]  Contrary to what courts have said, for instance, observation of a stranger to the neighborhood trying to hitch a ride with his shirt draped over a TV and wool gloves in his back pocket, an hour after he was seen peering into two houses, should be sufficient to authorize a search; [FN84] so should possession of reliable information that a person sold drugs five months earlier, when combined with recent police observation of people routinely leaving his house with small packages. [FN85]

**\*1057** Further, as I have argued elsewhere, [FN86] probable cause to search should not be conceptualized as a fixed quantity of certainty but rather, as is already the case with suspicion requirements associated with seizures, [FN87] should be varied according to the level of intrusion involved. This "proportionality" approach, which can be reconciled with both the language and the history of the Fourth Amendment, [FN88] has several advantages. [FN89]  The most important advantage for present purposes is the flexibility it gives the police. For instance, under this approach and the definition of probable cause urged above, the heavily criticized entry of Simpson's compound would be viewed in a different light:  based on their knowledge of Simpson's history and the inability to reach him at his home, the police may well have had enough cause to search his curtilage--if not his house--even if the Bronco had had no blood stains on it. [FN90]

The danger in "flexifying" probable cause, of course, is the extra discretion it gives police. But if this flexibility is coupled with a stringent warrant requirement, [FN91] police discretion may not be appreciably expanded. In the meantime, this flexibility will reduce the occasions in which police need to make "instrumental adjustments" while under oath, whether in a warrant proceeding, a suppression hearing or, as discussed below, a damages suit.

C. Changing the Remedy

The final and most controversial suggestion for minimizing testilying is to abolish the exclusionary rule. While the first two proposals attempt to accommodate the police by trying to siphon **\*1058** off the pressure to lie, this proposal is meant to change the behavior of prosecutors and judges by reducing the urge to wink at such lying. As Orfield and others have observed firsthand, for people in the latter positions, "instrumental adjustments" by police hoping to convict guilty people are very hard to fault, much less prosecute and punish, when the result is the dismissal of worthy charges. If the rule were abolished, on the other hand, prosecutors would be more willing to expose and prosecute such perjury, and judges more willing to conclude that it occurred, especially if, as suggested above, a successful perjury prosecution meant the prosecutor and judge would never have to work with the officer again.

Further, abolition of the exclusionary rule does not have to mean the Constitution will become a dead letter. A liquidated damages remedy, such as the one proposed by Professor Robert Davidow, [FN92] may well provide a more than adequate substitute. Davidow would authorize a government ombudsman to receive and investigate complaints against the police and to assign private counsel to sue the individual officer and the government in front of a judge. The officer found in bad-faith violation of the Constitution would be liable for a certain percentage of his salary, while the government would pay an equivalent sum for good-faith violations. Because such a system makes the officer liable for unreasonable mistakes, it is clearly a better individual deterrent than the rule, which is not very effective in this regard. [FN93] Because it holds the department liable for reasonable mistakes of law made by its officers, this type of damages action also provides a strong incentive for training programs, and thus would probably not diminish the institutional compliance that is the one proven effect of the exclusionary rule. [FN94]

**\*1059** Of course, the fact that a damages action directly affects the officer's wallet might produce even more incentive than the exclusionary rule to dissemble about illegal investigative actions. The three-part proposal described above should nonetheless reduce testilying because it will

reduce the illegal activity that spawns such fabrication. Positive reinforcement of truth-telling should produce more witnesses willing to contradict a lying officer, who will thus have greater incentive to avoid any action that necessitates a cover-up. Construing probable cause in a flexible manner will of course directly diminish the number of "illegal" police actions. Finally, the more realistic threat of perjury charges, brought by prosecutors who no longer fear losing their case as a result, should work to reduce violations of the Constitution as officers become less certain their malfeasance and subsequent lies about it will remain unchallenged.

Conclusion

  Police, like people generally, lie in all sorts of contexts for all sorts of reasons. [FN95]  This article has focused on police lying designed to convict individuals the police think are guilty. Strong measures are needed to reduce the powerful incentives to practice such testilying and the reluctance of prosecutors and judges to do anything about it. Among them might be the adoption of rewards for truth telling, the redefinition of probable cause, and the elimination of the exclusionary rule and its insidious effect on the resolve of legal actors to implement the commands of the Constitution.

  Ultimately, however, the various proposals set forth in this article are merely suggestive, meant to stimulate debate about how to curtail testilying at suppression hearings. [FN96]  There is **\*1060** strong evidence to suggest that police in many jurisdictions routinely engage in this kind of deceit, and that prosecutors and judges are sometimes accomplices to it. Even if it turns out that this evidence exaggerates the problem, [FN97] the fact remains that, because of the O.J. Simpson trial and similar events, more people than ever before believe it exists. To restore trust in the police and the criminal justice system, we need to take meaningful steps against testilying now.

FNa. Professor of Law & Alumni Research Scholar, University of Florida College of Law.

FN1. For one account of this series of events, see Jeffrey Toobin, A Horrible Human Event, New Yorker, Oct. 23, 1995, at 40, 41-42.

FN2. Vannatter also neglected to mention that much of the basis for his assertion that there was probable cause came from a warrantless entry of O.J.'s compound, the legality of which had not yet been litigated. See infra text accompanying notes 4-5.

FN3. For a description of these misrepresentations and how Judge Ito reacted to them, see Wayne R. LaFave, O.J. Simpson Case Commentaries:  Challenging Probable Cause for Search Warrants, 1994 WL 530235, Sept. 30, 1994, available   in WESTLAW, O.J.-Comment database (on file with the University of Colorado Law Review).

FN4. Kenneth B. Noble, Ruling Aids Prosecution of Simpson, N.Y. Times, Sept. 20, 1994, at A16.

FN5. See, e.g., Wayne R. LaFave, O.J. Simpson Case Commentaries:  Over the Wall:  A New Theory Regarding Entry of the Simpson Compound, 1994 WL 562135, at 1, Oct. 15, 1994, available in WESTLAW, O.J.-Comment database (on file with the University of Colorado Law Review) ("The LaFave poll (admittedly unscientific and consisting of nothing more than the random reactions of friends, colleagues and students with whom I have discussed the Simpson case) indicates that most people have responded to [these claims] with a fair degree of incredulity.").

FN6. See Toobin, supra note 1, at 41-42.

FN7. The idea of trust as a social good is presented in Sissela Bok, Lying: Moral Choice in Public and Private Life 26-27 (1978) ("[T]rust is a social good to be protected just as much as the air we breathe or the water we drink. When it is damaged, the community as a whole suffers; and when it is destroyed, societies falter and collapse.").

FN8. Joe Sexton, Jurors Question Honesty of Police, N.Y. Times, Sept. 25, 1995, at B3

(quoting Michael F. Vecchione, Brooklyn District Attorney Charles J. Hynes's deputy in charge of trials).  Consider also these words:

[I]t has to be recognized that, while there is no reason to suppose that policemen as individuals are any less fallible than other members of society, people are often shocked and outraged when policemen are exposed violating the law.  The reason is simple.  Their deviance elicits a special feeling of betrayal.  In a sense, they are doubly condemned; that is, not just for the infringement itself but even more for the breach of trust involved. Something extra is involved when public officials in general and policemen in particular deviate from accepted norms:  "That something more is the violation of a fiduciary relationship, the corruption of a public trust, of public virtue."

Maurice Punch, Conduct Unbecoming 8 (1985) (quoting Albert J. Reiss, Jr., Foreword to The Literature of Police Corruption ix-x (Anthony E. Simpson ed., 1977)).

FN9. See infra text accompanying notes 35-52.

FN10. See Mapp v. Ohio, 367 U.S. 643 (1961) (requiring exclusion of evidence  seized in violation of the Fourth Amendment); see also Miranda v. Arizona, 384 U.S. 436 (1966) (requiring exclusion of evidence seized in violation of the Miranda warnings requirement).

FN11. Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Procedures of the Police Dep't, City of New York, Commission Report 36 (1994) (Milton Mollen, Chair) [hereinafter Mollen Report] ("Several officers also told us that the practice of police falsification in connection with such arrests is so common in certain precincts that it has spawned its own word: 'testilying.'").

FN12. Irving Younger, The Perjury Routine, The Nation, May 8, 1967, at 596-97 ("Every lawyer who practices in the criminal courts knows that police perjury is commonplace."); see also David Wolchover, Police Perjury in London, 136 New L.J. 181, 183 (1986) (estimating that police officers lie in 3 out of 10 trials).

FN13. Myron W. Orfield, Jr., Deterrence, Perjury, and the Heater Factor:  An Exclusionary Rule in the Chicago Criminal Courts, 63 U. Colo. L. Rev. 75, 107 (1992) (survey of prosecutors, defense attorneys, and judges indicates a belief that, on average, perjury occurs 20% of the time, with defense attorneys estimating it occurs 53% of the time in connection with Fourth Amendment issues; only 8% believe that police never, or almost never, lie in court); see also Fred Cohen, Police Perjury:  An Interview with Martin Garbus, 8 Crim. L. Bull. 363, 367 (1972) ("[A]mong all the lawyers that I know--whether they are into defense work or prosecution--not one of them will argue that systematic police perjury does not exist. We may differ on its extent, its impact ... but no trial lawyer that I know will argue that police perjury is nonexistent or sporadic."); N. G. Kittel, Police Perjury:  Criminal Defense Attorneys' Perspective, 11  Am. J. Crim. Just. 11, 16 (1986) (57% of 277 attorneys believe police perjury takes place very often or often).

FN14. See Sarah Barlow, Patterns of Arrests for Misdemeanor Narcotics Possession: Manhattan Police Practices 1960-62, 4 Crim. L. Bull. 549, 549-50 (1968) (presenting data showing that "dropsy testimony"--i.e., police testimony that an arrestee had dropped drugs as the police came upon them--increased after Mapp v. Ohio imposed the exclusionary rule on state police, indicating that the "police are lying about the circumstances of such arrests so that the contraband which they have seized illegally will be admissible as evidence.").

FN15. Alan M. Dershowitz, The Best Defense xxi-xxii (1983) ("Rule IV:  Almost all police lie about whether they violated the Constitution in order to convict     guilty defendants.").

FN16. Orfield, supra note 13, at 83 ("Respondents, including prosecutors, estimate that police commit perjury between 20% and 50% of the time they testify on Fourth Amendment issues.").  It should also be noted that many of these respondents did not consider lying at a suppression hearing perjury, infra text accompanying note 47, which

would have the effect of deflating these percentages.

FN17. Jerome H. Skolnick, Deception by Police, Crim. Just. Ethics, Summer/Fall 1982, at 40, 42.

FN18. Scott Turow, Simpson Prosecutors Pay for their Blunders, N.Y. Times, Oct. 4, 1995, at A21 (Turow was a prosecutor for several years.).

FN19. Younger, supra note 12, at 596 (Younger was a prosecutor and a judge.).

FN20. H. Richard Uviller, Tempered Zeal:  A Columbia Law Professor's Year on the Streets with the New York City Police 116 (1988) (Uviller was a prosecutor for 14 years.).

FN21. See supra note 11 and accompanying text.

FN22. See id.; see also Robert Daley, The Prince of the City 73 (1978) (describing perjury that "detectives ... committed all the time in the interest of putting bad people in jail"); Myron R. Orfield, The Exclusionary Rule and Deterrence: An Empirical Study of Chicago Narcotics Officers, 54 Chi. L. Rev. 1016, at 1049-50 (1987) (Seventy-six percent of police surveyed believe police shade the facts regarding probable cause, 56% believed perjury was infrequent and 19% believe it was reasonably common.).

FN23. Mollen Report, supra note 11, at 38.

FN24. See also Jerome H. Skolnick, Justice Without Trial 212-19 (2d ed. 1975).

FN25. Uviller, supra note 20, at 116.

FN26. "[N]o Warrants shall issue, but upon probable cause, supported by Oath or affirmation ...."  U.S. Const. amend. IV.

FN27. Jonathan Rubinstein, City Police 386-88 (1973) (describing the preparation of false search warrants as routine, with supervisors often       selecting the officers most skilled in perjury as the ones to seek the warrant); see also Orfield, supra note 13, at 102-08 (describing improper use of "boilerplate" language in warrant applications).  In Albright v. Oliver, 114 S. Ct. 807 (1994), the complaint alleged that a detective repeatedly used an informant (on 50 occasions) despite the fact that on each occasion her information turned out to be false and charges were dismissed. Id. at 823 n.3 (Stevens, J., dissenting).

FN28. One of the more extreme examples (one hopes) is described in Commonwealth v. Lewin, 542 N.E.2d 275 (Mass. 1989), in which the court concluded that in all likelihood an informant named "John," who supplied the basis for 31 search warrants over a 10-month period, and for many others over a five-year period, never existed.  Id. at 284.  Many have speculated that the "informer" involved in Spinelli v. United States, 393 U.S. 410 (1969), did not exist.  See, e.g., Joseph D. Grano, A Dilemma for Defense Counsel: Spinelli-Harris Search Warrants and the Possibility of Police Perjury, 1971 Law F. 405, 427, 456-57.

FN29. Mollen Report, supra note 11, at 38.

FN30. Stanley Z. Fisher, "Just the Facts, Ma'am":  Lying and the Omissionof Exculpatory Evidence in Police Reports, 28 N. Eng. L. Rev. 1, 36-38 (1993).

FN31. Skolnick, supra note 17, at 43.  See also Carl B. Klockars, Blue Lies and Police Placebos, 27 Amer. Behav. Sci. 529, 540 (1984) (Police lie at suppression hearings because they see search-and-seizure rules, and other evidentiary rules, as procedural rules "the violation of which does not affect a perpetrator's factual guilt.").

FN32. Indeed, significant evidence suggests that police supervisors, driven by the same crime control and quota pressures that drive field officers, actively encourage testilying.

See Mollen Report, supra note 11, at 40-41 (describing how supervisors train officers in how to commit perjury); Allan N. Kornblum, The Moral Hazards:  Police Strategies for Honesty and Ethical Behavior 80 (1976) (describing New York City police practice of "flaking," or planting evidence on suspects to meet "norms of production").

FN33. Skolnick, supra note 17, at 42.

FN34. Although police reports are not testimony, in some jurisdictions they are written under oath.  In others, falsification of a report can result in statutory penalties.  See Fisher, supra note 30, at 9 n.36.

FN35. See Uviller, supra note 20, at 111 (asserting that perjury "is extremely elusive, almost impossible to identify with certainty in a particular instance"); Fisher, supra note 30, at 10 n.40 (stating that Uviller's experience mirrors his own).

FN36. See Alan M. Dershowitz, Controlling the Cops;  Accomplices to Perjury, N.Y. Times, May 2, 1994, at A17 ("I have seen trial judges pretend to believe officers whose testimony is contradicted by common sense, documentary evidence and even unambiguous tape recordings.... Some judges refuse to close their eyes to perjury, but they are the rare exception to the rule of blindness, deafness and muteness that guides the vast majority of judges and prosecutors."); Nat Hentoff, When Police Commit Perjury, Wash. Post, Sept. 5, 1985, at A21 (describing the view of Michael Avery that prosecutors and judges do nothing about obvious police perjury); David Rudovsky, Why It Was Hands Off on the Police, P hila. I nq., Aug. 28, 1995, at A7 (describing instances in which prosecutors and judges ignored "hard evidence" of false warrant applications, false police reports, and perjury in a series of Philadelphia cases); Marty I. Rosenbaum, Inevitable Error:  Wrongful New York State Homicide Convictions, 1965-1988, 18 N.Y.U. R ev. L. & Soc. Change 807, 809 (1990-91) ("[A] substantial number of the wrongful convictions ... resulted from prosecutorial misconduct ... includ[ing] ... the conscious use of perjured testimony."); Younger, supra note 12, at 596 ("[T]he policeman is as likely to be indicted for perjury by his co-worker, the prosecutor, as he is to be struck down by thunderbolts from an avenging heaven.").

FN37. Alan Dershowitz, Police Perjury Destroyed the Simpson Prosecution, Buff. News, Oct. 7, 1995, at 3B.

FN38. Turow, supra note 18, at A21.

FN39. Orfield, supra note 13.

FN40. The first three observers cited in supra note 36 are defense attorneys.

FN41. Orfield, supra note 13, at 109.

FN42. Id. at 110.

FN43. Id. at 112.

FN44. As one state's attorney stated:  "We view our role as neutral. We don't try to influence perjury one way or another."  Id. at 111.

FN45. Id. at 110-11.  In what seems to be a contradiction, Orfield reports that 61% believed prosecutors tolerate perjury, while 48% believe prosecutors discourage it.

FN46. Id. at 110.

FN47. Id. at 112.  Interestingly, of the 11 respondents who answered this way, two were judges, three were state's attorneys, and six were public defenders. Id. at 112 n.172. Prosecutors explained their views in this regard by calling the perjury "fudging" rather

than lying, or by defining perjury as lying about guilt or innocence. Id. at 112-13.

FN48. Id. at 114. In another part of the study, reported separately, Orfield found that 86% of police officers surveyed believed it "unusual but not rare" for judges to disbelieve police testimony. Orfield, supra note 22, at 1049.

FN49. Jay S. Silver, Truth, Justice, and the American Way: The Case Against the Client Perjury Rules, 47 Vand. L. Rev. 339, 358 n.75 (1994) ("The institutional tendency to tolerate police perjury likely stems from the prosecutor's interest in maintaining smooth working relations with police, who        gather the government's evidence and are often its most important witnesses at trial, and from the prosecutor's own competitive drive to win and to advance professionally."); see also sources cited  supra note 36.

FN50. Orfield, supra note 13, at 113 ("Many prosecutors believe that 'real' perjury only concerns questions of guilt or innocence, not questions of probable cause.").

FN51. Id. at 121 (finding that 70% of respondents believe that judges sometimes fail to suppress evidence when the law requires suppression "because [the judge] believes it is unjust to suppress the evidence given the circumstances of the case before him").

FN52. Morgan Cloud, The Dirty Little Secret, 43 Emory L.J. 1311, 1323-24 (1994).

FN53. Skolnick, supra note 24, at 203.
The prosecutor need not be successful in making the policeman approve of the strictures of due process of law, which he typically does not admire himself.  By accepting their legitimacy, however, he demonstrates to the policeman that it is at once possible to disagree with the rules of the game        as they are laid down, and at the same time to carry out the enforcement of substantive criminal law ....
Id.

FN54. The American Bar Association's Model Rules of Professional Conduct state that the "prosecutor in a criminal case shall ... make timely disclosure to the defense of all evidence or information known to the prosecutor that tends to negate the guilt of the accused or mitigates the offense."  Model Rules of Professional Conduct Rule 3.8(d) (1983).  The ABA's Criminal Justice Standards on the Prosecution Function provide, inter alia, that "[t]he duty of the prosecutor is to seek justice, not merely to convict," Standards for Criminal Justice s 3-1.1 (2d ed. 1979); that the prosecutor "has an affirmative responsibility to investigate suspected illegal activity when it is not adequately dealt with by other agencies," id. s 3-3.1(a); that the prosecutor must not "knowingly ... use illegal means to obtain evidence or to employ or instruct or encourage others to use such means," id. s 3-3.1(b); and that a prosecutor shall not "intentionally ... avoid pursuit of evidence because he or she believes it will damage the prosecution's case or aid the accused," id. s 3-3.11(c).

FN55. See Model Rules of Professional Conduct, supra note 54, Rule 3.8(d).

FN56. See generally Jerome H. Skolnick& James J. Fyfe, Above the Law: Police and the Excessive Use of Force 237-66 (1993) (stating that problem-oriented policing and community-oriented policing "stand in opposition to incident- driven policing," id. at 257).

FN57. See generally John H. Langbein& Lloyd L. Weinreb, Continental Criminal Procedure: "Myth" and Reality, 87 Yale L.J. 1549, 1552-54, 1562-63 & n.51 (German and French police are trained as "judicial officers" and required to report exculpatory as well as inculpatory information.).

FN58. See generally Symposium, Police Corruption, Municipal Corruption:  Cures at What Cost?, 40 N.Y.L. Sch. L. Rev. 1 (1995).  Several of the commentators in this symposium issue remark on the fact that police corruption scandals erupt at 20-year intervals despite institutional reform.  See, e.g., id. at 6, 45, 55 (three authors, a judge, an

ex-police commissioner, and an administrator, making this point).

FN59. Cloud, supra note 52, at 1344-48.

FN60. See supra notes 26-28 and accompanying text.

FN61. See Skolnick, supra note 24, at 144 ("The practice of making an unlawful exploratory search of the room of a suspected criminal is, so far as I could tell on several occasions, accepted by both the Westville police and the state police.").

FN62. "The vast majority of searches are conducted without a warrant ...." Richard Van Duizend et al., The Search Warrant Process: Preconceptions, Perceptions, Practices 19 (1985). Any significant increase in that percentage could burden judges, with a concomitant greater potential for rubber-stamping of applications.

FN63. Christopher Slobogin, The World Without a Fourth Amendment, 39 UCLA L. Rev. 1, 29-38 (1991).

FN64. Some courts have endorsed this approach. See, e.g., United States v. Manley, 632 F.2d 978 (2d Cir. 1980); People v. Darden, 313 N.E.2d 49 (1974).

FN65. Telephonic warrants, which allow police to obtain a warrant while still on the street in a fraction of the time normally required to obtain a warrant, Van Duizend et al., supra note 62, at 85-87, are a crucial aspect of most      proposals for expanding the warrant requirement. See also Craig M. Bradley, Two Models of the Fourth Amendment, 83 Mich. L. Rev. 1468, 1491-98 (1985); Cloud, supra note 52, at 1346; Slobogin, supra note 63, at 32.

FN66. For a description of the French procedure, see Richard S. Frase, Comparative Criminal Justice As a Guide to American Law Reform: How Do the French Do It, How Can We Find Out, and Why Should We Care?, 78 Cal. L. Rev. 539, 580 (1990). For a description of the Indian system, see Susan C. Lushing, Comparative Criminal Justice--Search and Seizure, Interrogation, and Identification of Suspects in India: A Research Note, 10 J. Crim. Just. 239, 240-42 (1982).

FN67. See Lushing, supra note 66, at 242.

FN68. See William A. Geller et al., A Report to the National Institute of Justice, Police Videotaping of Suspect Interrogations and Confessions: A Preliminary Examination of Issues and Practices 54 tbl. 1 (1992) (As of 1991, approximately one-sixth of all police and sheriffs' departments videotaped confessions, although in many jurisdictions it was at the interrogating detective's discretion.).

FN69. See Jeff Collins, New Technology Can Turn Officers into Walking Lenses, Recording Contacts for Their and the Public's Safety, Orange County Reg. May 8, 1995, at B1; Lan Nguyen, Cameras Roll with Patrol Cars: Video Rides Shotgun on Arlington Streets, Wash. Post, July 6, 1995, at B1 (describing video cameras that attach to the windshield and contain tape that cannot be erased). See generally Gary T. Marx, Undercover: Police Surveillance in America 55-56 (1988) (describing use of videotape in undercover operations).
FN70. 388 U.S. 218 (1967).

FN71. Id. at 235 ("Insofar as the accused's conviction may rest on a courtroom identification in fact the fruit of a suspect pretrial identification which the accused is helpless to subject to effective scrutiny at trial, the accused is deprived of that right of cross-examination which is an essential safeguard to his right to confront the witnesses against him.").

FN72. In United States v. Ash, 413 U.S. 300 (1973), the Supreme Court appeared to reject

the "critical stage" analysis of Wade and adopted a "trial- like confrontation" analysis, which contemplates application of the Sixth Amendment only to those stages of the criminal process in which the "intricacies of the law and the advocacy of the public prosecutor are   involved." Id. at 309; see also Charles H. Whitebread & Christopher Slobogin, Criminal Procedure: An Analysis of Cases and Concepts s 31.03(a) (1993).

FN73. Donald A. Dripps, Police, Plus Perjury, Equals Polygraphy (in press, manuscript on file with author).

FN74. Id. at 1.

FN75. Id. at 27.

FN76. Id. at 35.  ("[A] rule of admissibility [of polygraph results] would create incentives for the police to actively prevent, rather than actively encourage, swearing contests.").

FN77. Id. at 28.

FN78. One could add to these two punishments liability in damages but, at the federal level at least, this would require reversal of Briscoe v. LaHue, 460 U.S. 325 (1983).

FN79. Albert T. Quick, Attitudinal Aspects of Police Compliance with Procedural Due Process, 6 Am. J. Crim. L. 25, 48-54 (1978) (describing various methods of reinforcing police conformance with due process norms (e.g., promotions, bonuses, praise), an approach that is claimed to change attitudes and thus help establish the desired patterns of behavior).

FN80. Cf. Punch, supra note 8, at 155 (describing how police "operate by a code of silence which dictates that you do not 'rat on your mates'").

FN81. Skolnick, supra note 24, at 216.

FN82. Uviller, supra note 20, at 115-16.

FN83. See, e.g., United States v. Cortez, 449 U.S. 411, 418 (1981) (Probable cause "does not deal with hard certainties, but with probabilities [and] common-sense conclusions about human behavior .... [T]he evidence thus collected must be seen and weighed not in terms of library analysis by scholars, but as understood by those versed in the field of law enforcement."); Illinois v. Gates, 462 U.S. 213, 232 (1983) (after quoting the above passage in Cortez, stating that "probable cause is a fluid concept--turning on the assessment of probabilities in particular factual          contexts--not readily, or even usefully, reduced to a neat set of legal rules").

FN84. People v. Quintero, 657 P.2d 948 (Colo. 1983) (no probable cause on these facts).

FN85. These are essentially the facts of United States v. Leon, 468 U.S. 897 (1984), in which the suppression hearing judge ruled that probable cause did not exist.  Id. at 903 n.2.

FN86. Slobogin, supra note 63, at 68-75.

FN87. Cf. Michigan v. Sitz, 496 U.S. 444 (1990) (minimal intrusion of state sobriety checkpoint program held reasonable when balanced against substantial state interest in highway safety); Terry v. Ohio, 392 U.S. 1 (1968) (pat- down of outer clothing to search for weapons justified by circumstances).

FN88. Slobogin, supra note 63, at 75-78 (noting that the term "probable cause" had no clear meaning as an historical matter and thus can constitutionally be defined as "that cause which makes probable the reasonableness of the intrusion occasioned by a given

search or seizure").

FN89. For example, it allows the amendment greater scope than current law because it avoids imposing a "more-likely-than-not" certainty requirement every time a police action is labeled a search.  Id. at 77.

FN90. However, I would have required a warrant in this situation given the time elapsed between the initial investigation of the murder scene and the entry of the compound.  See id. at 32; Cloud, supra note 52, at 1346-47.

FN91. See Slobogin, supra note 63, at 29-33, 75.

FN92. Robert P. Davidow, Criminal Procedure Ombudsman Revisited, 73 J. Crim. L. & Criminology 939 (1982).

FN93. See, e.g., Dallin H. Oaks, Studying the Exclusionary Rule in Search and Seizure, 37 U. Chi. L. Rev. 665, 720-31 (1970) (pointing out, inter alia, that the primary effect of the rule is visited on the prosecutor rather than the police officer).  Indeed, a damages remedy could over-deter.  See Milton A. Loewenthal, Evaluating the Exclusionary Rule in Search and Seizure, 49 UMKC L. Rev. 24, 31-32 (1980).  The good-faith exception in the Davidow proposal should minimize that problem. Furthermore, of course, the latter remedy avoids the damage to the credibility of the criminal justice system caused when exclusion allows a criminal to be released on a "technicality."

FN94. See Yale Kamisar, Does (Did) (Should) the Exclusionary Rule Rest on a "Principled Basis" Rather Than an "Empirical Proposition"?, 16 Creighton L. Rev. 565, 590-91 (1983).  An ombudsman system could also facilitate detection of patterns of misbehavior and particular miscreant officers, something which is not easily accomplished under an exclusionary rule regime relying on individual attorneys.

FN95. For a treatment of other types of police lies, see Christopher Slobogin, Investigative Lies by the Police (in preparation).  See also Tom Barker & David Carter, Fluffing Up the Evidence and Covering Your Ass:  Some Conceptual Notes on Police Lying, 11 Deviant Behav. 61, 62-67 (1990).

FN96. Cf. Kevin R. Reitz, Testilying As a Problem of Crime Control:  A Reply to Professor Slobogin, 67 U. Colo. L. Rev. 1061 (1996).  My only quibble with Professor Reitz's criticisms of my proposals is that I think he underestimates the impact of flexifying probable cause and overestimates the impact of substituting a damages remedy for the exclusionary rule.

FN97. See id. at 1062-65.

END OF DOCUMENT

Testimony of Alan M. Dershowitz

House of Representatives Judiciary Committee

**December 1, 1998**

My name is Alan M. Dershowitz and I have been teaching criminal law at Harvard Law School for 35 years. I have also participated in the litigation — especially at the appellate level — of hundreds of federal and state cases, many of them involving perjury and the making of false statements. I have edited a casebook on criminal law and have written 10 books and hundreds of articles dealing with subjects relating to the issues before this committee. It is an honor to have been asked to share my experience and expertise with you all here today.

For nearly a quarter century, I have been teaching, lecturing and writing about the corrosive influences of perjury in our legal system, especially when committed by those whose job it is to enforce the law, and ignored — or even legitimized — by those whose responsibilities it is to check those who enforce the law.

On the basis of my academic and professional experience, I believe that no felony is committed more frequently in this country than the genre of perjury and false statements. Perjury during civil depositions and trials is so endemic that a respected appellate judge once observed that "experienced lawyers say that, in large cities, scarcely a trial occurs in which some witness does not lie." He quoted a wag to the effect that cases often are decided "according to the preponderance of perjury."[1] Filing false tax returns and other documents under pains and penalties of perjury is so rampant that everyone acknowledges that only a tiny fraction of offenders can be

prosecuted. Making false statements to a law enforcement official is so commonplace that the Justice Department guidelines provide for prosecution of only some categories of this daily crime. Perjury at criminal trials is so common that whenever a defendant testifies and is found guilty, he has presumptively committed perjury.[2]

Police perjury in criminal cases - particularly in the context of searches and other exclusionary rule issues - is so pervasive that the former police chief of San Jose and Kansas City has estimated that "hundreds of thousands of law-enforcement officers commit felony perjury every year testifying about drug arrests" alone.[3]

In comparison with their frequency, it is likely that false statement crimes are among the most under-prosecuted in this country. Though state and federal statutes carry stringent penalties for perjury, few perjurers ever actually are subjected to those penalties. As prosecutor E. Michael McCann has concluded, "Outside of income tax evasion, perjury is…probably the most under prosecuted crime in America."

[4] Moreover, there is evidence that false statements are among the most selectively prosecuted of all crimes, and that the criteria for selectivity bears little relationship to the willfulness or frequency of the lies, the certainty of the evidence or any other neutral criteria relating to the elements of perjury or other false statement crimes. Professor Richard H. Underwood, the Spears-Gilbert Professor of Law at the University of Kentucky's law school, writes that:

more often, the [perjury] law has been invoked for revenge, or for the purpose of realizing some political end (the very base reason that lies are sometimes told!), or for the purpose of nabbing a criminal who might otherwise be difficult to nab, or, dare I say it, for the purpose of gaining some tactical advantage. Proving that perjury was committed, or that a "false statement" or a "false claim" was made, may be an easier, or a more palatable, brief for the prosecution.[5]

Historically, false statements generally have admitted of considerable variations in degree.[6] The core concept of perjury was that of "bearing false witness," a biblical term that consisted in accusing another of crime.[7]

Clearly, the most heinous brand of lying is the giving of false testimony that results in the imprisonment or even execution of an innocent person. Less egregious, but still quite serious, is false testimony that results in the conviction of a person who committed the criminal conduct, but whose rights were violated in a manner that would preclude conviction if the police were to testify truthfully. There are many other points on this continuum, ranging from making false statements about income or expenses to testifying falsely in civil trials. The least culpable genre of false statements are those that deny embarrassing personal conduct of marginal relevance to the matter at issue in the legal proceeding.

Much of the public debate about President Clinton and possible perjury appears to ignore the following important lessons of history:

1. that the overwhelming majority of individuals who make false statements under oath are not prosecuted;

2. that those who are prosecuted generally fall into some special category of culpability or are victims of selective prosecution; and,

3. that the false statements of which President Clinton is accused fall at the most marginal end of the least culpable genre of this continuum of offenses and would never even be considered for prosecution in the routine case involving an ordinary defendant.

II

My interest in the corrosive effects of perjury began in the early 1970s when I represented — on a pro bono basis — a young man who was both a member of and a government informer against the Jewish Defense League. He was accused of making a bomb that caused the death of a woman, but he swore that a particular policeman, who had been assigned to be his handler, had made him certain promises in exchange for his information. The policeman categorically denied making any promises, but my client had — unbeknownst to the policeman — surreptitiously taped many of his conversations with the policeman. The tapes proved beyond any doubt that the policeman had committed repeated perjury, and all charges were dropped against my client. But the policeman was never charged with perjury. Instead he was promoted.[8]

The following year, I represented, on appeal, a lawyer accused of corruption. The major witness against him was a policeman who acknowledged at trial that he himself had committed three crimes while serving as a police officer. He denied that he had committed more than these three crimes. It was subsequently learned that he had, in fact, committed hundreds of additional crimes, including some he specifically denied under oath. He too was never prosecuted for perjury, because a young Assistant U.S. Attorney, named Rudolph Giuliani, led a campaign against prosecuting this admitted perjurer. Shortly afterward, the policeman explained:

Cops are almost taught how to commit perjury when they are in the Police Academy. Perjury to a policeman - and to a lawyer, by the way - is not a big deal. Whether they are giving out speeding tickets or parking tickets, they're almost always lying. But very few cops lie about the actual facts of a case. They may stretch an incident or whatever to fit it into the framework of the law based on what they consider a silly law of the Supreme Court.[9]

Nor is the evidence of police perjury merely anecdotal. Numerous commission reports have found rampant abuses in police departments throughout the country. All objective reports point to a pervasive problem of police lying, and tolerance of the lying by prosecutors and judges, all in the name of convicting the factually guilty whose rights may have been violated and whose convictions might be endangered by the exclusionary rule.

As the Mollen Commission reported:

The practice of police falsification in connection with such arrests is so common in certain precincts that it has spawned its own word: "testilying." . . . Officers also commit falsification to serve what they perceive to be "legitimate" law enforcement ends - and for ends that many honest and corrupt officers alike stubbornly defend as correct. In their view, regardless of the legality of the arrest, the defendant is in fact guilty and ought to be arrested.[10]

Even more troubling, in the Mollen Commission's view, "the evidence suggests that the . . . commanding officer not only tolerated, but encouraged, this unlawful practice." The commission provided several examples of perjured cover stories that had been suggested to a young officer by his supervisor:

Scenarios were, were you going to say (a) that you observed what appeared to be a drug transaction; (b) you observed a bulge in the defendant's waistband; or (c) you were informed by a male black, unidentified at this time, that at the location there were drug sales.

QUESTION: So, in other words, what the lieutenant was telling you is "Here's your choice of false predicates for the arrest."

OFFICER: That's correct. Pick which one you're going to use.[11]

Nor was this practice limited to police supervisors. As the Mollen Commission reported:

Several former and current prosecutors acknowledged — "off the record" — that perjury and falsification are serious problems in law enforcement that, though not condoned, are ignored. The form this tolerance takes, however, is subtle, which makes accountability in this area especially difficult.[12]

The epidemic is conceded even among the highest ranks of law enforcement. For example, William F. Bratton, who has headed the police departments of New York City and Boston, has confirmed that "testilying" is a "real problem that needs to be addressed." He also placed some of the responsibility squarely at the feet of prosecutors:

When a prosecutor is really determined to win, the trial prep procedure may skirt along the edge of coercing or leading the police witness. In this way, some impressionable young cops learn to tailor their testimony to the requirements of the law.[13]

Many judges who listen to or review police testimony on a regular basis privately agree with Judge Alex Kozinski of the United States Court of Appeals for the Ninth Circuit, who publicly stated: "It is an open secret long shared by prosecutors, defense lawyers and judges that perjury is widespread among law enforcement officers," and that the reason for it is that "the exclusionary rule . . . sets up a great incentive for . . . police to lie to avoid letting someone they think is guilty, or they know is guilty, go free."[14] Or, as Judge Irving Younger explained, "Every lawyer who practices in the criminal courts knows that police perjury is commonplace."[15]

As these judges attest, this could not happen without active complicity of many prosecutors and judges. Yet there is little apparent concern to remedy *that* serious abuse of the oath to tell the truth — even among those who now claim to be so concerned with the corrosive influences of perjury on our legal system. The sad reality appears to be that most people care about perjury only when they disapprove of the *substance* of the lie or of the *person* who is lying.

A perfect example of selective morality regarding perjury occurred when President George Bush pardoned former Secretary of Defense Caspar Weinberger in 1992, even though physical records proved that Weinberger had lied in connection with his testimony regarding knowledge of Iran arms sales. Not only was there no great outcry against pardoning an indicted perjurer, some of the same people who insist that President Clinton not be allowed to "get away" with lying were perfectly prepared to see Weinberger "get away" with perjury. Senator Bob Dole of Kansas spoke for many when he called the pardon a "Christmas Eve act of courage and compassion."[16]

The real issue is not the handful of convicted perjurers appearing before this committee, but the hundreds of thousands of perjurers who are never prosecuted, many for extremely serious and calculated acts of perjury designed to undercut constitutional rights of unpopular defendants.

If we really want to reduce the corrosive effects of perjury on our legal system, the place to begin is at or near the top of the perjury hierarchy. If instead we continue deliberately to blind ourselves to pervasive police perjury and other equally dangerous forms of lying under oath and focus on a politically charged tangential lie in the lowest category of possible perjury (hiding embarrassing facts only marginally relevant to a dismissed civil case), we would be reaffirming the dangerous message that perjury will continue to be a selectively prosecuted crime reserved for political or other agenda-driven purposes.

A Republican aide to this committee was quoted by *The New York Times* as follows:

"In the hearing, we'll be looking at perjury and its consequences, and whether it is tenable for a nation to have two different standards for lying under oath; one for the President and one for everyone else."[17]

On the basis of my research and experiences, I am convinced that if President Clinton were an ordinary citizen, he would not be prosecuted for his allegedly false statements, which were made in a civil deposition about a collateral sexual matter later found inadmissible in a case eventually dismissed and then settled. If President Clinton were ever to be prosecuted or impeached for perjury on the basis of the currently available evidence, it would indeed represent an improper double standard: a selectively harsher one for the president (and perhaps a handful of other victims of selective prosecution) and the usual laxer one for everyone else.

1. Jerome Frank, Courts On Trial 85 (1949).

2. Many such defendants now have years added on to their sentences under the federal guidelines, which add points for perjury at trial.

3. Joseph D. McNamara, *Has the Drug War Created an Officer Liars' Club?* Los Angeles Times, Feb. 11, 1996, at M1.

4. From Mark Curriden, *The Lies Have It*, A.B.A. J., May 1995, at 71, q*uoted in* Lisa C. Harris, *Perjury Defeats Justice*, 42 Wayne L. Rev. 1755, 1768-69 (1996) (footnote omitted). *See also* Hon. Sonia Sotomayor & Nicole A. Gordon, *Returning Majesty to the Law and Politics: A Modern Approach*, 30 Suffolk U. L. Rev. 35, 51 n.52 (1996) ("Perjury cases are not often pursued, and perhaps should be given greater consideration by prosecuting attorneys as a means of enhancing the credibility of the trial system generally."); Fred Cohen, *Police Perjury: An Interview With Martin Garbus*, 8 Crim. L. Bull. 363, 367 (1972), *quoted in*

Christopher Slobogin, *Testilying: Police Perjury and What to Do About It*, 67 U. Colo. L. Rev. 1037, 1060 n.13 (1996) ("…no trial lawyer that I know will argue that police perjury is nonexistent or sporadic.")

5. Richard H. Underwood, *Perjury: An Anthology*, 13 Ariz. J. Int'l & Comp. L. 307, 379 (1996).

6. *See, e.g.,* Richard H. Underwood, *False Witness: A Lawyer's History of the Law of Perjury*, 10 Ariz. J. Int'l & Comp. L. 215, 252 n.157 (1993).

7. *See, e.g.*, Underwood, *id.* at 223 and accompanying note 37.

8. *See* Dershowitz, The Best Defense 67 (1982). The chief of detectives of New York wrote a book about this case in which he confirmed these facts. *See* Albert Seedman, Chief! (1974).

9. *See* Dershowitz, The Best Defense, *supra* note 8, at 377. This was confirmed in a book entitled *Prince of the City* (and a motion picture of the same name), whose contents were approved by the policeman. *See* Robert Daley, Prince of the City (1978).

10. Commission to Investigate Allegations of Police Corruption and the Anti-Corruption Practices of the Police Department, Milton Mollen, Chair; July 7, 1994, at 36 [*hereinafter* Mollen Report]. The report then went on to describe how officers reported a litany of manufactured tales. For example, when officers unlawfully stop and search a vehicle because they believe it contains drugs or guns, officers will falsely claim in police reports and under oath that the car ran a red light (or committed some other traffic violation) and that they subsequently saw contraband in the car in plain view. To conceal an unlawful search of an individual who officers believe is carrying drugs or a gun, they will falsely assert that they saw a bulge in the person's pocket or saw drugs and money changing hands. To justify unlawfully entering an apartment where officers believe narcotics or cash can be found, they pretend to have information from an unidentified civilian informant. *Id.* at 38.

11. Mollen Report, *supra* note 10, at 41.

12. Mollen Report, *supra* note 10, at 42.

13. Boston Globe, November 15, 1995, at 1.

14. Stuart Taylor, Jr., *For the Record*, American Lawyer, Oct. 1995, at 72.

15. Irving Younger, *The Perjury Routine*, The Nation, May 8, 1967, at 596-97.

16. Elaine Sciolino, *On the Question of Pardons, Dole has Taken Both Sides*, The New York Times, 16 Oct. 1996, at A15.

17. Eric Schmitt, *Panel Considers Perjury and Its Consequences*, The New York Times, Nov. 28, 1998, at A13.

Dated this Dec __11__ ,  2023

# EXHIBIT

# C

**422 U.S. 806 (1975)**

# FARETTA

## v.

## CALIFORNIA.

No. 73-5772.

**Supreme Court of United States.**

Argued November 19, 1974.

Decided June 30, 1975.

CERTIORARI TO THE COURT OF APPEAL OF CALIFORNIA, SECOND APPELLATE DISTRICT.

*Jerome B. Falk, Jr.,* by appointment of the Court, 417 U. S. 906, argued the cause for petitioner. With him on the briefs was *Roger S. Hanson.*

*Howard J. Schwab,* Deputy Attorney General of California, argued the cause for respondent. With him on the brief were *Evelle J. Younger,* Attorney General, *Jack R. Winkler,* Chief Assistant Attorney General, *S. Clark Moore,* Assistant Attorney General, and *Russell Iungerich* and *Donald J. Oeser,* Deputy Attorneys General.[*]

807*807 MR. JUSTICE STEWART delivered the opinion of the Court.

The Sixth and Fourteenth Amendments of our Constitution guarantee that a person brought to trial in any state or federal court must be afforded the right to the assistance of counsel before he can be validly convicted and punished by imprisonment. This clear constitutional rule has emerged from a series of cases decided here over the last 50 years.[1] The question before us now is whether a defendant in a state criminal trial has a constitutional right to proceed *without* counsel when he voluntarily and intelligently elects to do so. Stated another way, the question is whether a State may constitutionally hale a person into its criminal courts and there force a lawyer upon him, even when he insists that he wants to conduct his own defense. It is not an easy question, but we have concluded that a State may not constitutionally do so.

# I

Anthony Faretta was charged with grand theft in an information filed in the Superior Court of Los Angeles County, Cal. At the arraignment, the Superior Court Judge assigned to preside at the trial appointed the public defender to represent Faretta. Well before the date of trial, however, Faretta requested that he be permitted to represent himself. Questioning by the judge revealed that Faretta had once represented himself in a criminal prosecution, that he had a high school education, and that he did not want to be represented by the public defender because he believed that that office was "very loaded down with . . . a heavy case load." The judge 808*808 responded that he believed Faretta was "making a mistake" and emphasized that in further proceedings Faretta would receive no special favors.[2] Nevertheless, after establishing that Faretta wanted to represent himself and did not want a lawyer, the judge, in a "preliminary ruling," accepted Faretta's waiver of the assistance of counsel. The judge indicated, however, that he might reverse this ruling if it later appeared that Faretta was unable adequately to represent himself.

Several weeks thereafter, but still prior to trial, the judge *sua sponte* held a hearing to inquire into Faretta's ability to conduct his own defense, and questioned him specifically about both the hearsay rule and the state law governing the challenge of potential jurors.[3] After consideration 809*809 of Faretta's answers, and observation of his demeanor, the judge ruled that Faretta had not made an intelligent and knowing waiver of his right to the assistance 810*810 of counsel, and also ruled that Faretta had no constitutional right to conduct his own defense.[4] The judge, accordingly, reversed his earlier ruling permitting self-representation and again appointed the public defender to represent Faretta. Faretta's subsequent request for leave to act as cocounsel was rejected, as were his efforts to make certain motions on his own behalf.[5] Throughout 811*811 the subsequent trial, the judge required that Faretta's defense be conducted only through the appointed lawyer from the public defender's office. At the conclusion of the trial, the jury found Faretta guilty as charged, and the judge sentenced him to prison.

The California Court of Appeal, relying upon a then-recent California Supreme Court decision that had expressly decided the issue,[6] affirmed the trial judge's ruling that Faretta had no federal or state constitutional right 812*812 to represent himself.[7] Accordingly, the appellate court affirmed Faretta's conviction. A petition for rehearing was denied without opinion, and the California Supreme Court denied review.[8] We granted certiorari. 415 U. S. 975.

## II

In the federal courts, the right of self-representation has been protected by statute since the beginnings of our Nation. Section 35 of the Judiciary Act of 1789, 1 Stat. 73, 92, enacted by the First Congress and signed by President Washington one day before the Sixth Amendment 813*813 was proposed, provided that "in all the courts of the United States, the parties may plead and manage their own causes personally or by the assistance of . . . counsel. . . ." The right is currently codified in 28 U. S. C. § 1654.

With few exceptions, each of the several States also accords a defendant the right to represent himself in any criminal case.[9] The Constitutions of 36 States explicitly confer that right.[10] Moreover, many state courts have 814*814 expressed the view that the right is also supported by the Constitution of the United States.[11]

This Court has more than once indicated the same view. In *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 279, the Court recognized that the Sixth Amendment right to the assistance of counsel implicitly embodies a "correlative right to dispense with a lawyer's help." The defendant in that case, indicted for federal mail fraud violations, insisted on conducting his own defense without benefit of counsel. He also requested a bench trial and signed a waiver of his right to trial by jury. The prosecution consented to the waiver of a jury, and the waiver was accepted by the court. The defendant was convicted, but the Court of Appeals reversed the conviction on the ground that a person accused of a felony could not competently waive his right to trial by jury except upon the advice of a lawyer. This Court reversed and reinstated the conviction, holding that "an accused, in the exercise of a free and intelligent choice, and with the considered approval of the court, may waive trial by jury, and so likewise may he competently and intelligently waive his Constitutional right to assistance of counsel." *Id.,* at 275.

The *Adams* case does not, of course, necessarily resolve the issue before us. It held only that "the Constitution 815*815 does not force a lawyer upon a defendant." *Id.,* at 279.[12] Whether the Constitution forbids a State from forcing a lawyer upon a defendant is a different question. But the Court in *Adams* did recognize, albeit in dictum, an affirmative right of self-representation:

"The right to assistance of counsel and the *correlative right to dispense with a lawyer's help* are not legal formalisms. They rest on considerations that go to the substance of an accused's position before the law. . . .

". . . What were contrived as protections for the accused should not be turned into fetters. . . . To deny an accused a choice of procedure in circumstances in which he, though a layman is as capable as any lawyer of making an intelligent choice, is to impair the worth of great Constitutional safeguards by treating them as empty verbalisms.

". . . When the administration of the criminal law . . . is hedged about as it is by the Constitutional safeguards for the protection of an accused, to deny him in the exercise of his free choice the right to dispense with some of these safeguards . . . is to imprison a man in his privileges and call it the Constitution." *Id.,* at 279-280 (emphasis added).

In other settings as well, the Court has indicated that 816*816 a defendant has a constitutionally protected right to represent himself in a criminal trial. For example, in *Snyder* v. *Massachusetts,* 291 U. S. 97, the Court held that the Confrontation Clause of the Sixth Amendment gives the accused a right to be present at all stages of the proceedings where fundamental fairness might be thwarted by his absence. This right to "presence" was based upon the premise that the "defense may be made easier if the accused is permitted to be present at the examination of jurors or the summing up of counsel, *for it will be in his power,* if present, to give advice or suggestion or *even to supersede his lawyers altogether and conduct the trial himself." Id.,* at 106 (emphasis added). And in *Price* v. *Johnston,* 334 U. S. 266, the Court, in holding that a convicted person had no absolute right to argue his own appeal, said this holding was in "sharp contrast" to his "recognized privilege of conducting his own defense at the trial." *Id.,* at 285.

The United States Courts of Appeals have repeatedly held that the right of self-representation is protected by the Bill of Rights. In *United States* v. *Plattner,* 330 F. 2d 271, the Court of Appeals for the Second Circuit emphasized that the Sixth Amendment grants the accused the rights of confrontation, of compulsory process for witnesses in his favor, and of assistance of counsel as minimum procedural requirements in federal criminal prosecutions. The right to the assistance of counsel, the court concluded, was intended to supplement the other rights of the defendant, and not to impair "the absolute and primary right to conduct one's own defense *in propria persona." Id.,* at 274. The court found support for its decision in the language of the 1789 federal statute; in the statutes and rules governing criminal procedure, see 28 U. S. C. § 1654, and Fed. Rule Crim. Proc. 44; in the many state constitutions that expressly guarantee self-representation; 817*817 and in this Court's recognition of the right in *Adams* and *Price.* On these grounds, the Court of Appeals held that implicit in the Fifth Amendment's guarantee of due process of law, and implicit also in the Sixth Amendment's guarantee of a right to the assistance of counsel, is "the right of the accused personally to manage and conduct his own defense in a criminal case." 330 F. 2d, at 274. See also *United States ex rel. Maldonado* v. *Denno,* 348 F. 2d 12, 15 (CA2); *MacKenna* v. *Ellis,* 263 F. 2d 35, 41 (CA5); *United States* v. *Sternman,* 415 F. 2d

1165, 1169-1170 (CA6);*Lowe* v. *United States,* 418 F. 2d 100, 103 (CA7); *United States* v. *Warner,* 428 F. 2d 730, 733 (CA8); *Haslam* v. *United States,* 431 F. 2d 362, 365 (CA9); compare *United States* v. *Dougherty,* 154 U. S. App. D. C. 76, 86, 473 F. 2d 1113, 1123 (intimating right is constitutional but finding it unnecessary to reach issue) with *Brown* v. *United States,*105 U. S. App. D. C. 77, 79-80, 264 F. 2d 363, 365-366 (plurality opinion stating right is no more than statutory in nature).

This Court's past recognition of the right of self-representation, the federal-court authority holding the right to be of constitutional dimension, and the state constitutions pointing to the right's fundamental nature form a consensus not easily ignored. "[T]he mere fact that a path is a beaten one," Mr. Justice Jackson once observed, "is a persuasive reason for following it."[13] We confront here a nearly universal conviction, on the part of our people as well as our courts, that forcing a lawyer upon an unwilling defendant is contrary to his basic right to defend himself if he truly wants to do so.

818*818 **III**

This consensus is soundly premised: The right of self-representation finds support in the structure of the Sixth Amendment, as well as in the English and colonial jurisprudence from which the Amendment emerged.

# A

The Sixth Amendment includes a compact statement of the rights necessary to a full defense:

"In all criminal prosecutions, the accused shall enjoy the right . . . to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

Because these rights are basic to our adversary system of criminal justice, they are part of the "due process of law" that is guaranteed by the Fourteenth Amendment to defendants in the criminal courts of the States.[14] The rights to notice, confrontation, and compulsory process, when taken together, guarantee that a criminal charge may be answered in a manner now considered fundamental to the fair administration of American justice— through the calling and interrogation of favorable witnesses, the cross-examination of adverse witnesses, and the orderly introduction of evidence. In short, the Amendment constitutionalizes the right in an adversary criminal trial to make a defense as we know it. See *California* v. *Green,* 399 U. S. 149, 176 (Harlan, J., concurring).

819*819 The Sixth Amendment does not provide merely that a defense shall be made for the accused; it grants to the accused personally the right to make his defense. It is the accused, not counsel, who must be "informed of the nature and cause of the accusation," who must be "confronted with the witnesses against him," and who must be accorded "compulsory process for obtaining witnesses in his favor." Although not stated in the Amendment in so many words, the

right to self-representation—to make one's own defense personally—is thus necessarily implied by the structure of the Amendment.[15] The right to defend 820*820 is given directly to the accused; for it is he who suffers the consequences if the defense fails.

The counsel provision supplements this design. It speaks of the "assistance" of counsel, and an assistant, however expert, is still an assistant. The language and spirit of the Sixth Amendment contemplate that counsel, like the other defense tools guaranteed by the Amendment, shall be an aid to a willing defendant—not an organ of the State interposed between an unwilling defendant and his right to defend himself personally. To thrust counsel upon the accused, against his considered wish, thus violates the logic of the Amendment. In such a case, counsel is not an assistant, but a master;[16] and the right to make a defense is stripped of the personal character upon which the Amendment insists. It is true that when a defendant chooses to have a lawyer manage and present his case, law and tradition may allocate to the counsel the power to make binding decisions of trial strategy in many areas. Cf. *Henry* v. *Mississippi,* 379 U. S. 443, 451; *Brookhart* v. *Janis,* 384 U. S. 1, 7-8; *Fay* v. *Noia,* 372 U. S. 391, 439. This allocation can only be justified, however, by the defendant's consent, at the 821*821 outset, to accept counsel as his representative. An unwanted counsel "represents" the defendant only through a tenuous and unacceptable legal fiction. Unless the accused has acquiesced in such representation, the defense presented is not the defense guaranteed him by the Constitution, for, in a very real sense, it is not *his* defense.

## B

The Sixth Amendment, when naturally read, thus implies a right of self-representation. This reading is reinforced by the Amendment's roots in English legal history.

In the long history of British criminal jurisprudence, there was only one tribunal that ever adopted a practice of forcing counsel upon an unwilling defendant in a criminal proceeding. The tribunal was the Star Chamber. That curious institution, which flourished in the late 16th and early 17th centuries, was of mixed executive and judicial character, and characteristically departed from common-law traditions. For those reasons, and because it specialized in trying "political" offenses, the Star Chamber has for centuries symbolized disregard of basic individual rights.[17] The Star Chamber not merely allowed but required defendants to have counsel. The defendant's answer to an indictment was not accepted unless it was signed by counsel. When counsel refused to sign the answer, for whatever reason, the defendant was 822*822 considered to have confessed.[18] Stephen commented on this procedure: "There is something specially repugnant to justice in using rules of practice in such a manner as 823*823 to debar a prisoner from defending himself, especially when the professed object of the rules so used is to provide for his defense." 1 J. Stephen, A History of the Criminal Law of England 341-342 (1883). The Star Chamber was swept away in 1641 by the revolutionary fervor of the Long Parliament. The notion of obligatory counsel disappeared with it.

By the common law of that time, it was not representation by counsel but self-representation that was the practice in prosecutions for serious crime. At one time, every litigant was required to "appear before the court in his own person and conduct his own cause in his own

words."[19] While a right to counsel developed early in civil cases and in cases of misdemeanor, a prohibition against the assistance of counsel continued for centuries in prosecutions for felony or treason.[20] Thus, in the 16th and 17th centuries the accused felon or traitor stood alone, with neither counsel nor the benefit of other rights—to notice, confrontation, and compulsory process—that we now associate with a genuinely fair adversary proceeding. The trial was merely a "long argument between the prisoner and the 824*824 counsel for the Crown."[21] As harsh as this now seems, at least "the prisoner was allowed to make what statements he liked. . . . Obviously this public oral trial presented many more opportunities to a prisoner than the secret enquiry based on written depositions, which, on the continent, had taken the place of a trial. . . ."[22]

With the Treason Act of 1695, there began a long and important era of reform in English criminal procedure. The 1695 statute granted to the accused traitor the rights to a copy of the indictment, to have his witnesses testify under oath, and "to make . . . full Defense, by Counsel learned in the Law."[23] It also provided for court appointment of counsel, *but only if the accused so desired*.[24] 825*825 Thus, as new rights developed, the accused retained his established right "to make what statements he liked."[25] The right to counsel was viewed as guaranteeing a choice between representation by counsel and the traditional practice of self-representation. The ban on counsel in felony cases, which had been substantially eroded in the courts,[26] was finally eliminated by statute in 1836.[27] In more recent years, Parliament has provided for court appointment of counsel in serious criminal cases, but only at the accused's request.[28] At no point in this process of reform in England was counsel ever forced upon the 826*826 defendant. The common-law rule, succinctly stated in *R.* v. *Woodward,*[1944] K. B. 118, 119, [1944] 1 All E. R. 159, 160, has evidently always been that "no person charged with a criminal offence can have counsel forced upon him against his will."[29] See 3 Halsbury's Laws of England ¶ 1141, pp. 624-625 (4th ed. 1973); *R.* v.*Maybury,* 11 L. T. R. (n. s.) 566 (Q. B. 1865).

# C

In the American Colonies the insistence upon a right of self-representation was, if anything, more fervent than in England.

The colonists brought with them an appreciation of the virtues of self-reliance and a traditional distrust of lawyers. When the Colonies were first settled, "the lawyer was synonymous with the cringing Attorneys-General and Solicitors-General of the Crown and the arbitrary Justices of the King's Court, all bent on the conviction of those who opposed the King's prerogatives, and twisting the law to secure convictions."[30] This prejudice gained strength in the Colonies where "distrust 827*827 of lawyers became an institution."[31] Several Colonies prohibited pleading for hire in the 17th century.[32] The prejudice persisted into the 18th century as "the lower classes came to identify lawyers with the upper class."[33] The years of Revolution and Confederation saw an upsurge of antilawyer sentiment, a "sudden revival, after the War of the Revolution, of the old dislike and distrust of lawyers as a class."[34] In the heat of these sentiments the Constitution was forged.

This is not to say that the Colonies were slow to recognize the value of counsel in criminal cases. Colonial judges soon departed from ancient English practice and allowed accused felons the aid of counsel for their defense.[35] At the same time, however, the basic right of 828*828 self-representation was never questioned. We have found no instance where a colonial court required a defendant in a criminal case to accept as his representative an unwanted lawyer. Indeed, even where counsel was permitted, the general practice continued to be self-representation.[36]

The right of self-representation was guaranteed in many colonial charters and declarations of rights. These early documents establish that the "right to counsel" meant to the colonists a right to choose between pleading through a lawyer and representing oneself.[37] After the 829*829 Declaration of Independence, the right of self-representation, along with other rights basic to the making of a defense, entered the new state constitutions in wholesale fashion.[38] The right to counsel was clearly thought to 830*830 supplement the primary right of the accused to defend himself,[39] utilizing his personal rights to notice, confrontation, and compulsory process. And when the Colonies or newly independent States provided by statute rather than by constitution for court appointment of counsel in criminal cases, they also meticulously preserved the right of the accused to defend himself personally.[40]

831*831 The recognition of the right of self-representation was not limited to the state lawmakers. As we have noted, § 35 of the Judiciary Act of 1789, signed one day before the Sixth Amendment was proposed, guaranteed in the federal courts the right of all parties to "plead and manage their own causes personally or by the assistance of . . . counsel." 1 Stat. 92. See 28 U. S. C. § 1654. At the time James Madison drafted the Sixth Amendment, some state constitutions guaranteed an accused the right to be heard "by himself" and by counsel; others provided that an accused was to be "allowed" counsel.[41] The various state proposals for the Bill of Rights had similar variations in terminology.[42] 832*832 In each case, however, the counsel provision was embedded in a package of defense rights granted personally to the accused. There is no indication that the differences in phrasing about "counsel" reflected any differences of principle about self-representation. No State or Colony had ever forced counsel upon an accused; no spokesman had ever suggested that such a practice would be tolerable, much less advisable. If anyone had thought that the Sixth Amendment, as drafted, failed to protect the long-respected right of self-representation, there would undoubtedly have been some debate or comment on the issue. But there was none.

In sum, there is no evidence that the colonists and the Framers ever doubted the right of self-representation, or imagined that this right might be considered inferior to the right of assistance of counsel. To the contrary, the colonists and the Framers, as well as their English ancestors, always conceived of the right to counsel as an "assistance" for the accused, to be used at his option, in defending himself. The Framers selected in the Sixth Amendment a form of words that necessarily implies the right of self-representation. That conclusion is supported by centuries of consistent history.

# IV

There can be no blinking the fact that the right of an accused to conduct his own defense seems to cut against the grain of this Court's decisions holding that the Constitution requires that no accused can be convicted and imprisoned unless he has been accorded the right to the assistance of counsel. See *Powell* v. *Alabama,* 287 U. S. 45; *Johnson* v. *Zerbst,* 304 U. S. 458; *Gideon* v. *Wainwright,* 372 U. S. 335; *Argersinger* v. *Hamlin,* 407 U. S. 25. For it is surely true that the basic thesis of those decisions is that the help of a lawyer is essential to assure 833*833 the defendant a fair trial.[43] And a strong argument can surely be made that the whole thrust of those decisions must inevitably lead to the conclusion that a State may constitutionally impose a lawyer upon even an unwilling defendant.

But it is one thing to hold that every defendant, rich or poor, has the right to the assistance of counsel, and quite another to say that a State may compel a defendant to accept a lawyer he does not want. The value of state-appointed counsel was not unappreciated by the Founders,[44] yet the notion of compulsory counsel was utterly foreign to them. And whatever else may be said of those who wrote the Bill of Rights, surely there can be no 834*834 doubt that they understood the inestimable worth of free choice.[45]

It is undeniable that in most criminal prosecutions defendants could better defend with counsel's guidance than by their own unskilled efforts. But where the defendant will not voluntarily accept representation by counsel, the potential advantage of a lawyer's training and experience can be realized, if at all, only imperfectly. To force a lawyer on a defendant can only lead him to believe that the law contrives against him. Moreover, it is not inconceivable that in some rare instances, the defendant might in fact present his case more effectively by conducting his own defense. Personal liberties are not rooted in the law of averages. The right to defend is personal. The defendant, and not his lawyer or the State, will bear the personal consequences of a conviction. It is the defendant, therefore, who must be free personally to decide whether in his particular case counsel is to his advantage. And although he may conduct his own defense ultimately to his own detriment, his choice must be honored out of "that respect for the individual which is the lifeblood of the law." *Illinois* v. *Allen,* 397 U. S. 337, 350-351 (BRENNAN, J., concurring).[46]

835*835 **V**

When an accused manages his own defense, he relinquishes, as a purely factual matter, many of the traditional benefits associated with the right to counsel. For this reason, in order to represent himself, the accused must "knowingly and intelligently" forgo those relinquished benefits. *Johnson* v. *Zerbst,* 304 U. S., at 464-465. Cf. *Von Moltke* v. *Gillies,* 332 U. S. 708, 723-724 (plurality opinion of Black, J.). Although a defendant need not himself have the skill and experience of a lawyer in order competently and intelligently to choose self-representation, he should be made aware of the dangers and disadvantages of self-representation, so that the record will establish that "he knows what he is doing and his choice is made with eyes open." *Adams* v. *United States ex rel. McCann,* 317 U. S., at 279.

Here, weeks before trial, Faretta clearly and unequivocally declared to the trial judge that he wanted to represent himself and did not want counsel. The record affirmatively shows that Faretta was literate, competent, and understanding, and that he was voluntarily exercising his informed

free will. The trial judge had warned Faretta that he thought it was a mistake not to accept 836*836 the assistance of counsel, and that Faretta would be required to follow all the "ground rules" of trial procedure.[47] We need make no assessment of how well or poorly Faretta had mastered the intricacies of the hearsay rule and the California code provisions that govern challenges of potential jurors on *voir dire*.[48] For his technical legal knowledge, as such, was not relevant to an assessment of his knowing exercise of the right to defend himself.

In forcing Faretta, under these circumstances, to accept against his will a state-appointed public defender, the California courts deprived him of his constitutional right to conduct his own defense. Accordingly, the judgment before us is vacated, and the case is remanded for further proceedings not inconsistent with this opinion.

*It is so ordered.*

MR. CHIEF JUSTICE BURGER, with whom MR. JUSTICE BLACKMUN and MR. JUSTICE REHNQUIST join, dissenting.

This case, like *Herring* v. *New York, post,* p. 853, announced today, is another example of the judicial tendency to constitutionalize what is thought "good." That effort fails on its own terms here, because there is nothing desirable or useful in permitting every accused person, even the most uneducated and inexperienced, to insist upon conducting his own defense to criminal charges.[1] Moreover, there is no constitutional basis for 837*837 the Court's holding, and it can only add to the problems of an already malfunctioning criminal justice system. I therefore dissent.

I

The most striking feature of the Court's opinion is that it devotes so little discussion to the matter which it concedes is the core of the decision, that is, discerning an independent basis in the Constitution for the supposed right to represent oneself in a criminal trial.[2] See *ante,* at 818-821, and n. 15. Its ultimate assertion that such a right is tucked between the lines of the Sixth Amendment is contradicted by the Amendment's language and its consistent judicial interpretation.

As the Court seems to recognize, *ante,* at 820, the conclusion that the rights guaranteed by the Sixth Amendment are "personal" to an accused reflects nothing more than the obvious fact that it is he who is on trial and therefore has need of a defense.[3] But neither that nearly 838*838 trivial proposition nor the language of the Amendment, which speaks in uniformly mandatory terms, leads to the further conclusion that the right to counsel is merely supplementary and may be dispensed with at the whim of the accused. Rather, this Court's decisions have consistently included the right to counsel as an integral part of the bundle making up the larger "right to a defense as we know it." For example, in *In re Oliver*, 333 U. S. 257 (1948), the Court reversed a summary contempt conviction at the hands of a "one-man grand jury," and had this to say:

"We . . . hold that failure to afford the petitioner a reasonable opportunity to defend himself against the charge of false and evasive swearing was a denial of due process of law. A person's right to reasonable notice of a charge against him, and an opportunity to be heard in his

defense—a right to his day in court—are basic in our system of jurisprudence; and these rights include, as a minimum, a right to examine the witnesses against him, to offer testimony, and to be represented by counsel." *Id.,* at 273.

See also *Argersinger* v. *Hamlin,* 407 U. S. 25, 27-33 (1972); *Gideon* v. *Wainwright,* 372 U. S. 335, 344 (1963).

The reason for this hardly requires explanation. The fact of the matter is that in all but an extraordinarily small number of cases an accused will lose whatever defense he may have if he undertakes to conduct the trial himself. The Court's opinion in *Powell* v.*Alabama,* 287 U. S. 45 (1932),* puts the point eloquently:

"Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may 839*839 be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect." *Id.,* at 69.

Obviously, these considerations do not vary depending upon whether the accused actively desires to be represented by counsel or wishes to proceed *pro se.* Nor is it accurate to suggest, as the Court seems to later in its opinion, that the quality of his representation at trial is a matter with which only the accused is legitimately concerned. See *ante,* at 834. Although we have adopted an adversary system of criminal justice, see *Gideon* v. *Wainwright, supra,* the prosecution is more than an ordinary litigant, and the trial judge is not simply an automaton who insures that technical rules are adhered to. Both are charged with the duty of insuring that justice, in the broadest sense of that term, is achieved in every criminal trial. See *Brady* v. *Maryland,* 373 U. S. 83, 87, and n. 2 (1963); *Berger* v. *United States,* 295 U. S. 78, 88 (1935). That goal is ill-served, and the integrity of and public confidence in the system are undermined, when an easy conviction is obtained due to the defendant's ill-advised decision to waive counsel. The damage thus inflicted is not mitigated by the lame explanation that the defendant simply availed himself of the "freedom" "to go to jail under his own banner . . . ." *United States ex rel.* 840*840 *Maldonado* v. *Denno,* 348 F. 2d 12, 15 (CA2 1965). The system of criminal justice should not be available as an instrument of self-destruction.

In short, both the "spirit and the logic" of the Sixth Amendment are that every person accused of crime shall receive the fullest possible defense; in the vast majority of cases this command can be honored only by means of the expressly guaranteed right to counsel, and the trial judge is in the best position to determine whether the accused is capable of conducting his defense. True freedom of choice and society's interest in seeing that justice is achieved can be vindicated only if the trial court retains discretion to reject any attempted waiver of counsel and insist that the accused be tried according to the Constitution. This discretion is as critical an element of basic

fairness as a trial judge's discretion to decline to accept a plea of guilty. See *Santobello* v. *New York,* 404 U. S. 257, 262 (1971).

## II

The Court's attempt to support its result by collecting dicta from prior decisions is no more persuasive than its analysis of the Sixth Amendment. Considered in context, the cases upon which the Court relies to "beat its path" either lead it nowhere or point in precisely the opposite direction.

In *Adams* v. *United States ex rel. McCann,* 317 U. S. 269 (1942), and *Carter* v. *Illinois,* 329 U. S. 173 (1946), the defendants had competently waived counsel but later sought to renounce actions taken by them while proceeding *pro se.* In both cases this Court upheld the convictions, holding that neither an uncounseled waiver of jury trial nor an uncounseled guilty plea is inherently defective under the Constitution. The language which the Court so carefully excises from those opinions relates, not to an affirmative right of self-representation, but to 841*841 the consequences of waiver.[4] In *Adams,* for example, Mr. Justice Frankfurter was careful to point out that his reference to a defendant's "correlative right to dispense with a lawyer's help" meant only that "[h]e may waive his Constitutional right to assistance of counsel. . . ," 317 U. S., at 279. See *United States* v. *Warner,* 428 F. 2d 730, 733 (CA8 1970). But, as the Court recognizes, the power to *waive* a constitutional right does not carry with it the right to insist upon its opposite. *Singer* v. *United States,* 380 U. S. 24, 34-35 (1965).

Similarly, in *Carter* the Court's opinion observed that the Constitution "does not require that *under all circumstances* counsel be forced upon a defendant," citing *Adams.* 329 U. S., at 174-175 (emphasis added). I, for one, find this statement impossible to square with the Court's present holding that an accused is absolutely entitled to *dispense* with a lawyer's help under all conditions. Thus, although *Adams* and *Carter* support the Court's conclusion that a defendant who represents himself may not thereafter disaffirm his deliberate trial decisions, see *ante,* at 834-835, n. 46, they provide it no comfort regarding the primary issue in this case.[5]

842*842 Far more nearly in point is *Price* v. *Johnston,* 334 U. S. 266 (1948), where this Court held that, although the courts of appeals possess the power to command that a prisoner be produced to argue his own appeal, the exercise of that power is a matter of sound judicial discretion. An examination of the whole of the Court's reasoning on this point is instructive:

"The discretionary nature of the power in question grows out of the fact that a prisoner has no absolute right to argue his own appeal or even to be present at the proceedings in an appellate court. The absence of that right is in sharp contrast to his constitutional prerogative of being present in person at each significant stage of a felony prosecution, and to his recognized privilege of conducting his own defense at the trial. Lawful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction justified by the considerations underlying our penal system. Among those so limited is the otherwise unqualified right given by § 272 of the Judicial Code, 28 U. S. C. § 394 [now § 1654], to parties in all the courts of the United States to `plead and manage their own causes personally.' " *Id.,* at 285-286 (citations omitted).

It barely requires emphasis that this passage contrasts the "constitutional prerogative" to be present at trial with the "recognized privilege" of self-representation, and strongly implies that the latter arises only from the federal statute. It is difficult to imagine a position less consistent with *Price* v. *Johnston* than that taken by the Court today.

843*843 The Court of Appeals cases relied upon by the Court are likewise dubious authority for its views. Only one of those cases, *United States* v. *Plattner,* 330 F. 2d 271 (CA2 1964), even attempted a reasoned analysis of the issue, and the decision in that case was largely based upon the misreading of *Adams* and *Price* which the Court perpetuates in its opinion today. See 330 F. 2d, at 275. In every other case cited *ante,* at 817, the Courts of Appeals assumed that the right of self-representation was constitutionally based but found that the right had not been violated and affirmed the conviction under review. It is highly questionable whether such holdings would even establish the law of the Circuits from which they came.

In short, what the Court represents as a well-traveled road is in reality a constitutional trail which it is blazing for the first time today, one that has not even been hinted at in our previous decisions. Far from an interpretation of the Sixth Amendment, it is a perversion of the provision to which we gave full meaning in *Gideon* v. *Wainwright* and *Argersinger* v. *Hamlin.*

## III

Like MR. JUSTICE BLACKMUN, I hesitate to participate in the Court's attempt to use history to take it where legal analysis cannot. Piecing together shreds of English legal history and early state constitutional and statutory provisions, without a full elaboration of the context in which they occurred or any evidence that they were relied upon by the drafters of our Federal Constitution, creates more questions than it answers and hardly provides the firm foundation upon which the creation of new constitutional rights should rest. We are well reminded that this Court once employed an exhaustive analysis of English and colonial practices regarding the 844*844 right to counsel to justify the conclusion that it was fundamental to a fair trial and, less than 10 years later, used essentially the same material to conclude that it was not. Compare *Powell* v. *Alabama,* 287 U. S., at 60-65, with *Betts* v. *Brady,* 316 U. S. 455, 465-471 (1942).

As if to illustrate this point, the single historical fact cited by the Court which would appear truly relevant to ascertaining the meaning of the Sixth Amendment proves too much. As the Court points out, *ante,* at 831, § 35 of the Judiciary Act of 1789 provided a statutory right to self-representation in federal criminal trials. The text of the Sixth Amendment, which expressly provides only for a right to counsel, was proposed the day after the Judiciary Act was signed. It can hardly be suggested that the Members of the Congress of 1789, then few in number, were unfamiliar with the Amendment's carefully structured language, which had been under discussion since the 1787 Constitutional Convention. And it would be most remarkable to suggest, had the right to conduct one's own defense been considered so critical as to require constitutional protection, that it would have been left to implication. Rather, under traditional canons of construction, *inclusion* of the right in the Judiciary Act and its *omission* from the constitutional amendment drafted at the same time by many of the same men, supports the conclusion that the omission was intentional.

There is no way to reconcile the idea that the Sixth Amendment impliedly guaranteed the right of an accused to conduct his own defense with the contemporaneous action of the Congress in passing a statute explicitly giving that right. If the Sixth Amendment created a right to self-representation it was unnecessary for Congress to enact any statute on the subject at all. 845*845 In this case, therefore, history ought to lead judges to conclude that the Constitution leaves to the judgment of legislatures, and the flexible process of statutory amendment, the question whether criminal defendants should be permitted to conduct their trials *pro se.* See *Betts* v. *Brady, supra.* And the fact that we have not hinted at a contrary view for 185 years is surely entitled to some weight in the scales.[6] Cf. *Jackman* v. *Rosenbaum Co.,* 260 U. S. 22, 31 (1922).

# IV

Society has the right to expect that, when courts find new rights implied in the Constitution, their potential effect upon the resources of our criminal justice system will be considered. However, such considerations are conspicuously absent from the Court's opinion in this case.

It hardly needs repeating that courts at all levels are already handicapped by the unsupplied demand for competent advocates, with the result that it often takes far longer to complete a given case than experienced counsel would require. If we were to assume that there will be widespread exercise of the newly discovered constitutional right to self-representation, it would almost certainly follow that there will be added congestion in the courts and that the quality of justice will suffer. Moreover, the Court blandly assumes that once an accused has elected to defend himself he will be bound by his choice and not be heard to complain of it later. *Ante,* at 834-835, n. 46. This assumption ignores the role of appellate review, for the reported cases are replete with instances of a convicted defendant being relieved of a 846*846 deliberate decision even when made *with the advice of counsel.* See *Silber* v. *United States,* 370 U. S. 717 (1962). It is totally unrealistic, therefore, to suggest that an accused will always be held to the consequences of a decision to conduct his own defense. Unless, as may be the case, most persons accused of crime have more wit than to insist upon the dubious benefit that the Court confers today, we can expect that many expensive and good-faith prosecutions will be nullified on appeal for reasons that trial courts are now deprived of the power to prevent.[7]

MR. JUSTICE BLACKMUN, with whom THE CHIEF JUSTICE and MR. JUSTICE REHNQUIST join, dissenting.

Today the Court holds that the Sixth Amendment guarantees to every defendant in a state criminal trial the right to proceed without counsel whenever he elects to do so. I find no textual support for this conclusion in the language of the Sixth Amendment. I find the historical evidence relied upon by the Court to be unpersuasive, especially in light of the recent history of criminal procedure. Finally, I fear that the right to self-representation constitutionalized today frequently will cause procedural confusion without advancing any significant strategic interest of the defendant. I therefore dissent.

# I

The starting point, of course, is the language of the Sixth Amendment:

"In all criminal prosecutions, the accused shall enjoy 847*847 the right to a speedy and public trial, by an impartial jury of the State and district wherein the crime shall have been committed, which district shall have been previously ascertained by law, and to be informed of the nature and cause of the accusation; to be confronted with the witnesses against him; to have compulsory process for obtaining witnesses in his favor, and to have the Assistance of Counsel for his defence."

It is self-evident that the Amendment makes no direct reference to self-representation. Indeed, the Court concedes that the right to self-representation is "not stated in the Amendment in so many words." *Ante,* at 819.

It could be argued that the right to assistance of counsel necessarily carries with it the right to waive assistance of counsel. The Court recognizes, however, *ante,* at 819-820, n. 15, that it has squarely rejected any mechanical interpretation of the Bill of Rights. Mr. Chief Justice Warren, speaking for a unanimous Court in *Singer* v. *United States,* 380 U. S. 24, 34-35 (1965), stated: "The ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right."

Where then in the Sixth Amendment does one find this right to self-representation? According to the Court, it is "necessarily implied by the structure of the Amendment."*Ante,* at 819. The Court's chain of inferences is delicate and deserves scrutiny. The Court starts with the proposition that the Sixth Amendment is "a compact statement of the rights necessary to a full defense." *Ante,* at 818. From this proposition the Court concludes that the Sixth Amendment "constitutionalize the right in an adversary criminal trial to make a defense as we know it." *Ibid.* Up to this point, at least as a general proposition, the Court's reasoning is unexceptionable. 848*848 The Court, however, then concludes that because the specific rights in the Sixth Amendment are personal to the accused, the accused must have a right to exercise those rights personally. Stated somewhat more succinctly, the Court reasons that because the accused has a personal right to "a defense as we know it," he necessarily has a right to make that defense personally. I disagree. Although I believe the specific guarantees of the Sixth Amendment are personal to the accused, I do not agree that the Sixth Amendment guarantees any particular procedural method of asserting those rights. If an accused has enjoyed a speedy trial by an impartial jury in which he was informed of the nature of the accusation, confronted with the witnesses against him, afforded the power of compulsory process, and represented effectively by competent counsel, I do not see that the Sixth Amendment requires more.

The Court suggests that thrusting counsel upon the accused against his considered wish violates the logic of the Sixth Amendment because counsel is to be an assistant, not a master. The Court seeks to support its conclusion by historical analogy to the notorious procedures of the Star Chamber. The potential for exaggerated analogy, however, is markedly diminished when one recalls that petitioner is seeking an absolute right to self-representation. This is not a case where defense counsel, against the wishes of the defendant or with inadequate consultation, has adopted a trial strategy that significantly affects one of the accused's constitutional rights. For such overbearing conduct by counsel, there is a remedy. *Brookhart* v. *Janis,* 384 U. S. 1 (1966); *Fay* v. *Noia,* 372 U. S. 391, 439 (1963). Nor is this a case where distrust, animosity, or

other personal differences between the accused and his would-be counsel have rendered effective representation unlikely or impossible. 849*849 See *Brown* v. *Craven,* 424 F. 2d 1166, 1169-1170 (CA9 1970). See also *Anders* v. *California,* 386 U. S. 738 (1967). Nor is this even a case where a defendant has been forced, against his wishes to expend his personal resources to pay for counsel for his defense. See generally *Fuller* v. *Oregon,* 417 U. S. 40 (1974); *James* v. *Strange,* 407 U. S. 128 (1972). Instead, the Court holds that any defendant in any criminal proceeding may insist on representing himself regardless of how complex the trial is likely to be and regardless of how frivolous the defendant's motivations may be. I cannot agree that there is anything in the Due Process Clause or the Sixth Amendment that requires the States to subordinate the solemn business of conducting a criminal prosecution to the whimsical—albeit voluntary—caprice of every accused who wishes to use his trial as a vehicle for personal or political self-gratification.

The Court seems to suggest that so long as the accused is willing to pay the consequences of his folly, there is no reason for not allowing a defendant the right to self-representation. *Ante,* at 834. See also *United States ex rel. Maldonado* v. *Denno,* 348 F. 2d 12, 15 (CA2 1965) ("[E]ven in cases where the accused is harming himself by insisting on conducting his own defense, respect for individual autonomy requires that he be allowed to go to jail under his own banner if he so desires . . ."). That view ignores the established principle that the interest of the State in a criminal prosecution "is not that it shall win a case, but that justice shall be done." *Berger* v. *United States,* 295 U. S. 78, 88 (1935). See also *Singer* v. *United States,* 380 U. S., at 37. For my part, I do not believe that any amount of *pro se* pleading can cure the injury to society of an unjust result, but I do believe that a just result should prove to be an effective balm for almost any frustrated *pro se* defendant.

850*850 ▌▌

The Court argues that its conclusion is supported by the historical evidence on self-representation. It is true that self-representation was common, if not required, in 18th century English and American prosecutions. The Court points with special emphasis to the guarantees of self-representation in colonial charters, early state constitutions, and § 35 of the first Judiciary Act as evidence contemporaneous with the Bill of Rights of widespread recognition of a right to self-representation.

I do not participate in the Court's reliance on the historical evidence. To begin with, the historical evidence seems to me to be inconclusive in revealing the original understanding of the language of the Sixth Amendment. At the time the Amendment was first proposed, both the right to self-representation and the right to assistance of counsel in federal prosecutions were guaranteed by statute. The Sixth Amendment expressly constitutionalized the right to assistance of counsel but remained conspicuously silent on any right of self-representation. The Court believes that this silence of the Sixth Amendment as to the latter right is evidence of the Framers' belief that the right was so obvious and fundamental that it did not need to be included "in so many words" in order to be protected by the Amendment. I believe it is at least equally plausible to conclude that the Amendment's silence as to the right of self-representation indicates that the Framers simply did not have the subject in mind when they drafted the language.

The paucity of historical support for the Court's position becomes far more profound when one examines it against the background of two developments in the more recent history of criminal procedure. First, until the middle of the 19th century, the defendant in a criminal proceeding in this country was almost always disqualified 851*851 from testifying as a witness because of his "interest" in the outcome. See generally *Ferguson* v. *Georgia,* 365 U. S. 570 (1961). Thus, the ability to defend "in person" was frequently the defendant's only chance to present his side of the case to the judge or jury. See, *e. g., Wilson* v. *State,* 50 Tenn. 232 (1871). Such Draconian rules of evidence, of course, are now a relic of the past because virtually every State has passed a statute abrogating the common-law rule of disqualification. See *Ferguson* v.*Georgia,* 365 U. S., at 575-577, 596. With the abolition of the common-law disqualification, the right to appear "in person" as well as by counsel lost most, if not all, of its original importance. See Grano, The Right to Counsel: Collateral Issues Affecting Due Process, 54 Minn. L. Rev. 1175, 1192-1194 (1970).

The second historical development is this Court's elaboration of the right to counsel. The road the Court has traveled from *Powell* v. *Alabama,* 287 U. S. 45 (1932), to*Argersinger* v. *Hamlin,* 407 U. S. 25 (1972), need not be recounted here. For our purposes, it is sufficient to recall that from start to finish the development of the right to counsel has been based on the premise that representation by counsel is essential to ensure a fair trial. The Court concedes this and acknowledges that "a strong argument can surely be made that the whole thrust of those decisions must inevitably lead to the conclusion that a State may constitutionally impose a lawyer upon even an unwilling defendant." *Ante,* at 833. Nevertheless, the Court concludes that self-representation must be allowed despite the obvious dangers of unjust convictions in order to protect the individual defendant's right of free choice. As I have already indicated. I cannot agree to such a drastic curtailment of the interest of the State in seeing that justice is done in a real and objective sense.

852*852 **III**

In conclusion, I note briefly the procedural problems that, I suspect, today's decision will visit upon trial courts in the future. Although the Court indicates that a *pro se* defendant necessarily waives any claim he might otherwise make of ineffective assistance of counsel, *ante,* at 834-835, n. 46, the opinion leaves open a host of other procedural questions. Must every defendant be advised of his right to proceed *pro se?* If so, when must that notice be given? Since the right to assistance of counsel and the right to self-representation are mutually exclusive, how is the waiver of each right to be measured? If a defendant has elected to exercise his right to proceed *pro se,* does he still have a constitutional right to assistance of standby counsel? How soon in the criminal proceeding must a defendant decide between proceeding by counsel or *pro se?* Must he be allowed to switch in midtrial? May a violation of the right to self-representation ever be harmless error? Must the trial court treat the *pro se* defendant differently than it would professional counsel? I assume that many of these questions will be answered with finality in due course. Many of them, however, such as the standards of waiver and the treatment of the *pro se* defendant, will haunt the trial of every defendant who elects to exercise his right to self-representation. The procedural problems spawned by an absolute right to self-representation will far outweigh whatever tactical advantage the defendant may feel he has gained by electing to represent himself.

If there is any truth to the old proverb that "one who is his own lawyer has a fool for a client," the Court by its opinion today now bestows a *constitutional* right on one to make a fool of himself.

[*] *John E. Thorne, pro se,* filed a brief as *amicus curiae.*

[1] See, *e. g., Powell* v. *Alabama,* 287 U. S. 45; *Johnson* v. *Zerbst,* 304 U. S. 458; *Betts* v. *Brady,* 316 U. S. 455; *Gideon* v. *Wainwright,* 372 U. S. 335; *Argersinger* v. *Hamlin,* 407 U. S. 25.

[2] The judge informed Faretta:

"You are going to follow the procedure. You are going to have to ask the questions right. If there is an objection to the form of the question and it is properly taken, it is going to be sustained. We are going to treat you like a gentleman. We are going to respect you. We are going to give you every chance, but you are going to play with the same ground rules that anybody plays. And you don't know those ground rules. You wouldn't know those ground rules any more than any other lawyer will know those ground rules until he gets out and tries a lot of cases. And you haven't done it."

[3] The colloquy was as follows:

"THE COURT: In the Faretta matter, I brought you back down here to do some reconsideration as to whether or not you should continue to represent yourself.

"How have you been getting along on your research?

"THE DEFENDANT: Not bad, your Honor.

"Last night I put in the mail a 995 motion and it should be with the Clerk within the next day or two.

"THE COURT: Have you been preparing yourself for the intricacies of the trial of the matter?

"THE DEFENDANT: Well, your Honor, I was hoping that the case could possibly be disposed of on the 995.

"Mrs. Ayers informed me yesterday that it was the Court's policy to hear the pretrial motions at the time of trial. If possible, your Honor, I would like a date set as soon as the Court deems adequate after they receive the motion, sometime before trial.

"THE COURT: Let's see how you have been doing on your research.

"How many exceptions are there to the hearsay rule?

"THE DEFENDANT: Well, the hearsay rule would, I guess, be called the best evidence rule, your Honor. And there are several exceptions in case law, but in actual statutory law, I don't feel there is none.

"THE COURT: What are the challenges to the jury for cause?

"THE DEFENDANT: Well, there is twelve peremptory challenges.

"THE COURT: And how many for cause?

"THE DEFENDANT: Well, as many as the Court deems valid.

"THE COURT: And what are they? What are the grounds for challenging a juror for cause?

"THE DEFENDANT: Well, numerous grounds to challenge a witness—I mean, a juror, your Honor, one being the juror is perhaps suffered, was a victim of the same type of offense, might be prejudiced toward the defendant. Any substantial ground that might make the juror prejudice[d] toward the defendant.

"THE COURT: Anything else?

"THE DEFENDANT: Well, a relative perhaps of the victim.

"THE COURT: Have you taken a look at that code section to see what it is?

"THE DEFENDANT: Challenge a juror?

"THE COURT: Yes.

"THE DEFENDANT: Yes, your Honor. I have done—

"THE COURT: What is the code section?

"THE DEFENDANT: On voir diring a jury, your Honor?

"THE COURT: Yes.

"THE DEFENDANT: I am not aware of the section right offhand.

"THE COURT: What code is it in?

"THE DEFENDANT: Well, the research I have done on challenging would be in Witkins Jurisprudence.

"THE COURT: Have you looked at any of the codes to see where these various things are taken up?

"THE DEFENDANT: No, your Honor, I haven't.

"THE COURT: Have you looked in any of the California Codes with reference to trial procedure?

"THE DEFENDANT: Yes, your Honor.

"THE COURT: What codes?

"THE DEFENDANT: I have done extensive research in the Penal Code, your Honor, and the Civil Code.

"THE COURT: If you have done extensive research into it, then tell me about it.

"THE DEFENDANT: On empaneling a jury, your Honor?

"THE COURT: Yes.

"THE DEFENDANT: Well, the District Attorney and the defendant, defense counsel, has both the right to 12 peremptory challenges of a jury. These 12 challenges are undisputable. Any reason that the defense or prosecution should feel that a juror would be inadequate to try the case or to rule on a case, they may then discharge that juror.

"But if there is a valid challenge due to grounds of prejudice or some other grounds, that these aren't considered in the 12 peremptory challenges. There are numerous and the defendant, the defense and the prosecution both have the right to make any inquiry to the jury as to their feelings toward the case."

[4] The judge concluded:

"[T]aking into consideration the recent case of People versus Sharp, where the defendant apparently does not have a constitutional right to represent himself, the Court finds that the ends of justice and requirements of due process require that the prior order permitting the defendant to represent himself in pro per should be and is hereby revoked. That privilege is terminated."

[5] Faretta also urged without success that he was entitled to counsel of his choice, and three times moved for the appointment of a lawyer other than the public defender. These motions, too, were denied.

[6] *People* v. *Sharp,* 7 Cal. 3d 448, 499 P. 2d 489.

When Sharp was tried the California Constitution expressly provided that the accused in a criminal prosecution had the right "to appear and defend, in person and with counsel." Cal. Const., Art. 1, § 13. In an earlier decision the California Supreme Court had held that this language meant that the accused had the right to appear by himself or with counsel. *People* v. *Mattson,* 51 Cal. 2d 777, 336 P. 2d 937. This view was rejected in *Sharp,* the California Supreme Court there holding that the defendant in a criminal prosecution has no right under the State or the Federal Constitution to represent himself at trial. See generally Y. Kamisar, W. LaFave & J. Israel, Modern Criminal Procedure 57-60 (4th ed.

1974); Note, 10 Calif. Western L. Rev. 196 (1973); Note, 24 Hastings L. J. 431 (1973); Comment, 64 J. Crim. L. 240 (1973).

Although immaterial to the court's decision, shortly before *Sharp* was decided on appeal the California Constitution had been amended to delete the right of self-representation from Art. 1, § 13, and to empower the legislature expressly "to require the defendant in a felony case to have the assistance of counsel." The new statutes on their face require counsel only in capital cases. See Cal. Penal Code §§ 686 (2), 686.1, 859, 987 (1970 and Supp. 1975). In other than capital cases the counsel retains by statutory terms a right "to appear and defend in person and with counsel." § 686 (2). However, this language tracks the old language of Art. 1, § 13, of the California Constitution; and in construing the constitutional language in *Sharp* to exclude any right of self-representation under former Art. 1, § 13, of the State Constitution, the California Supreme Court also stated that § 686 (2) does not provide any right of self-representation.

[7] The Court of Appeal also held that the trial court had not "abused its discretion in concluding that Faretta had not made a knowing and intelligent waiver of his right to be represented by counsel," since "Faretta did not appear aware of the possible consequences of waiving the opportunity for skilled and experienced representation at trial."

[8] The California courts' conclusion that Faretta had no constitutional right to represent himself was made in the context of the following not unusual rules of California criminal procedure: An indigent criminal defendant has no right to appointed counsel of his choice. See *Drumgo* v. *Superior Court,* 8 Cal. 3d 930, 506 P. 2d 1007; *People* v. *Miller,* 7 Cal. 3d 562, 574, 498 P. 2d 1089, 1097; *People* v. *Massie,* 66 Cal. 2d 899, 910, 428 P. 2d 869, 876-877; *People* v. *Taylor,* 259 Cal. App. 2d 448, 450-451, 66 Cal. Rptr. 514, 515-517. The appointed counsel manages the lawsuit and has the final say in all but a few matters of trial strategy. See, *e. g., People* v. *Williams,* 2 Cal. 3d 894, 905, 471 P. 2d 1008, 1015; *People* v. *Foster,* 67 Cal. 2d 604, 606-607, 432 P. 2d 976, 977-978; *People* v. *Monk,* 56 Cal. 2d 288, 299, 363 P. 2d 865, 870-871; see generally *Rhay* v. *Browder,* 342 F. 2d 345, 349 (CA9). A California conviction will not be reversed on grounds of ineffective assistance of counsel except in the extreme case where the quality of representation was so poor as to render the trial a "farce or a sham." *People* v. *Ibarra,* 60 Cal. 2d 460, 386 P. 2d 487; see *People* v. *Miller, supra,* at 573, 498 P. 2d, at 1096-1097; *People* v. *Floyd,* 1 Cal. 3d 694, 709, 464 P. 2d 64, 73; *People* v. *Hill,* 70 Cal. 2d 678, 689, 452 P. 2d 329, 334; *People* v. *Reeves,* 64 Cal. 2d 766, 774, 415 P. 2d 35, 39.

[9] See, *e. g., Mackreth* v. *Wilson,* 31 Ala. App. 191, 15 So. 2d 112; *Cappetta* v. *State,* 204 So. 2d 913 (Fla. Dist. Ct. App.); *Lockard* v. *State,* 92 Idaho 813, 451 P. 2d 1014; *People* v. *Nelson,* 47 Ill. 2d 570, 268 N. E. 2d 2; *Blanton* v. *State,* 229 Ind. 701, 98 N. E. 2d 186; *Westberry* v. *State,* 254 A. 2d 44 (Me.); *Allen* v. *Commonwealth,* 324 Mass. 558, 87 N. E. 2d 192; *People* v. *Haddad,* 306 Mich. 556, 11 N. W. 2d 240; *State* v. *McGhee,* 184 Neb. 352, 167 N. W. 2d 765; *Zasada* v. *State,* 19 N. J. Super. 589, 89 A. 2d 45; *People* v. *McLaughlin,* 291 N. Y. 480, 53 N. E. 2d 356; *State* v. *Pritchard,* 227 N. C. 168, 41 S. E. 2d 287; *State* v. *Hollman,* 232 S. C. 489, 102 S. E. 2d 873; *State* v. *Thomlinson,* 78 S. D. 235, 100 N. W. 2d 121; *State* v. *Penderville,* 2 Utah 2d 281, 272 P. 2d 195; *State* v. *Woodall,* 5 Wash. App. 901, 491 P. 2d 680. See generally Annot., 77 A. L. R. 2d 1233 (1961); 5 R. Anderson, Wharton's Criminal Law and Procedure § 2016 (1957).

[10] Some States grant the accused the right to be heard, or to defend, in person *and* by counsel: Ariz. Const., Art. 2, § 24; Ark. Const., Art. 2, § 10; Colo. Const., Art. 2, § 16; Conn. Const., Art. 1, § 8; Del. Const., Art. 1, § 7; Idaho Const., Art. 1, § 13; Ill. Const., Art. 1, § 8; Ind. Const., Art. 1, § 13; Ky. Const. Bill of Rights, § 11; Mo. Const., Art. 1, § 18 (a); Mont. Const., Art. 3, § 16; Nev. Const., Art. 1, § 8; N. H. Const., pt. 1, Art. 15; N. M. Const., Art. 2, § 14; N. Y. Const., Art. 1, § 6; N. D. Const., Art. 1, § 13; Ohio Const., Art. 1, § 10; Okla. Const., Art. 2, § 20; Ore. Const., Art. 1, § 11; Pa. Const., Art. 1, § 9; S. D. Const., Art. 6, § 7; Tenn. Const., Art. 1, § 9; Utah Const., Art. 1, § 12; Vt. Const., c. 1, Art. 10; Wis. Const., Art. 1, § 7; see La. Const., Art. 1, § 9.

Others grant the right to defend in person *or* by counsel: Kan. Const. Bill of Rights, § 10; Mass. Const., pt. 1, Art. 12; Neb. Const., Art. 1, § 11; Wash. Const., Art. 1, § 22.

Still others provide the accused the right to defend either by himself, by counsel, or both: Ala. Const., Art. 1, § 6; Fla. Const., Art. 1, § 16; Me. Const., Art. 1, § 6; Miss. Const., Art. 3, § 26; S. C. Const., Art. 1, § 14; Tex. Const., Art. 1, § 10.

[11] See, *e. g., Lockard* v. *State, supra; People* v. *Nelson, supra; Blanton* v. *State, supra; Zasada* v. *State, supra; People* v. *McLaughlin, supra; State* v. *Mems,* 281 N. C. 658, 190 S. E. 2d 164; *State* v. *Verna,* 9 Ore. App. 620, 498 P. 2d 793.

[12] The holding of *Adams* was reaffirmed in a different context in *Carter* v. *Illinois,* 329 U. S. 173, 174-175, where the Court again adverted to the right of self-representation:

"Neither the historic conception of Due Process nor the vitality it derives from progressive standards of justice denies a person *the right to defend himself* or to confess guilt. Under appropriate circumstances the Constitution requires that counsel be tendered; it does not require that under all circumstances counsel be forced upon a defendant." (Emphasis added.) See also *Moore* v. *Michigan,* 355 U. S. 155, 161.

[13] Jackson, Full Faith and Credit—The Lawyer's Clause of the Constitution, 45 Col. L. Rev. 1, 26 (1945).

[14] *Gideon* v. *Wainwright,* 372 U. S. 335, and *Argersinger* v. *Hamlin,* 407 U. S. 25 (right to counsel); *Pointer* v.*Texas,* 380 U. S. 400 (right of confrontation); *Washington* v. *Texas,* 388 U. S. 14 (right to compulsory process). See also *In re Oliver,* 333 U. S. 257, 273.

[15] This Court has often recognized the constitutional stature of rights that, though not literally expressed in the document, are essential to due process of law in a fair adversary process. It is now accepted, for example, that an accused has a right to be present at all stages of the trial where his absence might frustrate the fairness of the proceedings, *Snyder* v. *Massachusetts,* 291 U. S. 97; to testify on his own behalf, see *Harris* v. *New York,*401 U. S. 222, 225; *Brooks* v. *Tennessee,* 406 U. S. 605, 612; cf. *Ferguson* v. *Georgia,* 365 U. S. 570; and to be convicted only if his guilt is proved beyond a reasonable doubt, *In re Winship,* 397 U. S. 358; *Mullaney* v. *Wilbur,*421 U. S. 684.

The inference of rights is not, of course, a mechanical exercise. In *Singer* v. *United States,* 380 U. S. 24, the Court held that an accused has no right to a bench trial, despite his capacity to waive his right to a jury trial. In so holding, the Court stated that "[t]he ability to waive a constitutional right does not ordinarily carry with it the right to insist upon the opposite of that right." *Id.,* at 34-35. But that statement was made only *after* the Court had concluded that the Constitution does not affirmatively protect any right to be tried by a judge. Recognizing that an implied right must arise independently from the design and history of the constitutional text, the Court searched for, but could not find, any "indication that the colonists considered the ability to waive a jury trial to be of equal importance to the right to demand one." *Id.,* at 26. Instead, the Court could locate only "isolated instances" of a right to trial by judge, and concluded that these were "clear departures from the common law." *Ibid.*

We follow the approach of *Singer* here. Our concern is with an *independent* right of self-representation. We do not suggest that this right arises mechanically from a defendant's power to waive the right to the assistance of counsel. See *supra,* at 814-815. On the contrary, the right must be independently found in the structure and history of the constitutional text.

[16] Such a result would sever the concept of counsel from its historic roots. The first lawyers were personal friends of the litigant, brought into court by him so that he might "take `counsel' with them" before pleading. 1 F. Pollock & F. Maitland, The History of English Law 211 (2d ed. 1909). Similarly, the first "attorneys" were personal agents, often lacking any professional training, who were appointed by those litigants who had secured royal permission to carry on their affairs through a representative, rather than personally. *Id.,* at 212-213.

[17] "The court of star chamber was an efficient, somewhat arbitrary arm of royal power. It was at the height of its career in the days of the Tudor and Stuart kings. Star chamber stood for swiftness and power; it was not a competitor of the common law so much as a limitation on it—a reminder that high state policy could not safely be entrusted to a system so chancy as English law. . . ." L. Friedman, A History of American Law 23 (1973). See generally 5 W. Holdsworth, A History of English Law 155-214 (1927).

[18] "The proceedings before the Star Chamber began by a Bill `engrossed in parchment and filed with the clerk of the court.' It must, like the other pleadings, be signed by counsel . . . . However, counsel were obliged to be careful what they signed. If they put their hands to merely frivolous pleas, or otherwise misbehaved themselves in the conduct of their cases, they were liable to rebuke, suspension, a fine, or imprisonment." Holdsworth, *supra,*n. 17, at 178-179. Counsel, therefore, had to be cautious that any pleadings they signed would not unduly offend the Crown. See 1 J. Stephen, A History of the Criminal Law of England 340-341 (1883).

This presented not merely a hypothetical risk for the accused. Stephen gives the following account of a criminal libel trial in the Star Chamber:

"In 1632 William Prynne was informed against for his book called *Histrio Mastix.* Prynne's answer was, amongst other things, that his book had been licensed, and one of the counsel, Mr. Holbourn, apologised, not without good cause, for his style. . . . His trial was, like the other Star Chamber proceedings, perfectly decent and quiet, but the sentence can be described only as monstrous. He was sentenced to be disbarred and deprived of his university degrees; to stand twice in the pillory, and to have one ear cut off each time; to be fined £5,000; and to be perpetually imprisoned, without books, pen, ink, or paper. . . .

"Five years after this, in 1637, Prynne, Bastwick, and Burton, were tried for libel, and were all sentenced to the same punishment as Prynne had received in 1632, Prynne being branded on the cheeks instead of losing his ears.

"The procedure in this case appears to me to have been as harsh as the sentence was severe, though I do not think it has been so much noticed. . . . Star Chamber defendants were not only allowed counsel, but were required to get their answers signed by counsel. The effect of this rule, and probably its object was, that no defence could be put before the Court which counsel would not take the responsibility of signing—a responsibility which, at that time, was extremely serious. If counsel would not sign the defendant's answer he was taken to have confessed the information. Prynne's answer was of such a character that one of the counsel assigned to him refused to sign it at all, and the other did not sign it till after the proper time. Bastwick could get no one to sign his answer. Burton's answer was signed by counsel, but was set aside as impertinent. Upon the whole, the case was taken to be admitted by all the three, and judgment was passed on them accordingly. . . ." Stephen,*supra,* at 340-341.

That Prynne's defense was foreclosed by the refusal of assigned counsel to endorse his answer is all the more shocking when it is realized that Prynne was himself a lawyer. I. Brant, The Bill of Rights 106 (1965). On the operation of the Star Chamber generally, see Barnes, Star Chamber Mythology, 5 Am. J. Legal Hist. 1-11 (1961), and Barnes, Due Process and Slow Process in the Late Elizabethan-Early Stuart Star Chamber, 6 Am. J. Legal Hist. 221-249, 315-346 (1962).

[19] Pollock & Maitland, *supra,* n. 16, at 211.

[20] *Ibid.* See also Stephen, *supra,* n. 18, at 341.

[21] *Id.,* at 326.

The trial would begin with accusations by counsel for the Crown. The prisoner usually asked, and was granted, the privilege of answering separately each matter alleged against him:

"[T]he trial became a series of excited altercations between the prisoner and the different counsel opposed to him. Every statement of counsel operated as a question to the prisoner, . . . the prisoner either admitting or denying or explaining what was alleged against him. The result was that . . . the examination of the prisoner . . . was the very essence of the trial, and his answers regulated the production of the evidence. . . . As the argument proceeded the counsel [for the Crown] would frequently allege matters which the prisoner denied and called upon them to prove. The proof was usually given by reading depositions, confessions of accomplices, letters, and the like . . . . When the matter had been fully inquired into . . . the presiding judge `repeated' or summed up to the jury the matters alleged against the prisoner, and the answers given by him; and the jury gave their verdict." *Id.,* at 325-326.

[22] Holdsworth, *supra,* n. 17, at 195-196.

[23] 7 Will. 3, c. 3, § 1. The right to call witnesses under oath was extended to felony cases by statute in 1701. 1 Anne, Stat. 2, c. 9, § 3.

[24] The statute provided, in pertinent part, that the accused "shall be received and admitted to make his and their full Defence, by Counsel learned in the Law, and to make any Proof that he or they can produce by lawful Witness or Witnesses, who shall then be upon Oath, for his and their just Defence in that Behalf; and in case any Person or Persons so accused or indicted shall desire Counsel, the Court before whom such Person or Persons shall be tried, or some Judge of that Court, shall and is hereby authorized and required immediately, upon his or their Request, to assign to such Person and Persons such and so many Counsel, not exceeding Two, as the Person or Persons shall desire, to whom such Counsel shall have free Access at all seasonable Hours; any Law or Usage to the contrary notwithstanding."

[25] Holdsworth, *supra,* n. 17, at 195.

[26] In Mary Blandy's 1752 murder trial, for example, the court declared that counsel for the defendant could not only speak on points of law raised by the defense, but could also examine defense witnesses and cross-examine those of the Crown. 18 How. St. Tr. 1117. Later in that century judges often allowed counsel for the accused "to instruct him what questions to ask, or even to ask questions for him, with respect to matters of fact . . . [or] law." 4 W. Blackstone, Commentaries *355-356.

[27] 6 & 7 Will. 4, c. 114, § 1. The statute provided in pertinent part that the accused "shall be admitted, after the Close of the Case for the Prosecution, to make full Answer and Defence thereto by Counsel learned in the Law, or by Attorney in Courts where Attornies practise as Counsel."

[28] See, *e. g.,* Poor Prisoners' Defence Act, 1903, 3 Edw. 7, c. 38, § 1: Poor Prisoners' Defense Act, 1930, 20 & 21 Geo. 5, c. 32; Legal Aid and Advice Act, 1949, 12 & 13 Geo. 6, c. 51.

[29] Counsel had been appointed for the defendant Woodward but withdrew shortly before trial. When the trial court appointed a substitute counsel, the defendant objected: "I would rather not have legal aid. I would rather conduct the case myself." The trial court insisted, however, that the defendant proceed to trial with counsel, and a conviction resulted. On appeal, the Crown did not even attempt to deny a basic right of self-representation, but argued only that the right had been waived when the accused accepted the first counsel. The Court of Appeal rejected this argument: "The prisoner right at the beginning [of the trial] said that he wished to defend himself . . . and he was refused what we think was his right to make his own case to the jury instead of having it made for him by counsel." This, the court held, was an "injustice to the prisoner," and "although there was a good deal of evidence against the prisoner," the court quashed the conviction.

[30] C. Warren, A History of the American Bar 7 (1911).

[31] D. Boorstin, The Americans; The Colonial Experience 197 (1958).

[32] For example, the Massachusetts Body of Liberties (1641) in Art. 26 provided:

"Every man that findeth himselfe unfit to plead his owne cause in any Court shall have Libertie to imploy any man against whom the Court doth not except, to helpe him, Provided he give him noe fee or reward for his paines. . . ."

Pleading for hire was also prohibited in 17th century Virginia, Connecticut, and the Carolinas, Friedman, *supra*, n. 17, at 81.

[33] *Id.,* at 82.

[34] Warren, *supra*, n. 30, at 212.

[35] For example, Zephaniah Swift, in one of the first American colonial treatises on law, made clear that a right to counsel was recognized in Connecticut. He wrote:

"We have never admitted that cruel and illiberal principle of the common law of England, that when a man is on trial for his life, he shall be refused counsel, and denied those means of defence, which are allowed, when the most trifling pittance of property is in question. The flimsy pretence, that the court are to be counsel for the prisoner will only heighten our indignation at the practice: for it is apparent to the least consideration, that a court can never furnish a person accused of a crime with the advice, and assistance necessary to make his defence. . . .

"Our ancestors, when they first enacted their laws respecting crimes, influenced by the illiberal principles which they had imbied in their native country, denied counsel to prisoners to plead for them to any thing but points of law. It is manifest that there is as much necessity for counsel to investigate matters of fact, as points of law, if truth is to be discovered." 2 Z. Swift, A System of the Laws of the State of Connecticut 398-399 (1796).

Similarly, colonial Virginia at first based its court proceedings on English judicial customs, but "[b]y the middle of the eighteenth century the defendant was permitted advice of counsel if he could afford such services." H. Rankin, Criminal Trial Proceedings in the General Court of Colonial Virginia 67, 89 (1965).

[36] See, *e. g., id.,* at 89-90.

[37] See, *e. g.,* the Massachusetts Body of Liberties, Art. 26 (1641), *supra,* n. 32.

Similarly, the Concessions and Agreements of West New Jersey, in 1677, provided, for all cases, civil and criminal, "that no person or persons shall be compelled to fee any attorney or councillor to plead his cause, but that all persons have free liberty to plead his own cause, if he please."

The Pennsylvania Frame of Government of 1682, perhaps "the most influential of the Colonial documents protecting individual rights," 1 B. Schwartz, The Bill of Rights: A Documentary History 130 (1971) (hereinafter Schwartz), provided:

"That, in all courts all persons of all persuasions may freely appear in their own way, and according to their own manner, and there personally plead their own cause themselves; or, if unable, by their friends . . . ."

That provision was no doubt inspired by William Penn's belief that an accused should go free if he could personally persuade a jury that it would be unjust to convict him. In England, 12 years earlier, Penn, after preaching a sermon in the street, had been indicted and tried for disturbing the peace. Penn conceded that he was "unacquainted with the formality of the law," but requested that he be given a fair hearing and the "liberty of making my defence." The request was granted, Penn represented himself, and although the judges jailed him for contempt, the jury acquitted him of the charge. "The People's Ancient and Just Liberties Asserted, in the Trial of William Penn and William Mead, 1670," reproduced in 1 Schwartz 144, 147. See The Trial of William Penn, 6 How. St. Tr. 951 (1670), cited in *Illinois* v. *Allen,* 397 U. S. 337, 353 (opinion of DOUGLAS, J.).

[38] Article IX of the Pennsylvania Declaration of Rights in 1776 guaranteed "[t]hat in all prosecutions for criminal offences, a man hath a right to be heard by himself and his council . . . ." The Vermont Declaration of Rights (Art. X) in 1777 protected the right of self-representation with virtually identical language. The Georgia Constitution (Art. LVIII) in 1777 declared that its provisions barring the unauthorized practice of law were "not intended to exclude any person from that inherent privilege of every *freeman,* the liberty to plead his own cause." In 1780 the Massachusetts Declaration of Rights, Art. XII, provided that the accused had a right to be heard "by himself, or his counsel at his election." The New Hampshire Bill of Rights (Art. XV) in 1783 affirmed the right of the accused "to be fully heard in his defence by himself, and counsel." In 1792 the Delaware Constitution (Art. I, § 7) preserved the right in language modeled after Art. IX of the Pennsylvania Declaration of Rights. Similarly, in 1798 Georgia included in its Constitution (Art. III, § 8) a provision that protected the right of the accused to defend "by himself or counsel, or both." Other state constitutions did not express in literal terms a right of self-representation, but those documents granted all defense rights to the accused personally and phrased the right of counsel in such fashion as to imply the existence of the antecedent liberty. See Del. Declaration of Rights, § 14 (1776) (right "to be allowed counsel"); Md. Declaration of Rights, Art. XIX (1776) (right "to be allowed counsel"); N. J. Const., Art. XVI (1776) (criminals to have "same privileges of . . . counsel, as their prosecutors"); N. Y. Const., Art. XXXIV (1777) ("shall be allowed counsel").

[39] The Founders believed that self-representation was a basic right of a free people. Underlying this belief was not only the antilawyer sentiment of the populace, but also the "natural law" thinking that characterized the Revolution's spokesmen. See P. Kauper, The Higher Law and the Rights of Man in a Revolutionary Society, a lecture in the American Enterprise Institute for Public Policy Research series on the American Revolution, Nov. 7, 1973, extracted in 18 U. of Mich. Law School Law Quadrangle Notes, No. 2, p. 9 (1974). For example, Thomas Paine, arguing in support of the 1776 Pennsylvania Declaration of Rights, said:

"Either party . . . has a natural right to plead its own cause; this right is consistent with safety, therefore it is retained; but the parties may not be able, . . . therefore the civil right of pleading by proxy, that is, by a council, is an appendage to the natural right [of self-representation] . . . ." Thomas Paine on a Bill of Rights, 1777, reprinted in 1 Schwartz 316.

[40] Statutes providing for appointment of counsel on request of the accused were enacted by Delaware in 1719, 1 Laws of the State of Delaware, 1700-1797, p. 66 (Adams 1797); by Pennsylvania in 1718, 3 Stats, at Large of Pennsylvania 199 (Busch 1896); and by South Carolina in 1731, Laws of the Province of South Carolina 518-519 (Trott 1736). Appointment was also the practice in Connecticut in the latter part of the 18th century; appointment apparently was sometimes made even when the accused failed to request counsel, if he appeared in need of a lawyer, but there is no indication appointment was ever made over the objection of the accused. See Swift, *supra,* n. 35, at 392. Free-choice appointment remained the rule as the new Republic emerged. See the 1791 statute of New Hampshire, Laws of New Hampshire 247 (Melcher 1792), and the 1795 statute of New Jersey, § 2, Acts of the Nineteenth General Assembly of the State of New Jersey 1012.

[41] See counsel provisions in n. 38, *supra.*

[42] In ratifying the Constitution, three States urged that a right-to-counsel provision be added by way of amendment. Virginia and North Carolina proposed virtually identical packages of a defendant's rights, each including the provision that an accused be "allowed" counsel. 2 Schwartz 841, 967. The package proposed by New York provided that the accused "ought to . . . have . . . the assistance of Council for his defense." *Id.,* at 913. The idea of proposing amendments upon ratification had begun with the Pennsylvania dissenters from ratification, whose proposed package of a defendant's rights provided for the accused's "right . . . to be heard by himself and his counsel." *Id.,* at 664-665. It can be seen that Madison's precise formulation—"the right . . . to have the Assistance of Counsel for his defence"—varied in phrasing from each of the proposals. "The available debates on the various proposals throw no light on the significance or the interpretation which Congress attributed to the right to counsel." W. Beaney, The Right to Counsel in American Courts 23 (1955).

[43] As stated by Mr. Justice Sutherland in *Powell* v. *Alabama,* 287 U. S. 45:

"Even the intelligent and educated layman has small and sometimes no skill in the science of law. If charged with crime, he is incapable, generally, of determining for himself whether the indictment is good or bad. He is unfamiliar with the rules of evidence. Left without the aid of counsel he may be put on trial without a proper charge, and convicted upon incompetent evidence, or evidence irrelevant to the issue or otherwise inadmissible. He lacks both the skill and knowledge adequately to prepare his defense, even though he have a perfect one. He requires the guiding hand of counsel at every step in the proceedings against him. Without it, though he be not guilty, he faces the danger of conviction because he does not know how to establish his innocence. If that be true of men of intelligence, how much more true is it of the ignorant and illiterate, or those of feeble intellect. If in any case, civil or criminal, a state or federal court were arbitrarily to refuse to hear a party by counsel, employed by and appearing for him, it reasonably may not be doubted that such a refusal would be a denial of a hearing, and, therefore, of due process in the constitutional sense." *Id.,* at 69.

[44] See n. 38, *supra,* for colonial appointment statutes that predate the Sixth Amendment. Federal law provided for appointment of counsel in capital cases at the request of the accused as early as 1790, 1 Stat. 118.

[45] See, *e. g.,* U. S. Const., Amdt. 1. Freedom of choice is not a stranger to the constitutional design of procedural protections for a defendant in a criminal proceeding. For example, "[e]very criminal defendant is privileged to testify in his own defense, or to refuse to do so." *Harris* v. *New York,* 401 U. S. 222, 225. See *Brooks* v. *Tennessee,* 406 U. S. 605, 612; *Ferguson* v. *Georgia,* 365 U. S. 570. Cf. *Brown* v. *United States,* 356 U. S. 148.

[46] We are told that many criminal defendants representing themselves may use the courtroom for deliberate disruption of their trials. But the right of self-representation has been recognized from our beginnings by federal law and by most of the States, and no such result has thereby occurred. Moreover, the trial judge may terminate self-representation by a defendant who deliberately engages in serious and obstructionist misconduct. See *Illinois* v. *Allen,* 397 U. S. 337. Of course, a State may—even over objection by the accused—appoint a "standby counsel" to aid the accused if and when the accused requests help, and to be available to represent the accused in the event that termination of the defendant's self-representation is necessary. See *United States* v. *Dougherty,* 154 U. S. App. D. C. 76, 87-89, 473 F. 2d 1113, 1124-1126.

The right of self-representation is not a license to abuse the dignity of the courtroom. Neither is it a license not to comply with relevant rules of procedural and substantive law. Thus, whatever else may or may not be open to him on appeal, a defiant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of "effective assistance of counsel."

[47] See n. 2, *supra.*

[48] See n. 3, *supra.*

[1] Absent a statute giving a right to self-representation, I believe that trial courts should have discretion under the Constitution to insist upon representation by counsel if the interests of justice so require. However, I would note that the record does not support the Court's characterization of this case as one in which that occurred. Although he requested, and initially was granted, permission to proceed *pro se,* petitioner has expressed no dissatisfaction with the lawyer who represented him and has not alleged that his defense was impaired or that his lawyer refused to honor his suggestions regarding how the trial should be conducted. In other words, to use the Court's phrase, petitioner has never contended that "*his* defense" was not fully presented. Instances of overbearing or ineffective counsel can be dealt with without contriving broad constitutional rules of dubious validity.

[2] The Court deliberately, and in my view properly, declines to characterize this case as one in which the defendant was denied a fair trial. See *Herring* v. *New York, post,* at 871 (REHNQUIST, J., dissenting).

[3] The Court's attempt to derive support for its position from the fact that the Sixth Amendment speaks in terms of the "Assistance of Counsel" requires little comment. It is most curious to suggest that an accused who exercises his right to "assistance" has thereby impliedly consented to subject himself to a "master." *Ante,* at 820. And counsel's responsibility to his client and role in the litigation do not vary depending upon whether the accused would have preferred to represent himself.

[4] Indeed, the portion of the Court's quotation which warns against turning constitutional protections into "fetters" refers to the right to trial by jury, not the right to counsel. See *Adams* v. *United States ex rel. McCann,* 317 U. S. 269, 279 (1942). This Court has, of course, squarely held that there is no constitutional right to dispense with a jury. *Singer* v. *United States,* 380 U. S. 24 (1965).

[5] No more relevant is *Snyder* v. *Massachusetts,* 291 U. S. 97 (1934). The reference in that case to an accused's "power . . . to supersede his lawyers" simply helped explain why his defense might "be made easier" if he were "permitted to be present at the examination of jurors or the summing up of counsel . . . ." *Id.,* at 106. Mr. Justice Cardozo's opinion for the Court made plain that this right was rooted in considerations of fundamental fairness, and was to be distinguished from those conferred by the Confrontation Clause. See *id.,* at 107. The Court's present reliance on the *Snyder* dicta is therefore misplaced. See n. 2, *supra.*

[6] The fact that Congress has retained a statutory right to self-representation suggests that it has also assumed that the Sixth Amendment does not guarantee such a right. See 28 U. S. C. § 1654.

[7] Some of the damage we can anticipate from a defendant's ill-advised insistence on conducting his own defense may be mitigated by appointing a qualified lawyer to sit in the case as the traditional "friend of the court." The Court does not foreclose this option. See *ante,* at 834-835, n. 46.

# EXHIBIT

# D

Page 9                          TITLE 1—GENERAL PROVISIONS                          § 112

### § 110. Saving clause of Revised Statutes

All acts of limitation, whether applicable to civil causes and proceedings, or to the prosecution of offenses, or for the recovery of penalties or forfeitures, embraced in the Revised Statutes and covered by the repeal contained therein, shall not be affected thereby, but all suits, proceedings, or prosecutions, whether civil or criminal, for causes arising, or acts done or committed prior to said repeal, may be commenced and prosecuted within the same time as if said repeal had not been made.

(July 30, 1947, ch. 388, 61 Stat. 635.)

### § 111. Repeals as evidence of prior effectiveness

No inference shall be raised by the enactment of the Act of March 3, 1933 (ch. 202, 47 Stat. 1431), that the sections of the Revised Statutes repealed by such Act were in force or effect at the time of such enactment: *Provided, however,* That any rights or liabilities existing under such repealed sections shall not be affected by their repeal.

(July 30, 1947, ch. 388, 61 Stat. 635.)

REFERENCES IN TEXT

Act of March 3, 1933, referred to in text, was repealed by section 2 of act July 30, 1947, section 1 of which enacted this title.

### § 112. Statutes at Large; contents; admissibility in evidence

The Archivist of the United States shall cause to be compiled, edited, indexed, and published, the United States Statutes at Large, which shall contain all the laws and concurrent resolutions enacted during each regular session of Congress, all proclamations by the President in the numbered series issued since the date of the adjournment of the regular session of Congress next preceding; and also any amendments to the Constitution of the United States proposed or ratified pursuant to article V thereof since that date, together with the certificate of the Archivist of the United States issued in compliance with the provision contained in section 106b of this title. In the event of an extra session of Congress, the Archivist of the United States shall cause all the laws and concurrent resolutions enacted during said extra session to be consolidated with, and published as part of, the contents of the volume for the next regular session. The United States Statutes at Large shall be legal evidence of laws, concurrent resolutions, treaties, international agreements other than treaties, proclamations by the President, and proposed or ratified amendments to the Constitution of the United States therein contained, in all the courts of the United States, the several States, and the Territories and insular possessions of the United States.

(July 30, 1947, ch. 388, 61 Stat. 636; Sept. 23, 1950, ch. 1001, § 1, 64 Stat. 979; Oct. 31, 1951, ch. 655, § 3, 65 Stat. 710; Pub. L. 98–497, title I, § 107(d), Oct. 19, 1984, 98 Stat. 2291.)

AMENDMENTS

1984—Pub. L. 98–497 substituted "Archivist of the United States" for "Administrator of General Services" in three places.

1951—Act Oct. 31, 1951, substituted "106b of this title" for "205 of the Revised Statutes" in first sentence.

1950—Act Sept. 23, 1950, amended section generally to implement 1950 Reorg. Plan No. 20, § 1, eff. May 24, 1950, 15 F.R. 3178, 64 Stat. 1272, which transferred to the Administrator of General Services certain duties formerly performed by the Secretary of State.

EFFECTIVE DATE OF 1984 AMENDMENT

Amendment by Pub. L. 98–497 effective Apr. 1, 1985, see section 301 of Pub. L. 98–497, set out as a note under section 2102 of Title 44, Public Printing and Documents.

PUBLISHING PUB. L. 107–206 IN STATUTES AT LARGE

Pub. L. 107–206, title III, § 3002(b), Aug. 2, 2002, 116 Stat. 924, provided that: "In publishing the Act in slip form and in the United States Statutes at Large pursuant to section 112, of title 1, United States Code, the Archivist of the United States shall include after the date of approval at the end an appendix setting forth the text of the bill referred to in subsection (a) [set out as a Short Title of 2002 Amendment note under section 101 of Title 39, Postal Service]."

PUBLICATION OF CERTAIN LAWS OF 106TH CONGRESS

Pub. L. 106–554, § 1(b), Dec. 21, 2000, 114 Stat. 2763, provided that: "In publishing this Act in slip form and in the United States Statutes at Large pursuant to section 112 of title 1, United States Code, the Archivist of the United States shall include after the date of approval at the end appendixes setting forth the texts of the bills referred to in subsection (a) of this section [enacting into law H.R. 5656, H.R. 5657, H.R. 5658, H.R. 5660, H.R. 5661, H.R. 5662, and H.R. 5663 of the 106th Congress, as introduced on Dec. 14, 2000, and H.R. 5666 and H.R. 5667 of the 106th Congress, as introduced on Dec. 15, 2000, except that the text of H.R. 5666, as so enacted, shall not include section 123] and the text of any other bill enacted into law by reference by reason of the enactment of this Act."

Pub. L. 106–553, § 1(b), Dec. 21, 2000, 114 Stat. 2762, provided that: "In publishing this Act in slip form and in the United States Statutes at Large pursuant to section 112 of title 1, United States Code, the Archivist of the United States shall include after the date of approval at the end appendixes setting forth the texts of the bills referred to in subsection (a) of this section [enacting into law H.R. 5547 and H.R. 5548 of the 106th Congress, as introduced on Oct. 25, 2000]."

Pub. L. 106–429, § 101(a) [title V, § 595(b)], Nov. 6, 2000, 114 Stat. 1900, 1900A–60, provided that: "In publishing the Act in slip form and in the United States Statutes at Large pursuant to section 112, of title 1, United States Code, the Archivist of the United States shall include after the date of approval at the end appendixes setting forth the texts of the bill referred to in subsection (a) of this section [enacting into law S. 3140 of the 106th Congress, as introduced on Sept. 28, 2000]."

Pub. L. 106–429, § 101(b), Nov. 6, 2000, 114 Stat. 1900, provided that: "In publishing this Act in slip form and in the United States Statutes at Large pursuant to section 112 of title 1, United States Code, the Archivist of the United States shall include after the date of approval an appendix setting forth the text of the bill referred to in subsection (a) of this section [enacting into law H.R. 5526 of the 106th Congress, as introduced on Oct. 24, 2000]."

Pub. L. 106–398, § 2, Oct. 30, 2000, 114 Stat. 1654, provided that: "In publishing this Act in slip form and in the United States Statutes at Large pursuant to section 112 of title 1, United States Code, the Archivist of the United States shall include after the date of approval an appendix setting forth the text of the bill referred to in section 1 [enacting into law H.R. 5408 of the 106th Congress, as introduced on Oct. 6, 2000]."

Pub. L. 106–387, § 1(b), Oct. 28, 2000, 114 Stat. 1549, provided that: "In publishing this Act in slip form and in

the United States Statutes at Large pursuant to section 112 of title 1, United States Code, the Archivist of the United States shall include after the date of approval at the end an appendix setting forth the text of the bill referred to in subsection (a) of this section [enacting into law H.R. 5426 of the 106th Congress, as introduced on Oct. 6, 2000].''

Pub. L. 106–377, §1(b), Oct. 27, 2000, 114 Stat. 1441, provided that: ''In publishing this Act in slip form and in the United States Statutes at Large pursuant to section 112 of title 1, United States Code, the Archivist of the United States shall include after the date of approval at the end appendixes setting forth the texts of the bills referred to in subsection (a) of this section [enacting into law H.R. 5482 and 5483 of the 106th Congress, as introduced on Oct. 18, 2000].''

Pub. L. 106–346, §101(b), Oct. 23, 2000, 114 Stat. 1356, provided that: ''In publishing the Act in slip form and in the United States Statutes at Large pursuant to section 112 of title 1, United States Code, the Archivist of the United States shall include after the date of approval at the end an appendix setting forth the text of the bill referred to in subsection (a) of this section [enacting into law H.R. 5394 of the 106th Congress, as introduced on Oct. 5, 2000].''

Pub. L. 106–113, div. B, §1000(b), Nov. 29, 1999, 113 Stat. 1536, provided that: ''In publishing the Act in slip form and in the United States Statutes at Large pursuant to section 112, of title 1, United States Code, the Archivist of the United States shall include after the date of approval at the end appendixes setting forth the texts of the bills referred to in subsection (a) of this section [enacting into law H.R. 3421, H.R. 3422, H.R. 3423, H.R. 3424, H.R. 3425, H.R. 3426, H.R. 3427 (as amended), H.R. 3428, and S. 1948 of the 106th Congress, as introduced on Nov. 17, 1999].''

EFFECT OF REPEAL OF SECTION 73 OF ACT JAN. 12, 1895

This section and section 112a of this title are not affected by the repeal of section 73 of act Jan. 12, 1895, ch. 23, 28 Stat. 615, which related to the same subject matter, see section 56(i) of act Oct. 31, 1951, ch. 655, 65 Stat. 729.

### §112a. United States Treaties and Other International Agreements; contents; admissibility in evidence

(a) The Secretary of State shall cause to be compiled, edited, indexed, and published, beginning as of January 1, 1950, a compilation entitled ''United States Treaties and Other International Agreements,'' which shall contain all treaties to which the United States is a party that have been proclaimed during each calendar year, and all international agreements other than treaties to which the United States is a party that have been signed, proclaimed, or with reference to which any other final formality has been executed, during each calendar year. The said United States Treaties and Other International Agreements shall be legal evidence of the treaties, international agreements other than treaties, and proclamations by the President of such treaties and agreements, therein contained, in all the courts of the United States, the several States, and the Territories and insular possessions of the United States.

(b) The Secretary of State may determine that publication of certain categories of agreements is not required, if the following criteria are met:

(1) such agreements are not treaties which have been brought into force for the United States after having received Senate advice and consent pursuant to section 2(2) of Article II of the Constitution of the United States;

(2) the public interest in such agreements is insufficient to justify their publication, because (A) as of the date of enactment of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, the agreements are no longer in force,[1] (B) the agreements do not create private rights or duties, or establish standards intended to govern government action in the treatment of private individuals; (C) in view of the limited or specialized nature of the public interest in such agreements, such interest can adequately be satisfied by an alternative means; or (D) the public disclosure of the text of the agreement would, in the opinion of the President, be prejudicial to the national security of the United States; and

(3) copies of such agreements (other than those in paragraph (2)(D)), including certified copies where necessary for litigation or similar purposes, will be made available by the Department of State upon request.

(c) Any determination pursuant to subsection (b) shall be published in the Federal Register.

(d) The Secretary of State shall make publicly available through the Internet website of the Department of State each treaty or international agreement proposed to be published in the compilation entitled ''United States Treaties and Other International Agreements'' not later than 180 days after the date on which the treaty or agreement enters into force.

(Added Sept. 23, 1950, ch. 1001, §2, 64 Stat. 980; amended Pub. L. 103–236, title I, §138, Apr. 30, 1994, 108 Stat. 397; Pub. L. 108–458, title VII, §7121(a), Dec. 17, 2004, 118 Stat. 3807.)

REFERENCES IN TEXT

The date of enactment of the Foreign Relations Authorization Act, Fiscal Years 1994 and 1995, referred to in subsec. (b)(2)(A), is the date of enactment of Pub. L. 103–236, which was approved Apr. 30, 1994.

AMENDMENTS

2004—Subsec. (d). Pub. L. 108–458 added subsec. (d).
1994—Pub. L. 103–236 designated existing provisions as subsec. (a) and added subsecs. (b) and (c).

EFFECTIVE DATE OF 2004 AMENDMENT

Pub. L. 108–458, title VII, §7122, Dec. 17, 2004, 118 Stat. 3808, provided that: ''Notwithstanding any other provision of this Act [see Tables for classification], this subtitle [subtitle A (§§7101–7122) of title VII of Pub. L. 108–458, enacting sections 2228, 2732, 3922b, 4029, 7536a, and 7555 of Title 22, Foreign Relations and Intercourse, amending this section, section 112b of this title, section 1189 of Title 8, Aliens and Nationality, sections 2651a, 2656f, 4003, 7513, 7514, 7518, 7536, 7537, 7538, and 7554 of Title 22, and section 2405 of Title 50, Appendix, War and National Defense, repealing section 2774 of Title 22, enacting provisions set out as notes under section 1189 of Title 8, sections 1431, 2451, 2452, 2651a, 2656, 2656f, 7501, 7511, 7513, 7514, and 7536 of Title 22, and section 2405 of Title 50, Appendix, and amending provisions set out as a note under section 112b of this title] shall take effect on the date of enactment of this Act [Dec. 17, 2004].''

EFFECT OF REPEAL OF SECTION 73 OF ACT JAN. 12, 1895

This section and section 112 of this title are not affected by the repeal of section 73 of act Jan. 12, 1895, ch. 23, 28 Stat. 615, which related to the same subject matter, see section 56(i) of act Oct. 31, 1951, ch. 655, 65 Stat. 729.

---

[1] So in original. The comma probably should be a semicolon.

# THE
# LAWS OF THE UNITED STATES.

___

## ACTS OF THE FIRST CONGRESS
### OF THE
## UNITED STATES,

*Passed at the first session, which was begun and held at the City of New York on Wednesday, March 4, 1789, and continued to September 29, 1789.*

GEORGE WASHINGTON, President, JOHN ADAMS, Vice President of the United States, and President of the Senate, FREDERICK AUGUSTUS MUHLENBERG, Speaker of the House of Representatives.

### STATUTE I.

CHAPTER I.—*An Act to regulate the Time and Manner of administering certain Oaths.*

June 1, 1789.

SEC. 1. *Be it enacted by the Senate and [House of] Representatives of the United States of America in Congress assembled,* That the oath or affirmation required by the sixth article of the Constitution of the United States, shall be administered in the form following, to wit: " I, A. B. do solemnly swear or affirm (as the case may be) that I will support the Constitution of the United States." The said oath or affirmation shall be administered within three days after the passing of this act, by any one member of the Senate, to the President of the Senate, and by him to all the members and to the secretary; and by the Speaker of the House of Representatives, to all the members who have not taken a similar oath, by virtue of a particular resolution of the said House, and to the clerk: and in case of the absence of any member from the service of either House, at the time prescribed for taking the said oath or affirmation, the same shall be administered to such member, when he shall appear to take his seat.

*Constitution of the U. S. article 6, page 19.*

*Form of the oath or affirmation to support the Constitution of the United States, to be administered to the members of the Senate and to the members of the House of Representatives.*

SEC. 2. *And be it further enacted,* That at the first session of Congress after every general election of Representatives, the oath or affirmation aforesaid, shall be administered by any one member of the House of Representatives to the Speaker; and by him to all the members present, and to the clerk, previous to entering on any other business; and to the members who shall afterwards appear, previous to taking their seats. The President of the Senate for the time being, shall also administer the said oath or affirmation to each Senator who shall hereafter be elected, previous to his taking his seat: and in any future case of a President of the Senate, who shall not have taken the said oath or affirmation, the same shall be administered to him by any one of the members of the Senate.

*Manner of administering the oath or affirmation to Speaker of the House of Representatives.*

*To each Senator.*

SEC. 3. *And be it further enacted,* That the members of the several State legislatures, at the next sessions of the said legislatures, respectively, and all executive and judicial officers of the several States, who have been heretofore chosen or appointed, or who shall be chosen or

*To the members of the several State Legislatures, and to all executive and judicial officers of the States.*

23

24                FIRST CONGRESS. Sess. I. Ch. 2. 1789.

By whom the oaths or affirmations shall be administered in the several States.

appointed before the first day of August next, and who shall then be in office, shall, within one month thereafter, take the same oath or affirmation, except where they shall have taken it before ; which may be administered by any person authorized by the law of the State, in which such office shall be holden, to administer oaths. And the members of the several State legislatures, and all executive and judicial officers of the several States, who shall be chosen or appointed after the said first day of August, shall, before they proceed to execute the duties of their respective offices, take the foregoing oath or affirmation, which shall be administered by the person or persons, who by the law of the State shall be authorized to administer the oath of office ; and the person or persons so administering the oath hereby required to be taken, shall cause a record or certificate thereof to be made, in the same manner, as, by the law of the State, he or they shall be directed to record or certify the oath of office.

To all officers of the U. States appointed, or to be appointed, before they act.

SEC. 4. *And be it further enacted,* That all officers appointed, or hereafter to be appointed under the authority of the United States, shall, before they act in their respective offices, take the same oath or affirmation, which shall be administered by the person or persons who shall be authorized by law to administer to such officers their respective oaths of office ; and such officers shall incur the same penalties in case of failure, as shall be imposed by law in case of failure in taking their respective oaths of office.

Oath of secretary of the Senate and clerk of the House of Representatives.

SEC. 5. *And be it further enacted,* That the secretary of the Senate, and the clerk of the House of Representatives for the time being, shall, at the time of taking the oath or affirmation aforesaid, each take an oath or affirmation in the words following, to wit: "I, A. B. secretary of the Senate, or clerk of the House of Representatives (as the case may be) of the United States of America, do solemnly swear or affirm, that I will truly and faithfully discharge the duties of my said office, to the best of my knowledge and abilities."

APPROVED, June 1, 1789.

STATUTE I.

July 4, 1789.

[Repealed.]

CHAP. II.—*An Act for laying a Duty on Goods, Wares, and Merchandises imported into the United States.*(a)

SEC. 1. Whereas it is necessary for the support of government, for the discharge of the debts of the United States, and the encouragement and protection of manufactures, that duties be laid on goods, wares and merchandises imported : (b)

Act of August 10, 1790, ch. 35, sec. 1 and 2.

*Be it enacted by the Senate and House of Representatives of the United States of America in Congress assembled,* That from and after the first day of August next ensuing, the several duties hereinafter mentioned shall be laid on the following goods, wares and merchandises imported into the United States from any foreign port or place, that is to say :

(a) Duty Acts. Act of July 4, 1789, chap. 2; act of August 4, 1790, chap. 35 ; act of June 5, 1794, chap. 51 ; act of January 29, 1795, chap. 17 ; act of March 3, 1797, chap. 10 ; act of May 13, 1800, chap. 66 ; act of March 27, 1804, chap. 57 ; act of June 7, 1794, chap. 54 ; act of January 29, 1795, chap. 17 ; act of March 27, 1804, chap. 46 ; act of July 8, 1797, chap. 15 ; act of May 7, 1800, chap. 43 ; act of March 27, 1804, chap. 57 ; act of July 1, 1812, chap. 112 ; act of February 25, 1813, chap. 30 ; act of August 2, 1813, chap. 38 ; act of April 27, 1816, chap. 107 ; act of January 14, 1817, chap. 3 ; act of April 20, 1818, chap. 105 ; act of April 20, 1818, chap. 93 ; act of May 31, 1824, chap. 136 ; act of May 19, 1828, chap. 55 ; act of May 24, 1828, chap. 102 ; act of May 28, 1830, chap. 147 ; act of July 14, 1832, chap. 227 ; act of March 2, 1833, chap. 58 ; act of September 11, 1841, chap. 24 ; act of August 30, 1842, chap. 270.

(b) The powers of Congress to levy and collect taxes, duties, exposts and excises, is co-extensive with the United States. Loughborough v. Blake, 5 Wheat. 317 ; 4 Cond. Rep. 660.

# EXHIBIT

# E

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23

# Rule 5.1

24  (a) IN GENERAL. If a defendant is charged with an offense other than a
25  petty offense, a magistrate judge must conduct a preliminary hearing
unless:

26       (1) the defendant waives the hearing;

27       (2) the defendant is indicted;

28       (3) the government files an information under Rule 7(b) charging the
defendant with a felony;

(4) the government files an information charging the defendant with a misdemeanor; or

(5) the defendant is charged with a misdemeanor and consents to trial before a magistrate judge.

(b) SELECTING A DISTRICT. A defendant arrested in a district other than where the offense was allegedly committed may elect to have the preliminary hearing conducted in the district where the prosecution is pending.

(c) SCHEDULING. The magistrate judge must hold the preliminary hearing within a reasonable time, but no later than 14 days after the initial appearance if the defendant is in custody and no later than 21 days if not in custody.

(d) EXTENDING THE TIME. With the defendant's consent and upon a showing of good cause—taking into account the public interest in the prompt disposition of criminal cases—a magistrate judge may extend the time limits in Rule 5.1(c) one or more times. If the defendant does not consent, the magistrate judge may extend the time limits only on a showing that extraordinary circumstances exist and justice requires the delay.

(e) HEARING AND FINDING. At the preliminary hearing, the defendant may cross-examine adverse witnesses and may introduce evidence but may not object to evidence on the ground that it was unlawfully acquired. If the magistrate judge finds probable cause to believe an offense has been committed and the defendant committed it, the magistrate judge must promptly require the defendant to appear for further proceedings.

(f) DISCHARGING THE DEFENDANT. If the magistrate judge finds no probable cause to believe an offense has been committed or the defendant committed it, the magistrate judge must dismiss the complaint and discharge the defendant. A discharge does not preclude the government from later prosecuting the defendant for the same offense.

(g) RECORDING THE PROCEEDINGS. The preliminary hearing must be recorded by a court reporter or by a suitable recording device. A recording of the proceeding may be made available to any party upon request. A copy of the recording and a transcript may be provided to any party upon request and upon any payment required by applicable Judicial Conference regulations.

(h) PRODUCING A STATEMENT.

(1) *In General.* Rule 26.2(a)–(d) and (f) applies at any hearing under this rule, unless the magistrate judge for good cause rules otherwise in a particular case.

(2) *Sanctions for Not Producing a Statement.* If a party disobeys a Rule 26.2 order to deliver a statement to the moving party, the magistrate judge must not consider the testimony of a witness whose statement is withheld.

NOTES

(Added Apr. 24, 1972, eff. Oct. 1, 1972; amended Mar. 9, 1987, eff. Aug. 1, 1987; Apr. 22, 1993, eff. Dec. 1, 1993; Apr. 24, 1998, eff. Dec. 1, 1998; Apr. 29, 2002, eff. Dec. 1, 2002; Mar. 26, 2009, eff. Dec. 1, 2009.)

## NOTES OF ADVISORY COMMITTEE ON RULES—1972

Rule 5.1 is, for the most part, a clarification of old rule 5(c).

Under the new rule, the preliminary examination must be conducted before a "federal magistrate" as defined in rule 54. Giving state or local judicial officers authority to conduct a preliminary examination does not seem necessary. There are not likely to be situations in which a "federal magistrate" is not "reasonably available" to conduct the preliminary examination, which is usually not held until several days after the initial appearance provided for in rule 5.

Subdivision (a) makes clear that a finding of probable cause may be based on "hearsay evidence in whole or in part." The propriety of relying upon hearsay at the preliminary examination has been a matter of some uncertainty in the federal system. See C. Wright, Federal Practice and Procedure: Criminal §80 (1969, Supp. 1971); 8 J. Moore, Federal Practice 504[4] (2d ed. Cipes 1970, Supp. 1971); *Washington v. Clemmer*, 339 F.2d 715, 719 (D.C. Cir. 1964); *Washington v. Clemmer*, 339 F.2d 725, 728 (D.C. Cir. 1964); *Ross v. Sirica*, 380 F.2d 557, 565 (D.C. Cir. 1967); *Howard v. United States*, 389 F.2d 287, 292 (D.C. Cir. 1967); Weinberg and Weinberg, The Congressional Invitation to Avoid the Preliminary Hearing: An Analysis of Section 303 of the Federal Magistrates Act of 1968, 67 Mich.L.Rev. 1361, especially n. 92 at 1383 (1969); D. Wright, The Rules of Evidence Applicable to Hearings in Probable Cause, 37 Conn.B.J. 561 (1963); Comment, Preliminary Examination—Evidence and Due Process, 15 Kan.L.Rev. 374, 379–381 (1967).

A grand jury indictment may properly be based upon hearsay evidence. *Costello v. United States*, 350 U.S. 359 (1956); 8 J. Moore, Federal Practice 6.03[2] (2d ed. Cipes 1970, Supp. 1971). This being so, there is practical advantage in making the evidentiary requirements for the preliminary examination as flexible as they are for the grand jury. Otherwise there will be increased pressure upon United States Attorneys to abandon the preliminary examination in favor of the grand jury indictment. See C. Wright, Federal Practice and Procedure: Criminal §80 at p. 143 (1969). New York State, which also utilizes both the preliminary examination and the grand jury, has under consideration a new Code of Criminal Procedure which would allow the use of hearsay at the

preliminary examination. See McKinney's Session Law News, April 10, 1969, pp. A119–A120.

For the same reason, subdivision (a) also provides that the preliminary examination is not the proper place to raise the issue of illegally obtained evidence. This is current law. In *Giordenello v. United States*, 357 U.S. 480, 484 (1958), the Supreme Court said:

[T]he Commissioner here had no authority to adjudicate the admissibility at petitioner's later trial of the heroin taken from his person. That issue was for the trial court. This is specifically recognized by Rule 41(e) of the Criminal Rules, which provides that a defendant aggrieved by an unlawful search and seizure may "* * * move the district court * * * to suppress for use as evidence anything so obtained on the ground that * * *" the arrest warrant was defective on any of several grounds.

Dicta in *Costello v. United States*, 350 U.S. 359, 363 –364 (1956), and *United States v. Blue*, 384 U.S. 251, 255 (1966), also support the proposed rule. In *United States ex rel. Almeida v. Rundle*, 383 F.2d 421, 424 (3d Cir. 1967), the court, in considering the adequacy of an indictment said:

On this score, it is settled law that (1) "[an] indictment returned by a legally constituted nonbiased grand jury, * * * is enough to call for a trial of the charge on the merits and satisfies the requirements of the Fifth Amendment.", *Lawn v. United States*, 355 U.S. 399, 349, 78 S.Ct. 311, 317, 2 L.Ed.2d 321 (1958); (2) an indictment cannot be challenged "on the ground that there was inadequate or incompetent evidence before the grand jury", *Costello v. United States*, 350 U.S. 359, 363, 76 S.Ct. 406, 408, 100 L.Ed. 397 (1956); and (3) a prosecution is not abated, nor barred, even where "tainted evidence" has been submitted to a grand jury, *United States v. Blue*, 384 U.S. 251, 86 S.Ct. 1416, 16 L.Ed.2d 510 (1966).

See also C. Wright, Federal Practice and Procedure: Criminal §80 at 143 n. 5 (1969, Supp. 1971) 8 J. Moore, Federal Practice 6.03[3] (2d ed. Cipes 1970, Supp. 1971).

The Manual for United States Commissioners (Administrative Office of United States Courts, 1948) provides at pp. 24–25: "Motions for this purpose [to suppress illegally obtained evidence] may be made and heard only before a district judge. Commissioners are not empowered to consider or act upon such motions."

It has been urged that the rules of evidence at the preliminary examination should be those applicable at the trial because the purpose of the preliminary examination should be, not to review the propriety of the arrest or prior detention, but rather to determine whether there is evidence sufficient to justify subjecting the defendant to the expense and inconvenience of trial. See Weinberg and Weinberg, The Congressional Invitation to Avoid the Preliminary Hearing: An Analysis of Section 303 of the Federal Magistrates Act of 1968, 67 Mich. L. Rev. 1361, 1396–1399

(1969). The rule rejects this view for reasons largely of administrative necessity and the efficient administration of justice. The Congress has decided that a preliminary examination shall not be required when there is a grand jury indictment (18 U.S.C. §3060). Increasing the procedural and evidentiary requirements applicable to the preliminary examination will therefore add to the administrative pressure to avoid the preliminary examination. Allowing objections to evidence on the ground that evidence has been illegally obtained would require two determinations of admissibility, one before the United States magistrate and one in the district court. The objective is to reduce, not increase, the number of preliminary motions.

To provide that a probable cause finding may be based upon hearsay does not preclude the magistrate from requiring a showing that admissible evidence will be available at the time of trial. See Comment, Criminal Procedure—Grand Jury—Validity of Indictment Based Solely on Hearsay Questioned When Direct Testimony Is Readily Available, 43 N.Y.U. L. Rev. 578 (1968); *United States v. Umans*, 368 F.2d. 725 (2d Cir. 1966), cert. dismissed as improvidently granted 389 U.S. 80 (1967); *United States v. Andrews*, 381 F.2d 377, 378 (2d Cir. 1967); *United States v. Messina*, 388 F.2d 393, 394 n. 1 (2d Cir. 1968); and *United States v. Beltram*. 388 F.2d 449 (2d Cir. 1968); and *United States v. Arcuri*, 282 F.Supp. 347 (E.D.N.Y. 1968). The fact that a defendant is not entitled to object to evidence alleged to have been illegally obtained does not deprive him of an opportunity for a pretrial determination of the admissibility of evidence. He can raise such an objection prior to trial in accordance with the provisions of rule 12.

Subdivision (b) makes it clear that the United States magistrate may not only discharge the defendant but may also dismiss the complaint. Current federal law authorizes the magistrate to discharge the defendant but he must await authorization from the United States Attorney before he can close his records on the case by dismissing the complaint. Making dismissal of the complaint a separate procedure accomplishes no worthwhile objective, and the new rule makes it clear that the magistrate can both discharge the defendant and file the record with the clerk.

Subdivision (b) also deals with the legal effect of a discharge of a defendant at a preliminary examination. This issue is not dealt with explicitly in the old rule. Existing federal case law is limited. What cases there are seem to support the right of the government to issue a new complaint and start over. See *e.g., Collins v. Loisel*, 262 U.S. 426 (1923); *Morse v. United States*, 267 U.S. 80 (1925). State law is similar. See *People v. Dillon*, 197 N.Y. 254, 90 N.E. 820 (1910; *Tell v. Wolke*, 21 Wis.2d 613, 124 N.W.2d 655 (1963). In the *Tell* case the Wisconsin court stated the common rationale for allowing the prosecutor to issue a new complaint and start over:

The state has no appeal from errors of law committed by a magistrate upon preliminary examination and the discharge on a preliminary would operate as an unchallengeable acquittal. * * * The only way an error of

law committed on the preliminary examination prejudicial to the state may be challenged or corrected is by a preliminary examination on a second complaint. (21 Wis. 2d at 619–620.)

Subdivision (c) is based upon old rule 5(c) and upon the Federal Magistrates Act, 18 U.S.C. §3060(f). It provides methods for making available to counsel the record of the preliminary examination. See C. Wright, Federal Practice and Procedure: Criminal §82 (1969, Supp. 1971). The new rule is designed to eliminate delay and expense occasioned by preparation of transcripts where listening to the tape recording would be sufficient. Ordinarily the recording should be made available pursuant to subdivision (c)(1). A written transcript may be provided under subdivision (c)(2) at the discretion of the court, a discretion which must be exercised in accordance with *Britt v. North Carolina*, 404 U.S. 226, 30 L.Ed.2d 400, 405 (1971):

A defendant who claims the right to a free transcript does not, under our cases, bear the burden of proving inadequate such alternatives as may be suggested by the State or conjured up by a court in hindsight. In this case, however, petitioner has conceded that he had available an informal alternative which appears to be substantially equivalent to a transcript. Accordingly, we cannot conclude that the court below was in error in rejecting his claim.

### NOTES OF ADVISORY COMMITTEE ON RULES—1987 AMENDMENT

The amendments are technical. No substantive change is intended.

### NOTES OF ADVISORY COMMITTEE ON RULES—1993 AMENDMENT

The Rule is amended to conform to the Judicial Improvements Act of 1990 [P.L. 101–650, Title III, Section 321] which provides that each United States magistrate appointed under section 631 of title 28, United States Code, shall be known as a United States magistrate judge.

### COMMITTEE NOTES ON RULES—1998 AMENDMENT

The addition of subdivision (d) mirrors similar amendments made in 1993 which extended the scope of Rule 26.2 to Rules 32, 32.1, 46 and Rule 8 of the Rules Governing Proceedings under 28 U.S.C. §2255. As indicated in the Committee Notes accompanying those amendments, the primary reason for extending the coverage of Rule 26.2 rested heavily upon the compelling need for accurate information affecting a witness' credibility. That need, the Committee believes, extends to a preliminary examination under this rule where both the prosecution and the defense have high interests at stake.

A witness' statement must be produced only after the witness has personally testified.

*Changes Made to Rule 5.1 After Publication ("GAP Report")*. The Committee made no changes to the published draft.

### COMMITTEE NOTES ON RULES—2002 AMENDMENT

The language of Rule 5.1 has been amended as part of the general restyling of the Criminal Rules to make them more easily understood and to make style and terminology consistent throughout the rules. These changes are intended to be stylistic, except as noted below.

First, the title of the rule has been changed. Although the underlying statute, 18 U.S.C. §3060, uses the phrase *preliminary examination*, the Committee believes that the phrase *preliminary hearing* is more accurate. What happens at this proceeding is more than just an examination; it includes an evidentiary hearing, argument, and a judicial ruling. Further, the phrase *preliminary hearing* predominates in actual usage.

Rule 5.1(a) is composed of the first sentence of the second paragraph of current Rule 5(c). Rule 5.1(b) addresses the ability of a defendant to elect where a preliminary hearing will be held. That provision is taken from current Rule 40(a).

Rule 5.1(c) and (d) include material currently located in Rule 5(c): scheduling and extending the time limits for the hearing. The Committee is aware that in most districts, magistrate judges perform these functions. That point is also reflected in the definition of "court" in Rule 1(b), which in turn recognizes that magistrate judges may be authorized to act.

Rule 5.1(d) contains a significant change in practice. The revised rule includes language that expands the authority of a United States magistrate judge to grant a continuance for a preliminary hearing conducted under the rule. Currently, the rule authorizes a magistrate judge to grant a continuance only in those cases in which the defendant has consented to the continuance. If the defendant does not consent, then the government must present the matter to a district judge, usually on the same day. The proposed amendment conflicts with 18 U.S.C. §3060, which tracks the original language of the rule and permits only district judges to grant continuances when the defendant objects. The Committee believes that this restriction is an anomaly and that it can lead to needless consumption of judicial and other resources. Magistrate judges are routinely required to make probable cause determinations and other difficult decisions regarding the defendant's liberty interests, reflecting that the magistrate judge's role has developed toward a higher level of responsibility for pre-indictment matters. The Committee believes that the change in the rule will provide greater judicial economy and that it is entirely appropriate to seek this change to the rule through the Rules Enabling Act procedures. *See* 28 U.S.C. §2072(b). Under those procedures, approval by Congress of this rule change would supersede the parallel provisions in 18 U.S.C. §3060.

Rule 5.1(e), addressing the issue of probable cause, contains the language currently located in Rule 5.1(a), with the exception of the sentence, "The finding of probable cause may be based upon hearsay evidence in whole or in part." That language was included in the original promulgation of the rule in 1972. Similar language was added to Rule 4 in 1974. In the Committee Note on the 1974 amendment, the Advisory

Committee explained that the language was included to make it clear that a finding of probable cause may be based upon hearsay, noting that there had been some uncertainty in the federal system about the propriety of relying upon hearsay at the preliminary hearing. *See* Advisory Committee Note to Rule 5.1 (citing cases and commentary). Federal law is now clear on that proposition. Thus, the Committee believed that the reference to hearsay was no longer necessary. Further, the Committee believed that the matter was best addressed in Rule 1101(d)(3), Federal Rules of Evidence. That rule explicitly states that the Federal Rules of Evidence do not apply to "preliminary examinations in criminal cases, . . . issuance of warrants for arrest, criminal summonses, and search warrants." The Advisory Committee Note accompanying that rule recognizes that: "The nature of the proceedings makes application of the formal rules of evidence inappropriate and impracticable." The Committee did not intend to make any substantive changes in practice by deleting the reference to hearsay evidence.

Rule 5.1(f), which deals with the discharge of a defendant, consists of former Rule 5.1(b).

Rule 5.1(g) is a revised version of the material in current Rule 5.1(c). Instead of including detailed information in the rule itself concerning records of preliminary hearings, the Committee opted simply to direct the reader to the applicable Judicial Conference regulations governing records. The Committee did not intend to make any substantive changes in the way in which those records are currently made available.

Finally, although the rule speaks in terms of initial appearances being conducted before a magistrate judge, Rule 1(c) makes clear that a district judge may perform any function in these rules that a magistrate judge may perform.

### COMMITTEE NOTES ON RULES—2009 AMENDMENT

The times set in the former rule at 10 or 20 days have been revised to 14 or 21 days. See the Committee Note to Rule 45(a).

# EXHIBIT

# F

**Blake Amafa**                                   Case No.  C1275157A/B

## I. LAW OF THE CASE

The law of the case is decreed as follows:

It is the public policy of this state that public agencies exist to aid in the conduct of the people's business....The people of this state do not yield their sovereignty to the agencies which serve them.  [California Government Code, Section 11120.]

In enacting this chapter, the Legislature finds and declares that the public commissions, boards and councils and the other public agencies in this State exist to aid in the conduct of the people's business....The people of this State do not yield their sovereignty to the agencies which serve them. [California Government Code Section 54950.]

Laws, whether organic or ordinary, are either written or unwritten. [California Code of Civil Procedure, Section 1895.]

A written law is that which is promulgated in writing, and of which a record is in existence. [California Code of Civil Procedure, Section 1896]

The organic law is the Constitution of Government, and is altogether written. Other written laws are denominated statutes. The written law of this State is therefore contained in its Constitution and statutes, and in the Constitution and statutes of the United States. [California Code of Civil Procedure, Section 1897]

Any judicial record may be impeached by evidence of a want of jurisdiction in the Court or judicial officer, of collusion between the parties, or of fraud in the party offering the record, in respect to the proceedings. [California Code of Civil Procedure, Section 1916]

...at the Revolution, the sovereignty devolved on the people; and they are truly the sovereigns of the country, but they are sovereigns without subjects...with none to govern but themselves..... [CHISHOLM v. GEORGIA (US) 2 Dall 419, 454, 1 L Ed 440, 455 @DALL (1793) pp471-472.]

The very meaning of 'sovereignty' is that the decree of the sovereign makes law. [American Banana Co. v. United Fruit Co., 29 S.Ct. 511, 513, 213 U.S. 347, 53 L.Ed. 826, 19 Ann.Cas. 1047.]

The people of this State, as the successors of its former sovereign, are entitled to all the rights which formerly belonged to the King by his prerogative. [Lansing v. Smith, 4 Wend. 9 (N.Y.) (1829), 21 Am.Dec. 89 10C Const. Law Sec. 298; 18 C Em.Dom. Sec. 3, 228; 37 C Nav.Wat. Sec. 219; Nuls Sec. 167; 48 C Wharves Sec. 3, 7.]

EXHIBIT F

**Blake Amafa**                                    Case No. __C1275157A/B__

A consequence of this prerogative is the legal *ubiquity* of the king. His majesty in the eye of the law is always present in all his courts, though he cannot personally distribute justice. (Fortesc.c.8. 2Inst.186) His judges are the mirror by which the king's image is reflected. 1 Blackstone's Commentaries, 270, Chapter 7, Section 379.

....This declaration of rights may not be construed to impair or deny others retained by the people." [California Constitution, Article 1, Declaration Of Rights Sec. 24.]

The state cannot diminish rights of the people. [Hurtado v. People of the State of California, 110 US 516.]

The assertion of federal rights, when plainly and reasonably made, is not to be defeated under the name of local practice. [Davis v. Wechsler, 263 US 22, 24.]

Where rights secured by the Constitution are involved, there can be no rule making or legislation which would abrogate them. [Miranda v. Arizona, 384 US 436, 491.]

There can be no sanction or penalty imposed upon one because of this exercise of constitutional rights. [Sherer v. Cullen, 481 F 946.]

Whereas, the people of California have presented a constitution....and which, on due examination, is found to be republican in its form of government.... [Act [of Congress] for the Admission of California Into the Union, Volume 9, Statutes at Large, Page 452.]

Republican government. One in which the powers of sovereignty are vested in the people and are exercised by the people, either directly, or through representatives chosen by the people, to whom those powers are specially delegated. [In re Duncan, 139 U.S. 449, 11 S.Ct. 573, 35 L.Ed. 219; Minor v. Happersett, 88 U.S. (21 Wall.) 162, 22 L.Ed. 627." Black's Law Dictionary, Fifth Edition, p. 626.]

The State of Nevada is an inseparable part of the United States of America, and the United States Constitution is the supreme law of the land. [Nevada Constitution, Article 3, Sec. 1.]

This Constitution, and the Laws of the United States which shall be made in Pursuance thereof; and all Treaties made, or which shall be made, under the Authority of the United States, shall be the supreme Law of the Land; and the Judges in every State shall be bound thereby; any Thing in the Constitution or Laws of any State to the Contrary notwithstanding. [Constitution for the United States of America, Article VI, Clause 2.]

Conspiracy against rights:  If two or more persons conspire to injure, oppress, threaten, or intimidate any person in any State,

EXHIBIT F

Steph. Comm. 383; The Thomas Fletcher, C.C.Ga., 24 F.
481. Ex parte Thistleton, 52 Cal 225; Erwin v. U.S.;
D.C.Ga., 37 F. 488, 2 L.R.A. 229; State v. Herrald, is,
96 Ohio St. 205, 117 N.E. 229, 231.][Black's Law
Dictionary, 4th Ed., 425, 426]

The following persons are magistrates: ...The judges of the
superior courts.... [California Penal Code, Sec. 808.]

EXHIBIT F

**Blake Amafa**                              Case No. ___C1275157A/B___

Territory, Commonwealth, Possession, or District in the free
exercise or enjoyment of any right or privilege secured to him by
the Constitution or laws of the United States, or because of his
having so exercised the same; or If two or more persons go in
disguise on the highway, or on the premises of another, with
intent to prevent or hinder his free exercise or enjoyment of any
right or privilege so secured - They shall be fined under this
title or imprisoned not more than ten years, or both; and if
death results from the acts committed in violation of this
section or if such acts include kidnapping or an attempt to
kidnap, aggravated sexual abuse or an attempt to commit
aggravated sexual abuse, or an attempt to kill, they shall be
fined under this title or imprisoned for any term of years or for
life, or both, or may be sentenced to death.  [18, USC 241]

Deprivation of rights under color of law:  Whoever, under color
of any law, statute, ordinance, regulation, or custom, willfully
subjects any person in any State, Territory, Commonwealth,
Possession, or District to the deprivation of any rights,
privileges, or immunities secured or protected by the
Constitution or laws of the United States, or to different
punishments, pains, or penalties, on account of such person being
an alien, or by reason of his color, or race, than are prescribed
for the punishment of citizens, shall be fined under this title
or imprisoned not more than one year, or both; and if bodily
injury results from the acts committed in violation of this
section or if such acts include the use, attempted use, or
threatened use of a dangerous weapon, explosives, or fire, shall
be fined under this title or imprisoned not more than ten years,
or both; and if death results from the acts committed in
violation of this section or if such acts include kidnapping or
an attempt to kidnap, aggravated sexual abuse, or an attempt to
commit aggravated sexual abuse, or an attempt to kill, shall be
fined under this title, or imprisoned for any term of years or
for life, or both, or may be sentenced to death.  [18, USC 242]

Property rights of citizens:  All citizens of the United States
shall have the same right, in every State and Territory, as is
enjoyed by white citizens thereof to inherit, purchase, lease,
sell, hold, and convey real and personal property.  [42 USC
1982]

Civil action for deprivation of rights:  Every person who, under
color of any statute, ordinance, regulation, custom, or usage,
of any State or Territory or the District of Columbia, subjects,
or causes to be subjected, any citizen of the United States or
other person within the jurisdiction thereof to the deprivation
of any rights, privileges, or immunities secured by the
Constitution and laws, shall be liable to the party injured in
an action at law, suit in equity, or other proper proceeding for
redress, except that in any action brought against a judicial
officer for an act or omission taken in such officer's judicial
capacity, injunctive relief shall not be granted unless a
declaratory decree was violated or declaratory relief was

EXHIBIT F

**Blake Amafa**                                    Case No._____

unavailable.  For the purposes of this section, any Act of
Congress applicable exclusively to the District of Columbia
shall be considered to be a statute of the District of Columbia.
[42 USC 1983]

Conspiracy to interfere with civil rights:  Depriving persons of
rights or privileges:  If two or more persons in any State or
Territory conspire or go in disguise on the highway or on the
premises of another, for the purpose of depriving, either
directly or indirectly, any person or class of persons of the
equal protection of the laws, or of equal privileges and
immunities under the laws; or for the purpose of preventing or
hindering the constituted authorities of any State or Territory
from giving or securing to all persons within such State or
Territory the equal protection of the laws; or if two or more
persons conspire to prevent by force, intimidation, or threat,
any citizen who is lawfully entitled to vote, from giving his
support or advocacy in a legal manner, toward or in favor of the
election of any lawfully qualified person as an elector for
President or Vice President, or as a Member of Congress of the
United States; or to injure any citizen in person or property on
account of such support or advocacy; in any case of conspiracy
set forth in this section, if one or more persons engaged therein
do, or cause to be done, any act in furtherance of the object of
such conspiracy, whereby another is injured in his person or
property, or deprived of having and exercising any right or
privilege of a citizen of the United States, the party so injured
or deprived may have an action for the recovery of damages
occasioned by such injury or deprivation, against any one or more
of the conspirators.  [42 USC 1985(3)]

Action for neglect to prevent:  Every person who, having
knowledge that any of the wrongs conspired to be done, and
mentioned in section 1985 of this title, are about to be
committed, and having power to prevent or aid in preventing the
commission of the same, neglects or refuses so to do, if such
wrongful act be committed, shall be liable to the party injured,
or his legal representatives, for all damages caused by such
wrongful act, which such person by reasonable diligence could
have prevented; and such damages may be recovered in an action
on the case; and any number of persons guilty of such wrongful
neglect or refusal may be joined as defendants in the action;
and if the death of any party be caused by any such wrongful act
and neglect, the legal representatives of the deceased shall
have such action therefor, and may recover not exceeding $5,000
damages therein, for the benefit of the widow of the deceased,
if there be one, and if there be no widow, then for the benefit
of the next of kin of the deceased.  But no action under the
provisions of this section shall be sustained which is not
commenced within one year after the cause of action has accrued.
[42 USC 1986]

COURT. The person and suit of the sovereign; the place where the
sovereign sojourns with his regal retinue, wherever that may be.

EXHIBIT F

1

2

3    **Blake Amafa**                                   Case No._____

4    [Black's Law Dictionary, 5th Edition, page 318.]

5    COURT. An agency of the sovereign created by it directly or
     indirectly under its authority, consisting of one or more
     officers, established and maintained for the purpose of hearing
6    and determining issues of law and fact regarding legal rights
     and alleged violations thereof, and of applying the sanctions of
     the law, authorized to exercise its powers in the course of law
7    at times and places previously determined by lawful authority.
     [Isbill v. Stovall, Tex.Civ.App., 92 S.W.2d 1067, 1070; Black's
     Law Dictionary, 4th Edition, page 425]

8    COURT OF RECORD. To be a court of record a court must have four
     characteristics, and may have a fifth. They are:

9
         A. A judicial tribunal having attributes and
10       exercising functions independently of the person of
         the magistrate designated generally to hold it [Jones
         v. Jones, 188 Mo.App. 220, 175 S.W. 227, 229; Ex parte
11       Gladhill, 8 Metc. Mass., 171, per Shaw, C.J. See,
         also, Ledwith v. Rosalsky, 244 N.Y. 406, 155 N.E. 688,
         689][Black's Law Dictionary, 4th Ed., 425, 426]

12       B. Proceeding according to the course of common law
         [Jones v. Jones, 188 Mo.App. 220, 175 S.W. 227, 229;
13       Ex parte Gladhill, 8 Metc. Mass., 171, per Shaw, C.J.
         See, also, Ledwith v. Rosalsky, 244 N.Y. 406, 155 N.E.
         688, 689][Black's Law Dictionary, 4th Ed., 425, 426]

14       C. Its acts and judicial proceedings are enrolled, or
         recorded, for a perpetual memory and testimony. [3 Bl.
15       Comm. 24; 3 Steph. Comm. 383; The Thomas Fletcher,
         C.C.Ga., 24 F. 481; Ex parte Thistleton, 52 Cal 225;
         Erwin v. U.S., D.C.Ga., 37 F. 488, 2 L.R.A. 229;
16       Heininger v. Davis, 96 Ohio St. 205, 117 N.E. 229,
         231]

17       D. Has power to fine or imprison for contempt. [3 Bl.
         Comm. 24; 3 Steph. Comm. 383; The Thomas Fletcher,
18       C.C.Ga., 24 F. 481; Ex parte Thistleton, 52 Cal 225;
         Erwin v. U.S., D.C.Ga., 37 F. 488, 2 L.R.A. 229;
         Heininger v. Davis, 96 Ohio St. 205, 117 N.E. 229,
19       231.][Black's Law Dictionary, 4th Ed., 425, 426]

20       E. Generally possesses a seal. [3 Bl. Comm. 24; 3
         Steph. Comm. 383; The Thomas Fletcher, C.C.Ga., 24 F.
         481; Ex parte Thistleton, 52 Cal 225; Erwin v. U.S.,
21       D.C.Ga., 37 F. 488, 2 L.R.A. 229; Heininger v. Davis,
         96 Ohio St. 205, 117 N.E. 229, 231.][Black's Law
         Dictionary, 4th Ed., 425, 426]

22   The following persons are magistrates: ...The judges of the
     superior courts.... [California Penal Code, Sec. 808.]

23   EXHIBIT F

24

25

26

27

28

EXHIBIT F

Wharves Sec. 3, 7.]

**Blake Amafa**                                    Case No. C1275157A/B

...our justices, sheriffs, mayors, and other ministers, which
under us have the laws of our land to guide, shall allow the said
charters pleaded before them in judgement in all their points,
that is to wit, the Great Charter as the common law....
[Confirmatio Cartarum, November 5, 1297, *Sources of Our Liberties*
Edited by Richard L. Perry, American Bar Foundation]

Henceforth the writ which is called Praecipe shall not be served
on any one for any holding so as to cause a free man to lose his
court.  [Magna Carta, Article 34].

If any claim, statement, fact, or portion in this action is held
inapplicable or not valid, such decision does not affect the
validity of any other portion of this action.

The singular includes the plural and the plural the singular.

The present tense includes the past and future tenses; and the
future, the present.

The masculine gender includes the feminine and neuter.

EXHIBIT F

1

2

## <u>VERIFICATION</u>

3

4    I, **Blaker Amanfa** am the defendant in the above-entitled action and I have read the above

5    ***Notice of Removal and Affidavit, exhibits A-F,*** I am competent to testify to the matters
stated herein and I have personal knowledge of the matters stated herein except as to those
matters stated upon belief or information and, as to those matters, I believe them to be true.

6    I declare under penalty of perjury under the laws of the State of Nevada, that the foregoing

7    is true, correct, complete, and not misleading.  Executed this  11  ,day of Dec   2023, in
County of Clark State of Nevada.

8

9              Blake Amafa

10   _____

     **Blake Amafa**

11   10300 W. CHARLESTON BLVD STE 13 314
     LAS VEGAS, NV 89314
     Email: dum57ltd@gmail.com

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28